UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.

CARMEN RINCON and CARLOS RINCON,
as Personal Representatives of the Estate of
Ethan Rincon, deceased

       Plaintiff,

v.


THE VILLAGE OF PALMETTO BAY, a municipal
Corporation of the State of Florida, SERGEANT VICTOR EVANS,
individually and in his official capacity
as a police officer for the Village of Palmetto Bay,
OFFICER JOHN DALTON, individually and in his official capacity
as a police officer for the Village of Palmetto Bay, and
OFFICER BRIAN ZAMORSKI, individually and in his official capacity
as a police officer for the Village of Palmetto Bay, and OFFICER
MARLENE TABORDA, individually and in her official capacity
as a police officer for the Village of Palmetto Bay,

       Defendants.
_____/

## **COMPLAINT AND DEMAND FOR JURY TRIAL**

CARMEN RINCON and CARLOS RINCON, as Personal Representatives of the Estate

of Ethan Rincon, deceased (collectively "Plaintiff"), sue Defendants, Village of Palmetto Bay

("Village"), Sergeant Victor Evans ("Evans"), Officer John Dalton ("Dalton"), Officer Brian

Zamorski ("Zamorski") and Officer Marlene Taborda ("Taborda") (hereinafter referred to

collectively as "Village Police" or "Village Officers"), independently, jointly and severally, and

allege:

**A.  NATURE OF CASE**

1. This action arises out of the wrongful death of Ethan Rincon ("Ethan") by and through CARMEN RINCON and CARLOS RINCON, as the Personal Representatives of his estate, on behalf of the estate and his statutory survivors.

2. This action alleges violations of civil rights and other state and federal laws which resulted in Ethan's death on March 22, 2016 in Palmetto Bay, Miami-Dade County, Florida, located in the Southern District of Florida.

3. The claims are brought pursuant to Title 42 U.S.C. § 1983 under the Fourth, Eighth and Fourteenth Amendments to the United States Constitution.

4. The suit generally alleges that the Defendants acted illegally, improperly and negligently in by and through the acts and/or omissions of the Village, its police department, its police officers and supervisors.

5. Defendants, without legal cause or excuse, caused an unreasonable confrontation with Ethan, and then punished him excessively by killing him, violating his rights under the Fourth, Eighth and Fourteenth Amendments to the United States Constitution.

6. These violations were committed as a result of the deliberate indifference to the policies, customs and practices of the Defendant Village through its police department.

**B.  JURISDICTION AND VENUE**

7. This Court has jurisdiction pursuant to Title 28 U.S.C. § 1331 and § 1343(a)(3). This Court has supplemental/ancillary jurisdiction pursuant to Title 28 U.S.C. § 1367 with respect to state law claims the Plaintiff may bring as they derive from the common nucleus of facts, and because the claims are interrelated and should be tried in a single judicial proceeding under the concepts of judicial economy, convenience and fairness.

8.   Pursuant to Title 28 U.S.C. § 1391, venue in the United States District Court for the Southern District of Florida is proper because this is the judicial district in which Ethan resided when alive and where the Defendants reside and operate.  Last, Ethan's death was caused in and occurred in Miami Dade County. Further, as stated in Paragraph 2 above, all events or omissions giving rise to Plaintiff's claims occurred in this district.

9.   Plaintiff anticipates amplifying this complaint with state tort claims as soon as the Florida pre-suit statute of repose period expires. Plaintiff has already complied with the notice mandated by Florida Statute 768.286(6)(a).[1]

**C.  PARTIES**

10. At the time of his death at the hands of the Village Officers, Ethan was a United States citizen residing in Miami-Dade County, Florida.

11. Plaintiff - CARMEN RINCON and CARLOS RINCON as the Personal Representatives of the Estate of Ethan Rincon - pursuant to the laws of the state of Florida are authorized by law to bring this action.

12. The Defendant Village is a municipality located in Miami-Dade County, Florida, and is responsible, through its police officers, employees, servants and agents, for enforcing the ordinances of the Defendant Village, as well as the laws of the state of Florida, through its police department. It is also responsible for ensuring that its officers, employees, servants and agents are properly hired, properly trained and obey the laws of the state of Florida and of the United States.  The Defendant Village is also responsible to ensure that its police officers follow proper established and written protocol and procedures.

---

[1] Plaintiff reserves the right to seek leave to amend this complaint to add ancillary state tort claims upon expiration of the response period.

13. Village Officer Victor Evans, at all times relevant to this complaint, was a duly appointed uniformed police officer of the Defendant Village, acting under color of law, employed by and serving under the Defendant Village. He was therefore, also an employee of the Defendant Village.

14. Village Officer John Dalton, at all times relevant to this complaint, was a duly appointed uniformed police officer of the Defendant Village, acting under color of law, employed by and serving under the Defendant Village. He was therefore, also an employee of the Defendant Village.

15. Village Officer Brian Zamorski, at all times relevant to this complaint, was a duly appointed uniformed police officer of the Defendant Village, acting under color of law, employed by and serving under the Defendant Village. He was therefore, also an employee of the Defendant Village.

16. Village Officer Marlene Taborda, at all times relevant to this complaint, was a duly appointed uniformed police officer of the Defendant Village, acting under color of law, employed by and serving under the Defendant Village.  She was therefore, also an employee of the Defendant Village.

### D.  ALLEGATIONS OF FACT

#### a.  <u>The Vandalism Report and Police Dispatch</u>

17. On or about March 22, 2016, Ethan was alone and inside his home located in Miami-Dade County, Florida (the "home").

18. Village police were called regarding a vandalism occurring at that the time at or near the home and were given a description of the suspect.

19. Village Officers arrived to the home.  They began investigating the reported call. They contacted the complainant and started looking for the person who matched the description of the vandalism suspect.

20. Around that time, Ethan's mother arrived after receiving a call from a neighbor who described the event to her saying she thought Ethan was the person who had caused the vandalism.[2]

21. Shortly thereafter, Ethan's father arrived at the home.

22. Ethan's mother told the police that her son was home in his room and was alone. She emphatically and repeatedly advised them that he suffered from Asperger's Syndrome.

### b.  Police Protocol for "Barricaded Subjects"

23. At this point in time, the Village police had a specific amount of information. **One**, they knew - or highly suspected - that Ethan *had committed* the vandalism. **Two,** they knew - or highly suspected - that Ethan was inside the house.  **Three**, they knew that the house belonged to his parents and that neither parent had any firearms or explosives therein because both parents were on the scene.  **Four**, they knew that because they had the house surrounded, Ethan was not a danger of escaping and/or of harming others. **Last,** since there was absolute silence within the home, the Village Officers had no reason to believe that Ethan was then a danger even to himself.  Thus, there were three possibilities.  Ethan was either awake, asleep or dead. In *any* of those scenarios however, he was not exhibiting a clear and present threat to himself or others.  *The vandalism was over*.  It was property damage. The "victims" were his own parents who likely would never want to press charges. The property damaged was covered by insurance.  All of this equates to one truthful

---

[2] Ethan's mother sought legal advice and counsel to assist her in getting Ethan immediate psychological help, even if, need be, on an involuntary basis.

conclusion; that there were no exigent circumstances to enter the residence and shoot and kill Ethan.

24. Accordingly, none of the circumstances that presented at the time justified an immediate entry to conduct a routine arrest.

25. The scenario should have been treated as one of a barricaded *subject with mental health issues*. Florida law enforcement officers receive very specific training in how to handle individuals suffering from mental health conditions in a variety of different scenarios, including a hold-up in a barricaded location. The Village Police did not make any efforts to follow this training and protocol. (See Exhibit A)

26. The Village Police did not make any attempts to communicate with Ethan or utilize the presence of his mother or father to convince him to exit the home.

27. The Village Police did not allow the father to attempt to sway his son into exiting the home to speak to the police.

28. The Village Police did not call for a trained negotiator.[3]

29. Both parents advised the Village Police that there were no firearms in the residence.

30. Both parents begged the Village Police to allow them to go inside to convince Ethan to come out of the home to meet the police. The Village Police would not listen.

31. The Village Officers did not call a Swat team which is especially trained to make high-risk entries into residences where a barricaded or locked up suspect is believed to be hiding.

32. Swat teams have not only specific training for these types of operations, but they also have significant modern day resources and techniques they implement so that a resort to violence, particularly the discharge of a firearm, is unnecessary or, only a last resort.

---

[3] Even if the Village Police did not have a trained negotiator, the Village did not make any effort to call in a negotiator from the Miami-Dade Police Department which certainly was an option.

33.  For example, Swat teams have bullet proof shields they can use in making an entry. They have optics and robotics they can use. Water and power supplies can be cut off to the residence to essentially turn the stand-off into a safe waiting game.  One technique commonly used is to merely breach the front door so the suspect knows he/she is now vulnerable. In short, the list goes on and on as to what alternative measures exist before going into a house with guns blazing. And those are all consistent with proper police protocol and procedure.

34. Defendant Village and the Village Officers further violated such protocol by not waiting for a high level supervisor to arrive on the scene to take command and make sure this matter was handled appropriately.  Rather, they impatiently and boldly forced their entry into the home, confronted and then shot and killed Ethan.

35. While the Village Police, through the media, have stated that the shooting was in self-defense alleging that Ethan wielded a pick ax at them, other than their self-serving uncorroborated statements, there is as of yet, no forensic evidence which supports that defense. In fact, a preliminary on-scene investigation highly suggests that such claim simply would have been impossible.  In any event, even if that *were true*, Ethan's death resulted from a premature, ill-advised decision to break protocol in the first place.

36. Ethan was shot suddenly without justification and without provocation. No Taser was used as an alternative.  Rather, he was shot multiple times in the chest.

**E.  CUSTOMS, POLICIES AND PRACTICES**

37. Although the Defendant Village has only been incorporated since September 2002, its police force derives from the Miami-Dade County Police Department ("MDPD"). And, indeed, the MDPD itself have exercise customs, policies and practices resulting in the deprivation of

constitutional rights of Miami- Dade County citizens on several occasions with not only excessive use of force claims but also the use of force resulting in unnecessary death.

38. In *Calderon v. JD Patterson and Others*, 13-20169-cv-Moreno. Calderon, a 25 year old make with no prior criminal history, was approached by MDPD officers and asked if he had any weapons. Calderon admitted he had a knife and in a slow and non-threatening manner displayed the knife which was in a sheaf that he was carrying. MDPD officer Schottenheimer approached from behind another officer who did no draw his/her weapon and fired Calderon once and then, to make sure that he/she caused Caldron's death, fired three more rounds in Calderon's back which had turned around as a result of the first round which struck Calderon in the front of his body.  This unjustified hooting and killing occurred in 2011.

39. In *Barnes v. Miami Dade Police Department*, 13-20778-cv-Lenard, MDPD officers approached Barnes who was walking peacefully in public with a friend. MDPD officers in an unmarked vehicle raced to their location scaring Barnes and his friend who attempted to run away out of fear. The MDPD officers did not identify themselves, drew their weapons and one of the m shot the plaintiff in the leg. Although Barnes was disabled, an officer fired a second round into plaintiff's left side without justification. This unjustified shooting took place in or about 2012.

40. In *Soto v. Miami Dade County*, 14-21307-cv-KMW, Soto appeared at the Miami Dade County Building Code Compliance Office to appear for a board of rules and appeals meeting. An argument ensued between Soto and a county official and two plain clothes MDPD officers ordered Soto to leave the building. The officers followed Soto into the elevator and once therein, began to beat Soto ripping his shirt and causing him to bleed. The

officers then placed Soto in a patrol car with the windows rolled up and no ventilation and left it parked in the direct sunlight.  They drove to a private location and spoke to an individual who would not allow Soto to see his/her face.  That conversation lasted about an hour while Soot remained "baking" within the police car. The MDPD officers then drove to a gas station for no known reason and ultimately, Soto passed out.

41. In *The Estate of Federico Osorio v. Miami Dade County*, 16-cv-20713, the plaintiff alleged that on March 4, 2014, two MDPD officers shot and killed Federico Osorio in his own home, after being informed by his mother, Martha Fajardo that her son had a previous history of mental illness. There, just like with Ethan here, Federico was home alone and committing no crime at the time.

42. In *Cordoves v. Miami Dade County*, Case 14-20114-CMA, the plaintiff alleged that on November 14, 2010, the plaintiff, who suffered from post-traumatic stress, severe panic disorder and major depression recurrent, was walking peacefully at a mall with her federally recognized service dog.  When mall security objected to her entering into a store because no pets were allowed, she objected and an argument ensued. MDPD Officer Pompee was summoned and arrived. Pompee aggressively arrested the plaintiff placing her in a bear hug and lifting her off the floor. He then began to toss the plaintiff around like a rag doll and slammed her up against a glass pane on the side of the store. The officer was given notice that he was delating with a mentally handicapped individual.  The officer squeezed the plaintiff so hard she stopped breathing. The officer mocked her claiming that she was faking her condition.  Fire rescue was called and a difibulator was used.  The plaintiff was taken to an emergency room at Baptist Hospital where she was treated and later released.

43. In *Martinez v. MDC*, 12-23534-cv-PAS, the plaintiffs alleged that on October 3, 2010, the plaintiffs were at a restaurant where to MDPD officers were working off-duty details.  The plaintiffs had a discussion and MDPD officers Huerta and Fleitas intervened. The officers physically attacked one of the plaintiffs – Gustavo Martinez – and then placed him under arrest. The arrest report describe the incident in a manner consistent with justification of the use of force and probable cause for the arrest. Unfortunately however, for MDC and Officers Huerta and Fleitas, a video of the entire episode was recorded by a mall surveillance camera which totally impeached the sworn testimony of the officers arrest affidavit.   Neither officer Huerta or Fleitas was disciplined or terminated for the event or their perjury.

44. In *Robertson v. MDC,* 13-24926, the plaintiffs claimed that on April 23, 2010, they were at Vanessa's Café which they owned and were closing at the time when several MDPD officers entered claiming they were investigation a robbery suspect believed to be on the premises at the time. When the plaintiffs assured the officers that the suspect was not there, Officer Ramirez began a verbal tirade, spitting saliva and using foul language in the plaintiff's face after which he struck the plaintiff with a closed fist sending the 56 year old man to the ground. Other officers grabbed 58 year old Vanessa Robertson who suffered from symptoms of a previous stroke by the throat and threw her into one of the restaurant booths. The officers continued to afflict their assault on both plaintiffs. Despite the officers bringing charges for battery on law enforcement officers, the State Attorney's office dismissed all criminal charges against the plaintiffs.

F.  **DAMAGES AND ATTORNEY'S FEES (FOR APPLICABLE CLAIMS)**

45. Although this complaint does not yet include state tort claims, the Plaintiff has already initiated the requisite/statutory pre-suit notice to the Defendant Village and intends to seek

of leave of court in the future to amend this complaint.  Plaintiff gives notice that pursuant to Florida's Wrongful Death Act, Fla. Stats. §768.17 et seq., the Survivors of Rincon and Personal Representative will be entitled to recover the following damages as suffered as the result of Ethan's death including the following items of damages:

    a.  Future loss of support and services from the date of death reduced to present value;

    b.  The value of loss of support and services from the date of decedent's injuries to his death with interest and future loss of support and services from the date of death and reduced to present value;

    c.  Their mental pain and suffering from the date of injuries;

    d.  Medical and/or funeral expenses due to the decedent's injuries or death may be recovered by the survivor(s) who paid them; and

    e.  As the decedent's Personal Representatives, CARMEN RINCON and CARLOS RINCON, may recover for the decedent's estate the following:

46. The loss of prospective net accumulations beyond death reduced to present value.

47. Medical or funeral expenses due to the decedent's injuries or death that have become a charge against the Estate or that were paid by or on behalf of decedent.

48.  In their claims pursuant to Title 42 U.S.C. Sec. 1983, Plaintiff is entitled to recover the damages listed in paragraph 36 and in addition, Plaintiff is entitled to recover the following damages:

    a.  The Estate of Ethan Rincon, by and through CARMEN RINCON and CARLOS RINCON, Personal Representatives, is entitled to recover hedonic damages suffered by the decedent. In other words, the value determined by the trier of fact, of Ethan Rincon's past and future loss of enjoyment of their lives.

b.  The survivors of Ethan Rincon are entitled to recover damages suffered for the deprivation without due process of their constitutionally protected liberty interests in their relationship with Ethan as guaranteed by the Fourteenth Amendment, and state law as incorporated  into Title 42 U.S.C . Sec. 1983.

49. Plaintiff has retained legal counsel in this matter and is obligated to pay counsel reasonable fees for their services.

50. As to all claims made pursuant to Title 42 U.S.C. Sec. 1983, Plaintiff shall be entitled to an award of attorney's fees pursuant to Title 42 U.S.C. Sec. 1988 in the event they prevail in any one or more of those claims.

### COUNT I - TITLE 42 U.S.C. §1983 – WRONGFUL DEATH RESULTING FROM EXCESSIVE USE OF FORCE AGAINST ETHAN (AS TO VILLAGE OFFICERS)

Plaintiff realleges Paragraphs 1 through 36 and further states.

51. On or about March 22, 2016, Village Officers were acting under color of state law as a member of Defendant, Village's police department.  They subjected Ethan to the deprivation of rights and privileges secured to him by the Constitution of the United States, including the constitutional rights to not be deprived of his life and liberty, due process of law, the constitutional right to be free from the use of excessive force against his person and to be free from unlawful searches and seizures, under the Fourth, and Fourteenth Amendments to the United States Constitution and the right against cruel and unusual punishment under the Eight Amendment of the United States Constitution.

52. On March 22, 2016, Village Officers acting in the course and scope of their duties with the Village, prematurely engaged in an unnecessarily dangerous confrontation with Ethan inside his home, who, at the time was neither a threat to himself nor others.

53. Village Officers violated protocol with no reason to believe that there was any clear and present danger posed to anyone since Ethan was home alone and the police were aware of that.

54. Village Officers failed to wait for a Swat backup.

55. Village Officers did not take any action that objectively or subjectively could have been perceived as posing any threat to the safety of Village Officers or others.

56. Village Officers then threatened to arrest Ethan's parents for obstruction of justice if they would not give them the key to open the front door of the home.

57. Village Officers did not have the consent of either parent to enter into the home.

58. Without legal justification, they forcibly entered the home. Rather than attempt to convince Ethan to come out so he could be arrested and subjected to a fair trial, Village Officers indiscriminately hunted him down and suddenly opened fire on Ethan.

59. The Village Officers used excessive, unreasonable and unnecessarily dangerous levels of force not reasonably necessary to accomplish the purpose of the moment. Their decision and actions were in contravention of accepted law enforcement standards relating to the entry of a structure, relating to dealing with a person suffering from a severe mental health problem, relating to the use of force in gaining control over a person subject to arrest. This was a routine felony arrest.

60. The shooting death of Ethan by Village Officers was in violation of clear established constitutional law under the Eighth and Fourteenth Amendments to the Constitution guaranteeing the right to be free from cruel and unusual punishment and the right to due process.

61. Village Officers are not entitled to qualified immunity since no reasonable police officer acting under these circumstances would have entered the residence nor used this level of force used on Ethan.

62. CARMEN RINCON and CARLOS RINCON, as the Personal Representatives of the Estate of Ethan Rincon, claims damages for the wrongful death of Ethan. Said damages include loss of his income, services, protection, care, assistance, society, companionship, comfort, guidance, counsel and advice, and for funeral and burial expenses under Title 42 U.S.C. §1983 and the Florida Wrongful Death Statute.

WHEREFORE, the Plaintiff demands compensatory and punitive damages against Defendant Village Officers, attorney's fees, costs and trial by jury for all issues so triable by right.

**COUNT II - TITLE 42 U.S.C. §1983 - WRONGFUL DEATH RESULTING FROM EXCESSIVE USE OF FORCE AGAINST ETHAN (AS TO DEFENDANT VILLAGE)**

Plaintiff realleges Paragraphs 1 through 36 and further alleges:

63. At all times material hereto, the Defendant Village, as represented by the acts of its employees, permitted and tolerated and caused a pattern of practice of unjustified, unreasonable and illegal arrests and use of excessive force against members of the public, the mishandling of in-custody arrestees, and the cover-up of misconduct, including lying and perjury, by police officers of the Defendant Village. Although such acts were improper, officers involved were not prosecuted and/or disciplined, and/or subjected to retraining, and some of said incidents were in fact covered up with official claims that their acts were justified and proper. As a result, Village of Palmetto Bay police officers, including Defendant Village Officers, were caused and encouraged to believe that the members of the public could be subjected to unlawful arrests, illegal use of force, the mishandling of

members of the public after their arrest, cover-ups, obstruction of justice, lying and perjury, and that said improper or illegal conduct would, in fact, be permitted by the Defendant Village.

64. Defendant Village, through its police officers, maintained a custom of using excessive force, making unlawful arrests and detentions and mishandling and/or mistreating arrestees, as well as cover-ups, lying, perjury and obstruction of justice.

65. The cited conduct represents a pattern in which citizens were abused, injured, endangered or killed by the sometimes negligent and other times intentional and/or reckless misconduct of the Defendant Village's police officers and/or that serious incompetence or misbehavior was widespread throughout the Defendant Village's police department.

66. Defendant Village has maintained a system of review of incidents of abuse of lawful authority such as, illegal or excessive use of force and unlawful detentions, and/or arrests, among other things, as well as the mishandling of in-custody arrestees by police officers, and complaints thereof, cover-ups by its police department of police misconduct, lying, perjury and obstruction of justice by several police officers, a tolerance for untruthfulness by its police officers which has failed to identify the unlawful use of force and/or seizures by to appropriate discipline, and/or supervision, and/or retraining, to the extent that it has become the de facto policy and custom of the Defendant Village to tolerate such acts by its police officers.

67. Defendant Village through the its police department, has maintained a long-standing, widespread history of failure to properly hire, and/or train, and/or supervise and/or discipline its police officers for, among other things, illegal use of force, unlawful arrests, misconduct in dealing with in-custody arrestees, cover-ups by its police department of police

misconduct, a tolerance for untruthfulness by its police officers, even though it had notice of this unlawful conduct by its employees.

68. The foregoing acts, practices, omissions, policies or customs of the Defendant Village caused police officers, including Defendant Village Officers, to believe that acts such as improper use of force and unlawful seizures, arrests, excessive use of force, cover-ups of police misconduct, a tolerance for untruthfulness by its police officers, among other things, would not be investigated or sanctioned, but instead would be tolerated, with the foreseeable result that officers, including Defendant Village Officer Evans were more likely to use excessive or improper force, cover-up police misconduct, make unlawful seizures and arrests.

69. Ethan has been a victim of said abuses of lawful authority, and said illegal acts were the direct result of the previously described acts, omissions, practices, polices or customs of the Defendant Village.

70. As a direct and proximate result of the acts described above, in violation of the United States Constitution, CARMEN RINCON and CARLOS RINCON as the Personal Representatives of the Estate of Ethan Rincon, claim damages for the wrongful death of Ethan Rincon, and for all of the constitutional violations alleged herein.

WHEREFORE, the Plaintiff demands compensatory damages against Defendant Village, and Village Officers, attorney's fees, costs and trial by jury for all issues so triable by right.

**COUNT III – NEGLIGENT FAILURE TO PROPERLY TRAIN (AS TO DEFENDANT VILLAGE)**

Plaintiff realleges Paragraphs 1 through 36 and further alleges:

71. While the Defendant Village had "written" customs, policies and practices to deal with a situation such as the one presented here, the Defendant Village did not properly train its officers to follow such written protocol. That creates a custom, policy and practice.

72. The Defendant Village's written policies mirror those from the Miami-Dade Police Department. They are the product of many years of experience, thought and legal rulings. However, they are useless if a law enforcement agency does not train its officers in executing the protocol in the field.

73. The Defendant Village owed Ethan a duty to follow its written protocol in handling situations such as the one presented here.

74. The Defendant Village failed to properly train its officers including the Defendant Village Officers in handling situations such as the one presented here consistent with its own written policy.

75. As a direct, natural and legal result of this negligent failure to properly train, Ethan lost his life.

WHEREFORE, the Plaintiff demands compensatory damages against Defendant Village, attorney's fees, costs and trial by jury for all issues so triable by right.

## COUNT IV- NEGLIGENT FAILURE TO SUPERVISE (AS TO DEFENDANT VILLAGE)

Plaintiff realleges Paragraphs 1 through 36 and further alleges:

76. In a situation such as the one presented here, one of the responding officers was a sergeant. A sergeant is considered a fist line supervisor within the Defendant Village's police department.

77. This particular sergeant, however, failed to properly supervise the incident and failed to properly supervise the other officers on the scene. Moreover, this type of event required the supervision of at least a lieutenant or a higher commanding officer.

78. This particular sergeant knew or should have known that a higher level of supervisory presence and guidance was necessary under the facts and circumstances that presented themselves at the time.

79. As stated earlier, there was no urgency or emergency here. Ethan was home alone; there was no noise coming from inside the home there was no evidence that he was a threat to himself or others. Whatever crime had occurred was at the time of the "bravado invasion" was, historical.  That crime – was a crime against property, not even a person. And, it was against his parent's property who the police most certainly knew were not going to seek prosecution for. Moreover, the police had every reason to know that the losses were insurable.

80. In short and in sum, reason and common sense demonstrated that patience and following protocol is what should have occurred here. But for the lack of proper supervision, Ethan would not have been killed.

81. The Defendant Village owed a duty to Ethan to properly supervise the event to bring about a result least likely to result in death or serious bodily injury to Ethan.

82. The Defendant Village failed in that duty by precipitately entering into the home and thereby creating the environment which led to Ethan's unnecessary and premature death.

83. As a direct and proximate result if this negligence, Ethan was killed.


WHEREFORE, the Plaintiff demands compensatory damages against Defendant Village, attorney's fees, costs and trial by jury for all issues so triable by right.

Dated this  17th  day of June, 2016.

                                        Respectfully submitted,


                                          s/ Richard Diaz
                                          _____
                                          Richard J. Diaz, Esq.
                                          F.B.N. 0767697
                                          3127 Ponce de Leon Blvd.
                                          Coral Gables, FL  33134
                                          Telephone: (305) 444-7181
                                          Facsimile: (305) 444-8178
                                          Email: rick@rjdpa.com


                                          s/ Roberto Pertierra
                                          _____
                                          Roberto Pertierra, Esq.
                                          F.B.N. 616370
                                          2655 S. Le Jeune Road, Suite 1105
                                          Coral Gables, FL  33134
                                          Telephone: (305) 444-0011
                                          Facsimile: (305) 441-2122
                                          Email: pertierrapa@gmail.com


                                          s/ Rene Sotorrio
                                          _____
                                          Rene Sotorrio, Esq.
                                          F.B.N. 226734
                                          312 Minorca Ave.
                                          Coral Gables, FL  33134
                                          Telephone: (305) 444-5565
                                          Facsimile: (305) 444-8588
                                          Email: rene@sotottiolaw.com

VII.  **HOSTAGE SITUATIONS AND BARRICADED SUBJECTS:**

A.  **Purpose:**

To establish procedures applicable to situations involving hostages being held by armed or barricaded subjects threatening harm to themselves or others.  These procedures are intended to provide guidelines by which such situations may be brought to the desired conclusion without inquiries and with a minimum of confusion and disruption of normal operations.

B.  **Policy:**

The ultimate desired conclusion in a hostage or barricaded subject situation is the safe release of the innocent and the arrest of the subject without death or injury to anyone.  It is the Department's policy to use constructive negotiations in conjunction with tactical advantage to successfully terminate the situation.

C.  **General:**

In hostage or barricaded subject situations, appropriate response is required to contain the situation and to establish communication with the subject.  Control of responding officers must be established to facilitate deployment and to avoid confusion which could result in reckless action by the subject.

Criminals who use hostages to effect their escape are desperate individuals who, if allowed to escape, will pose a continuing threat to the hostage and to the public at large.  Assurance that a hostage will be released unharmed is a meaningless promise.  The Department does not have the ability to protect a hostage who is removed from the presence of officers.  Although protection of innocent persons is of great importance, officers shall not act as substitutes for a hostage.  The safety of hostages can be best assured by keeping them in the presence of officers and by preventing their removal.  However, officers should realize that exceptional situations could arise where considered judgment might dictate otherwise.

Individual initiative must not be stifled to the point that appropriate reaction would not be forthcoming in the event of an overt action by the subject.  In a hostage recovery situation, good judgment dictates that a tactical plan be developed to ensure successful termination of the situation rather than making a direct immediate attempt to apprehend the subject.  The passage of time should benefit the Department's objective as its entire resource can be utilized toward developing the tactical plan.

D.  **Tactical Ploy:**

A barricaded person poses a danger to officers who seek to arrest him, as well as others present.  Good judgment dictates that a tactical plan be developed rather than arbitrarily rushing the subject.

Officers should seal avenues of escape and call for assistance. {CALEA 46.1.4f}  Once the subject is isolated, time is to the benefit of the officers.  To minimize the possibility of injury to officers and others, appropriate special equipment and personnel should be requested as needed.  An effort should be made to contact the subject to persuade him to surrender . {CALEA 46.1.4a}

E.  **Supervision at Scene of Barricaded Suspect:**

When a suspect is located as the result of a follow-up investigation, the senior investigative officer at the scene is in command.  In situations which develop from radio calls or spontaneous activities, the senior uniformed officer present is in command. {CALEA 46.1.4i}

F.  **Guidelines for Utilization of Special Response Team (SRT): {CALEA 46.1.4b}**

1.  Supervisors must be aware of the magnitude of an incident for which the SRT is utilized.  As a consequence of a request for SRT, numerous personnel are contacted to respond and are thus unavailable for other functions.

    Due to the number of personnel and associated resources involved, these guidelines will be complied with by supervisors requesting assistance from SRT.

2.  SRT responds to the following situations:

> **EXHIBIT**
>
> **A**

    a.   Barricaded Subjects:   Not all subjects who refuse to surrender should be considered barricaded.  A barricaded subject is defined within the following limited criteria:

       (1)  The subject is probably armed; and

       (2)  The subject is believed to have been involved in a specified criminal act or is a significant specified threat to the lives of citizens and/or police; and

       (3)  The subject is in a position of advantage affording cover and concealment or is contained in an open area and the presence or approach of police officers could precipitate an adverse reaction by the subject; and

       (4)  The subject refuses to surrender.

    b.   Hostage Situations:  The same criteria as for barricaded subjects applies with the addition of a person(s) being held by the subject against his will.

    c.   Suicide Situations:  Instances where suicidal/mentally deranged subjects are armed and have specified intent to harm themselves.

    d.   Sniper Situations:  Situations where it is determined that a sniper subject is isolated and not mobile.

    e.   Mobile Field Force (MFF) Support:  Those instances when the MFF Commander has articulable reason to believe the MFF may encounter sniper fire.

    f.   High Risk Search and Arrest Warrants Service:   When the affected entity supervisor (normally a Lieutenant or higher rank) has articulable reason to believe that armed subjects will be encountered.

    g.   Special Operations:  The use of SRT with units involved in unique investigative activities, such as Reverse Stings, Drug Interdiction, Multi-Agency Task Forces, etc., will be considered on a case-by-case basis.

    h.   Dignitary Protection:  As directed by the Assistant Director, Police Services.

    i.   Major Aircraft Disaster.

    j.   Aircraft, boat, bus, train or Metrorail hijack situations.

**G.  Action:**

1.   When a hostage or barricaded subject situation exists, the first officer on the scene will:

    a.   Notify the CB and request that his immediate supervisor respond to the scene.

    b.   Request assistance of the type and numbers he believes to be immediately necessary and, if appropriate, a safe route for responding units and deployment points should be given. {CALEA 46.1.4d}

    c.   Identify and preserve evidence and the crime scene when practicable.

    d.   Establish a CP if needed. {CALEA 46.1.4i}

2.   The first supervisor to arrive at the scene will initiate appropriate action to confirm that a hostage is being held or that a subject is barricaded and determine the nature and seriousness of the offense being committed.  Based upon information provided, a decision will be made if SRT is required. If confirmed and unresolved, establish or assume responsibility for a CP, if appropriate.  Request platoon commander respond to the scene.

3. The supervisor-in-charge will:

    a. Deploy responding units so as to contain the situation most effectively. Suspects will be contained and isolated in the smallest area possible. This area will be designated as the "inner perimeter". {CALEA 46.1.4f} An outer perimeter will be established in order to provide a secured area for command operations and to protect spectators or the general public from becoming involved in the inner perimeter. Outer perimeter personnel will be responsible for pursuit of persons/vehicles fleeing outside of the inner perimeter, surveillance units if utilized, and control of travel routes. {CALEA 46.1.4f,n}

    b. Evacuate civilian personnel from the immediate area. {CALEA 46.1.4g}

    c. Determine available means to communicate with the subject and if possible, establish contact to determine the reason for his action.

    d. Request SRT and negotiator personnel through the Communications Bureau Shift Commander. {CALEA 46.1.4b}

    e. Attempt to identify persons familiar with the subject and information concerning the building or structure.

    f. Persons familiar with the subject should not be allowed to communicate with the subject without approval of a supervisor from SRT.

    g. Designate response area for backup units, fire equipment, ambulance, and news media. {CALEA 46.1.4h,j,k}

    h. Request assistance from county/private agencies: {CALEA 46.1.4j}

        (1) Fire Rescue to stand by.

        (2) Private ambulances for injured: {CALEA 46.1.4h}

        (3) Fire engine company if chemical agents used.

4. SRT Personnel:

    a. The SRT Commander or Tactical Operations Section (TOS) Lieutenant will:

        (1) Respond to all call-outs for SRT tactical and/or negotiator personnel.

        (2) Coordinate with the supervisor-in-charge and confirm tactical solution.

        (3) Have the authority for all decisions related to the resolution of the incident once SRT assumes control of the inner perimeter. {CALEA 46.1.4i}

    b. The Squad Team Leader will:

        (1) Supervise SRT personnel until the SRT Commander or TOS Lieutenant assumes command.

        (2) Determine type of equipment necessary.

        (3) Identify location of the offender.

        (4) Stage and deploy team personnel.

    c. The Negotiator will: {CALEA 46.1.4c,m}

        (1) Report to the SRT Commander or TOS Lieutenant.

(2) Determine number of offenders and hostages, demands and motivations of offenders, and any other information useful to a resolution of the incident.

5. The use of chemical agents may be incorporated into a tactical plan devised by the Squad Team Leader and approved by the SRT Commander or TOS Lieutenant. The Squad Team Leader has the authority to authorize use on tactical operations. Such usage will be properly documented. The use of deadly force will be consistent with Florida Statutes Section 776.05 and MDPD Policy. {CALEA 46.1.4l}

6. Seek release of hostages and surrender of the offender. The CP will monitor any frequencies being used by support unit.

7. Regular police service calls connected with the emergency will be dispatched by the CB on the appropriate channel.

## VIII. CORRECTIONAL INSTITUTION DISORDER PLAN:

### A. Purpose:

To establish procedures and areas of responsibility in the event of a disorder at any correctional institution within Miami-Dade County (Annex P). {CALEA 46.1.2}

### B. General:

If rioting, fighting, or general disorders occur in any correctional institution within Miami-Dade County, the MDPD may be requested to assist. When Federal institutions are involved, MDPD personnel may only provide assistance outside the complex; e.g., perimeter security and searches. The following three levels of disorder may be expected involving inmate clientele:

1. Level I: Rioting, fighting, or general disorder which can be quelled by internal force of the affected institution.

2. Level II: Rioting, fighting, or general disorder which can be quelled by internal forces of the institution, but requires supplementary assistance from MDPD.

3. Level III: Rioting, fighting, or general disorder with escape possibilities that are beyond the control of institution personnel which culminates in a request for MDPD to restore order at the incident site.

### C. Emergency Procedure:

1. Notification of the Communications Bureau Shift Commander: In the event of a Level II or Level III disorder, institutional personnel will notify the Communications Bureau Shift Commander (per institutes internal standard operating procedure).

2. Upon notification, the Communications Bureau Shift Commander will:

   a. Notify concerned uniformed platoon commander as to affected institution and level of occurrence.

   b. Notify municipality and request available units to respond when a county facility located within a municipality is involved.

   c. Notify the Staff Duty Officer.

3. The Uniformed Platoon Commander will:

   a. Contact correctional institution personnel and verify the following:

      (1) Level/nature of disturbance.