UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 16-cv-22254-DPG

CARMEN RINCON and CARLOS RINCON,
Personally, and as Personal Representatives of the Estate
of Ethan Rincon, deceased,

      Plaintiffs,

v.

MIAMI-DADE COUNTY, a subdivision
of the State of Florida, SERGEANT VICTOR EVANS,
individually and in his official capacity
as a police officer for Miami Dade County,
OFFICER JOHN DALTON, individually and in his official capacity
as a police officer for Miami Dade County, and
OFFICER BRIAN ZAMORSKI, individually and in his official capacity
as a police officer for Miami Dade County, and OFFICER
MARLENE TABORDA, individually and in her official capacity
as a police officer for Miami-Dade County,

      Defendants.
_____/

## PLAINTIFFS' FOURTH AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

      Plaintiffs, Carmen Rincon and Carlos Rincon, personally and as Personal Representatives

of the Estate of Ethan Rincon ("Ethan"), deceased, sue Defendants, Miami-Dade County

("MDC")[1]; Sergeant Victor Evans ("Evans"); Officer John Dalton ("Dalton"); Officer Brian

Zamorski ("Zamorski"); and Officer Marlene Taborda ("Taborda") (hereinafter referred to

---

[1] Defendant MDC is sued because it employs and controls the Miami-Dade Police Department
("MDPD"), which was and is responsible for policing the Village of Palmetto Bay, where Ethan
was killed.

collectively  as "MDC Police" or "MDPD Officers"), independently, jointly and severally, and allege:

## A. NATURE OF CASE

1.  This action arises out of the illegal entry and search of the Rincon residence, located in Palmetto Bay, Florida, and the unjustifiable use of deadly force resulting in the unjustified shooting and killing of Plaintiffs' son, Ethan Rincon, inside the Rincon residence.  Ethan's parents, Carmen and Carlos Rincon, personally and as the Personal Representatives of Ethan's estate, bring this action, personally and on behalf of the estate and themselves as statutory survivors, to redress Ethan's wrongful death and the violation of Ethan's constitutionally protected civil rights, to redress their own severe emotional distress, and pursuant to other state and federal laws as more fully appears herein.

2.  This action alleges violations of civil rights and other state and federal laws, as well as a state-law tort, which occurred on March 22, 2016, in and at the Rincon residence.  Plaintiffs seek damages in excess of $75,000, exclusive of attorney's fees and taxable costs.

3.  Plaintiffs' federal claims are brought pursuant to Title II of the Americans with Disability Act of 1990 ("ADA"), and 42 U.S.C. § 1983, under the Fourth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

4.  Additionally, this cause generally involves a conspiratorial cover-up by the four MDPD Officers who participated in the unlawful entry into the Rincon residence.  The cover-up was designed to make the entry appear lawful and further to make Ethan's killing appear justified.  This cause further involves a pattern and practice on the part of MDC to fail to properly train, supervise, investigate, and reprimand its police officers when necessary, as shown more fully herein.

### B.  JURISDICTION AND VENUE

5.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3). This Court has supplemental/ancillary jurisdiction pursuant to 28 U.S.C. § 1367 with respect to Plaintiffs' state-law claims, as they derive from a common nucleus of facts,  and because the claims are interrelated and should be tried in a single judicial proceeding under the concepts of judicial economy, convenience, fairness, due process, *res judicata*, and collateral estoppel.

6.  This action for damages is brought to redress violations of federally-protected constitutional rights pursuant to Title II of the ADA and 42 U.S.C. §§ 1983 and 1988, and the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the Constitution of the United States of America, along with violations of various state laws.

7.   Pursuant to 28 U.S.C. § 1391, venue properly lies in the Southern District of Florida because this is the judicial district in which Ethan resided when alive and where the Defendants reside and/or operate, because the illegal conduct occurred in Miami-Dade County, and because Ethan's death was caused in and occurred in Miami-Dade County.

8.  Notice of this claim was provided to Defendant MDC in accordance with Fla. Stat. § 768.28 and Plaintiffs have satisfied all conditions precedent to bringing this lawsuit.

### C.  PARTIES

9.  At the time of his death at the hands of the MDPD Officers, Ethan was a United States citizen residing in Miami-Dade County, Florida.

10. Plaintiffs, Ethan's parents, Carmen and Carlos Rincon, as the Personal Representatives of the Estate of Ethan Rincon, are authorized by law to bring this action pursuant to the laws of the state of Florida.  Moreover, as to their personal claims, Plaintiffs are residents of Miami-Dade County, Florida.

11. The Defendant MDC is a political sub-division of the state of Florida and is responsible, through its police officers, employees, servants, and agents, for enforcing the ordinances of MDC as well as the laws of the state of Florida, through the MDPD. It is also responsible for ensuring that its officers, employees, servants, and agents are properly hired, properly trained, and obey the laws of the state of Florida and of the United States.  The Defendant MDC is also responsible to ensure that its police officers follow proper established and written protocols and procedures.  In furtherance of its legal obligations, Defendant MDC operates and maintains a police department, the MDPD.

12. Evans, at all times relevant to this complaint, was a duly appointed and ranked uniform patrol police sergeant of the MDPD, acting under color of law, employed by and serving under the authority of Defendant MDC. Defendant Evans is sued in his individual and official capacities.  However, Evans was acting outside of his discretionary authority.

13. Dalton, at all times relevant to this complaint, was a duly appointed and ranked uniform patrol police officer of the MDPD, acting under color of law, employed by and serving under the authority of Defendant MDC. Defendant Dalton is sued in his individual and official capacities. However, Dalton was acting outside of his discretionary authority.

14. Zamorski, at all times relevant to this complaint, was a duly appointed and ranked uniform patrol police officer of the MDPD, acting under color of law, employed by and serving under the authority of Defendant MDC.  Defendant Zamorski is sued in his individual and official capacities. However, Zamorski was acting outside of his discretionary authority.

15. Taborda, at all times relevant to this complaint, was a duly appointed and ranked uniform patrol police officer of the MDPD, acting under color of law, employed by and serving

under the authority of Defendant MDC. Defendant Taborda is sued in her individual and official capacities.  However, Taborda was acting outside of her discretionary authority.

16. At all times material hereto, the MDPD Officers were acting under color of state law and color of their authority as public officials and public employees of Defendant MDC. However, the MDPD Officers are not entitled to qualified immunity as they were acting outside their discretionary authority as their conduct was so reckless, willful, wonton and outrageous, and with total disregard for Ethan's rights as well as against established law regarding interacting with mentally handicapped individuals, search-and-seizure procedures, and the justifiable use of deadly force.

**D. ALLEGATIONS OF FACT**

    **a.** <u>**The Vandalism Report and Police Dispatch**</u>

17. On March 22, 2016, Ethan suffered from Asperger's Syndrome, a qualifying mental health illness under the ADA.

18. During the evening of March 22, 2016, MDPD received a telephone report regarding vandalism to personal property in the neighborhood of the Rincon residence.  Defendants Evans, Dalton, Zamorski, and Taborda, among other MDPD officers, responded to the call. Upon arrival in the neighborhood, the MDPD Officers contacted the complainant, who provided a description of the subject, Ethan.  The MDPD Officers began looking for the person who matched the description of the subject.

19. At some point in time, the four individual Defendants who had been given a description of Ethan, were advised that the subject, Ethan, was inside the Rincon residence where he lived.   At that time, Ethan was alone inside his home, not committing any crime whatsoever.

20. At that time, the vandalism had stopped, and there was no crime of any type in progress; the individual defendants, all MDPD police officers, nonetheless approached the Rincon residence.

21. A neighbor called Ethan's mother, Carmen Rincon, who drove home. Carmen met the MDPD Officers and called Ethan's father, Carlos Rincon, who arrived shortly thereafter.

22. Ethan's mother told the MDPD Officers that Ethan was home alone and likely sleeping in his bedroom or listening to music with his headphones on; that Ethan suffered from Asperger's Syndrome; and that she and her husband were in the process of getting their son professional help via their family attorney, Ramon de la Cabada, Esq.  Ethan's parents also assured the MDPD Officers that there were no firearms in the residence.

23. Ethan's parents called Mr. de la Cabada on their cell phone so he could explain to the MDPD Officers that he was in the process of filing a Baker Act petition to help Ethan because Ethan was behaving emotionally unstable for the last 48 hours.

24. With Mr. de la Cabada on the line, Carlos Rincon handed his cell phone to Defendant Evans so he could understand Ethan's history and mental health handicap to help the MDPD Officers assess how to handle the situation going forward.

25. Defendant Evans terminated the phone call with Mr. de la Cabada and said, "I don't need to talk to anybody."

26. At this point, the MDPD Officers had the following information: **One**, that Ethan *may* have committed the vandalism; **Two,** that no crime was in progress; **Three**, that Ethan was alone in the house; **Four**, that the house belonged to Ethan's parents; **Five,** that there were no firearms inside the Rincon residence; **Six,** that there were no signs of Ethan having any intent to escape; **Last,** that there was absolute silence within the home.  The MDPD

Officers had no reason to believe that Ethan was a danger to anyone, including himself. These facts demonstrate the absence of any exigent circumstances that would justify the MDPD Officers to forcibly enter the Rincon residence without consent of the Plaintiffs or a search or arrest warrant.

27. Nevertheless, the MDPD Officers were determined to enter the Rincon residence and confront Ethan. Neither Carmen nor Carlos Rincon consented to the MDPD Officers forcible entry into their home. It is clearly established law that police may not forcibly enter a residence to conduct a routine felony arrest without a warrant. *Payton v. New York*, 445 U.S. 573 (1980).

28. The MDPD Officers made no attempt to communicate with Ethan to have him voluntarily exit the residence so they could address him. The MDPD Officers also refused to allow Ethan's parents to try to communicate with Ethan through a door or window.

29. When the Plaintiffs begged for the opportunity to try to communicate with their son, the MDPD Officers became nasty and unnecessarily assertive.

30. The MDPD Officers did not call for a trained negotiator, as they should have—especially in light of the fact they knew that Ethan was suffering from a mental health handicap.

31. The MDPD Officers did not introduce into the residence a robotic device through which it could have attempted to communicate with Ethan.

32. The MDPD Officers did not call the MDPD SWAT team, whose officers are highly trained on building entries and sweeps as well as searching for and securing suspects therein. SWAT Teams have unique weapons, tactics, and assets to use minimal force with maximum effect to accomplish any lawful police mission. SWAT teams have bulletproof

shields to use in making an entry to confront a suspect; they have optics and robotics they can use to assess the risk.

**b. The Illegal Entry into the Rincon Residence & the Shooting**

33. The MDPD Officers demanded that the Plaintiffs open the front door or give them the keys for the Officers to open it. When Plaintiffs refused, the MDPD Officers threatened them with arrest.

34. Fearing arrest and under extreme coercion and duress, Carmen Rincon reluctantly unlocked the front door of the residence.

35. Defendants Evans, Zamorski, and Dalton – still without consent – then opened the front door and entered the Rincon residence.

36. Meanwhile, Defendant Taborda remained at the front door, restraining the Plaintiffs from entering the residence or attempting to communicate with their son, Ethan.  During this time, the Plaintiffs continuously begged the MDPD Officers to not go inside and instead to allow *them* to attempt to communicate with Ethan from the front door to attempt to convince Ethan to exit the residence.

37. The layout of the Rincon residence – particularly to the left side where the shooting took place – is simplistic, but must be understood in order to appreciate why the MDPD Officers are liable individually for their conduct *once inside the residence*.

38. The front door opens immediately into a living room.  Upon entering through the front door, if one walks on the left side of the living room walking about 7-8 paces forward, a hallway to the left leads away from the living room and to the left wing of the residence where three bedrooms are located. This main hallway is approximately 20 feet long and "dead ends" into an intersecting, perpendicular hallway with doors into three bedrooms.

One bedroom is to the extreme left, then Ethan's bedroom is approximately in the middle of the hallway and a third bedroom is to the extreme right.

39. The total walking distance from the front door of the Rincon home to Ethan's bedroom is approximately 15 - 20 paces. If one stands at the entry of the residence, normal conversation in Ethan's bedroom is clearly audible.  A hallway leads from the living room to the left to the door of Ethan's bedroom creates a "tunnel effect" that enhances these acoustics.   The MDPD Officers entered the Rincon residence in a "hunt mode" rather than in a manner calculated at communicating with and trying to convince Ethan to submit peacefully and exit his bedroom so they could talk to him in a safe, controlled environment. Evans, Dalton and Zamorski went down the left-hand hallway from the living room. Within seconds, the three MDPD Officers fired multiple gunshots killing Ethan. The MDPD Officers impatiently and cavalierly forced their entry into the Rincon home without consent, without a warrant, and without exigent circumstances. Once inside, they confronted, shot, and killed Ethan without legal justification.

40. There was no communication – no warnings or commands – before the MDPD Officers unloaded a barrage of bullets at Ethan. The Plaintiffs and two neighbors close to the front door of the residence heard no yelling or orders by the MDPD Officers before shots rang out and Ethan was killed.

41. Immediately after the shooting, Evans exited the house saying that Ethan was shot because he attacked the MDPD Officers with a pickaxe.  Defendant Evans did not claim that he – or any other officer – warned Ethan to drop any pickaxe before firing upon him.

42. The Plaintiffs were restricted and not allowed to enter the residence to tend to their son.

43. The Florida Department of Law Enforcement ("FDLE") was called to handle the shooting investigation.

44. In order to cover-up for her fellow officers and justify the shooting, Defendant Taborda lied to FDLE investigators by claiming that she heard yelling inside the residence before any shots were fired.

45. In order to cover-up for themselves, the Defendant MDPD Officers refused to give voluntary statements to FDLE investigators for years. They deliberately waited until the FDLE finished their investigation and the Miami-Dade County State Attorney's Office ("SAO") "criminally cleared" them. Plaintiffs allege that Defendants' conduct was intended and calculated to obstruct the FDLE and SAO investigations, to make it difficult to reconstruct the events and objectively determine whether this shooting was justified.

46. Under *Brown v. City of Margate,* 842 F. Supp. 515 (S.D. Fla. 1993), a law enforcement officer is not entitled to qualified immunity if the officer commits perjury or otherwise obstructs an investigation to deflect criminal or civil liability.

47. While Defendant MDC, through the media, and via its spokesperson, stated that the shooting was in self-defense, alleging that Ethan wielded a pickaxe at the police officers, the forensic evidence and reconstruction of the shooting scene completely contradict and eviscerate that defense and reveals the defense as an intentional cover-up.

48. Only Evans, Dalton, and Zamorski participated in and witnessed the shooting. Defendant Taborda did not see the shooting as she was restraining the Plaintiffs at the front door of the residence. Ethan was dead. It is therefore logical and evident that the MDPD spokesperson spoke of the events inside the Rincon residence based on information from at least one of the MDPD Officers involved in the shooting of Ethan, despite the shooting

officers' assertion of the *Garrity* privilege to refuse to give statements to an investigative agency.  The circumstances indicate that at least one MDPD Officer made self-serving statements to the MDPD spokesperson to provide the press a false narrative concerning the circumstances of the shooting and to seek to establish a false basis for the assertion and justification of the shooting as self-defense.

49. A reconstruction of the scene of the shooting admits of only one conclusion: Ethan was well *inside* his bedroom at the time he was shot and killed, notwithstanding the fact that he posed no clear and present danger of serious bodily injury or death to any of the Defendant MDPD Officers. The reconstruction conclusively shows that all of the shooting officers were well *outside* of Ethan's bedroom in different positions within the two intersecting hallways. The reconstruction of the trajectory of some of the projectiles shows that one of the shooting officers fired upon Ethan blindly through a wall and door casing while Ethan was still *inside* his room, where he could not even be seen by the shooting officer.

50. Furthermore, the door to Ethan's room did not swing a full 90 degrees inward because it was partially obstructed by furniture against the wall of Ethan's bedroom; the bedroom door opened only approximately 70 degrees. As a result, Ethan could not have wielded the pickaxe in any menacing way. Considering Ethan's body dimensions – height and width – and the dimensions of the pickaxe, along with the door's aperture, it was not possible for Ethan to wield a pickaxe in any menacing way within the confined space at the threshold entrance to his bedroom where the reconstruction shows he was standing when he allegedly threatened the police with a pickaxe.

51. Additionally, no stipling was found on Ethan´s body.  This is significant because it indicates that none of the 10 or 11 rounds fired at Ethan, all were fired at more than 5 to 6

feet from Ethan.  In short, none of the shooting officers could possibly have had a reasonable fear of serious bodily injury or death when they shot Ethan.

### E.  CUSTOMS, POLICIES, AND PRACTICES

52. The MDPD has customs, policies, and practices that result in the deprivation of constitutional rights of Miami-Dade County citizens, including the excessive use of force – including firearms – resulting in unnecessary injury and/or death.  Even the most cursory of reviews of news stories shows ample evidence of a pattern of such customs, policies, and practices on the part of MDPD and its officers.

53. In 2011, MDPD officers approached Calderin, a 25-year-old male with no prior criminal history, and asked if he had any weapons. Calderin admitted he had a knife and in a slow and non-threatening manner displayed the knife, which was in a sheath that he was carrying. MDPD officer Schottenheimer approached from behind another officer, who did not draw his/her weapon, and fired at Calderin once. Officer Schottenheimer then fired three more rounds into Calderin's back. The victim had turned around as a result of the first round, which had struck Calderin in the front of his body.  Based upon information and belief, none of the MDPD officers involved in this incident were disciplined, terminated, or required to undergo remedial training.

54. In 2012, MDPD officers approached Barnes, who was walking peacefully in public with a friend. Other MDPD officers, in an unmarked vehicle, raced to their location, scaring Barnes and his friend. Out of fear, both Barnes and his friend to run away. The MDPD officers did not identify themselves, but instead drew their weapons; one of them shot Barnes in the leg. Although the first shot had disabled Barnes, an officer fired a second round into Barnes's left side without justification or provocation. Based upon information

and belief, none of the MDPD officers involved in this incident were disciplined, terminated, or required to undergo remedial training.

55. In 2010, Soto appeared, accompanied by her father, at the Miami-Dade County Building Code Compliance Office to appear for a Board of Rules and Appeals meeting. An argument ensued between Soto and a county official. Two plainclothes MDPD officers ordered Soto to leave the building. The officers followed Soto into the elevator and once therein began to beat Soto and shoved her father, ripping his shirt and causing him to bleed. The officers then placed Soto in a patrol car with the windows rolled up and no ventilation and left it parked in the direct sunlight.  They drove to a private location and spoke to an individual who would not allow Soto to see his/her face.  That conversation lasted about an hour while Soto remained "baking" inside the police car. The MDPD officers then drove to a gas station for no known reason. Ultimately, Soto passed out.  Based upon information and belief, none of the MDPD officers involved in this incident were disciplined, terminated, or required to undergo remedial training.

56. On March 4, 2014, two MDPD officers shot and killed Federico Osorio in his own home after Osorio's mother Martha Fajardo informed the officers that her son had a history of mental illness. Osorio was home alone and committing no crime at the time of the shooting. Based upon information and belief, none of the MDPD officers involved in this incident were disciplined, terminated, or required to undergo remedial training.

57. On November 14, 2010, Gladys Cordoves, who suffered from post-traumatic stress syndrome, severe panic disorder, and recurrent major depression, was walking peacefully at a mall with her service dog.  Mall security personnel objected to her entering into a store, stating that no pets were allowed. Cordoves objected and an argument ensued. MDPD

officer Pompee was summoned and arrived. Pompee aggressively arrested Cordoves, placing her in a bear hug and lifting her off the floor. The police officer roughly and unjustifiably manhandled Cordoves, slamming her up against a glass pane on the side of the store. The officer was given notice that he was dealing with a mentally handicapped individual.  The officer squeezed Cordoves so hard that she stopped breathing. The officer mocked her, claiming that she was faking her condition.  Fire rescue was called and a defibrillator was used.  Cordoves was taken to the emergency room at Baptist Memorial Hospital, where she was treated and later released.  Based upon information and belief, none of the MDPD officers involved in this incident were disciplined, terminated, or required to undergo remedial training.

58. On October 3, 2010, Elsa and Gustavo Martinez were at a restaurant where two MDPD officers were working off-duty details.  The Martinezes argued and MDPD officers Huerta and Fleitas intervened. The officers physically attacked Gustavo Martinez and then placed him under arrest. The arrest report describes the incident in a manner consistent with justification for the use of force and probable cause for the arrest. Unfortunately for MDC and Officers Huerta and Fleitas, a mall surveillance camera recorded a video of the entire episode. The video entirely contradicted the sworn testimony of the officers' arrest affidavit.   Neither officer Huerta nor Fleitas was disciplined, terminated, or was required to undergo remedial training for the event or for their perjury.

59. On April 23, 2010, as the Robertsons, the owners of Vanessa's Café were closing their restaurant at the time that several MDPD officers entered, claiming they were investigating a robbery suspect whom they believed to be on the premises. When the Robertsons assured the officers that the suspect was not there, officer Ramirez verbally and physically abused

one of them. The officer struck Mr. Robertson with a closed fist, sending the 56-year-old man to the ground. Other officers grabbed 58-year-old Vanessa Robertson (who suffered from symptoms of a stroke) by the throat and threw her into one of the restaurant's booths. The officers subsequently continued to assault both Robertsons. Despite the officers' charging the Robertsons with battery on law enforcement officers, the SAO dismissed all criminal charges.  Based upon information and belief, none of the MDPD officers involved in this incident were disciplined, terminated, or required to undergo remedial training.

60. In May of 2015, MDPD officers engaged an outrageous shooting spree in the middle of a residential area. Adrian Montesano, 27, robbed a Walgreens and then, in a nearby trailer park, shot officer Saul Rodriguez. By 5 a.m., a massive manhunt had ensued to locate Montesano, who had stolen Rodriguez's patrol vehicle. Montesano drove the police vehicle to his grandmother's house and fled in her blue Volvo. It is not known when, or how, but Corsini Valdes, 50, who had not taken part in Montesano's crime spree, joined Montesano in the Volvo. After a wild chase, Montesano crashed the Volvo in the backyard of a townhouse on 65th street, just off 27th Avenue. The car was wedged tight between a tree and a light pole, with no chance of moving.  Witness Anthony Vandiver said that in less than a minute the police opened fire, shooting more than 50 times into the Volvo. "They were saying put your hands up, and the guys were still moving after they shot maybe 50, 60 times. And the guy tried to put his hands up. And as soon as he put his hands up, it erupted again. And that was it for them. That guy tried his best to give up."  Witnesses said the two men in the Volvo were trying to surrender but the police officers just kept shooting the unarmed suspects. Neither man – like Ethan here – had a firearm. No weapons were found in the Volvo.  Montesano and Valdes were not the only ones struck by the huge

number of bullets shot from M4 assault rifles and high-capacity handguns. Two officers were hit in the crossfire, one officer shot in the arm, and the other hit in the arm and grazed on the head, an injury that could have been fatal had it been half an inch to the right. Two others sustained ruptured eardrums from the deafening blasts. Residents were fortunate not to have been shot in the wild and uncontrolled shooting. "It was like the Wild Wild West, man, crazy," said Vandiver, who barely made it through the back door of his home before the gunfire erupted.  "Shooting just wild; shooting all over the place. Bullets could have come through the window. Anything could have happened man. They weren't thinking, they weren't thinking at all," said another witness who requested that his name not be published for fear of retaliation.  This indiscriminate shooting by MDPD officers shows that they have lost sight of their training and failed to coordinate their actions. The irresponsible shooting endangered the public as well as the officers themselves. Another neighbor stated that officers were laughing as the bullet-riddled bodies of Montesano and Valdes were pulled from the Volvo. "The policemen that had on the black and white vests were out there laughing like it was so funny," a neighbor told CBS. Senior commanders admitted they are very lucky more officers were not seriously hurt or killed. Even more haunting is the danger the residents in the area faced. At the time of the shooting, parents were getting their kids ready for school and across the street men and women stood exposed on a Metrorail platform. "Get all the officers off to the side.  We've got to get rescue in here," one panicked officer could be heard saying on a radio transmission. "There's too many officers here! Back them up!" Adrian Montesano and his passenger, Corsini Valdes, were long dead by that time, but officers continued to fire. "That was it for them. That guy

tried his best to give up," Vandiver recounted. "I swear to God; on everything I love, my kids, my momma, everything.  I seen it all."

61. MDPD's customs, policies, and practices resulting in constitutional violations have not discontinued in recent years.  Indeed, the pattern continues as of today.

62. On February 12, 2018, MDPD officers approached an 84-year-old man, Raymond Bishop, who, while armed and threatening to kill himself, did not pose a threat to anyone else and immediately fired upon him, causing his death.

63. On May 23, 2018, MDPD officers lost sight of a vehicle, which fled from the police after committing a traffic infraction. The officers later found the vehicle and saw three males trying to remove its license plate. Although none of the three subjects were armed or posed any threat to the MDPD officers or anyone else, one of the subjects, Antonio Levan Daines, was shot but survived.

64. On September 7, 2018, a MDPD officer approached a male who was doing nothing except "acting erratically" at the Miami International Airport. Officers fired their weapons upon and injured the subject.

65. On or about November 22, 2018, MDPD officers shot an unarmed teenager near the 3100 block of SW 146th Avenue. The 15-year-old boy was involved an altercation with his guardian; he had been off his medications, causing his erratic behavior.  The police responded and while four officers were trying to subdue the teenager, he was shot in the torso. There was no weapon found on the teenager. This was not a "rookie officer" involved shooting. Rather, the officer was Ronald Neubauer was a 28-year veteran.  And, this was Neubauer's second shooting in 2018 – in March, he was one of two officers who fired at and struck a disoriented motorist, Jahmal Parker, who stole a taser from a police officer.

Juan Perez, the MDPD Director, made an admission against the interests of the MDPD, "I have a lot of concerns as to what happened here so far."

66. Based upon information and belief, none of MDPD officers involved in any of the incidents alleged above were disciplined, terminated, or required to undergo remedial training.

67. Even a single act that is as outrageous as the shooting and killing of Ethan inside his bedroom in the Rincon residence is sufficient to establish customs, policies, and practices. *Oklahoma City v. Tuttle*, 471 U.S. 808 (1985).

68. Concerning the individual Defendants inside the Rincon residence – Evans, Dalton, and Zamorski – through even a cursory review of their MDPD Employee Profiles, which are public records, it is apparent that excessive use of force is common and routine both at MDPD in general and among these Officers particularly.  Specifically, from 1998 through 2016, 28 complaints of excessive use of force were made against Dalton; from 1996 through 2016, 9 complaints of excessive use of force were made against Zamorski; and from 1999 through 2016, 7 complaints of excessive use of force were made against Evans. There is no evidence that MDC, or anyone, took any remedial or punitive action against any of the three Defendants, or required any retraining or counseling.  In short, the Defendant MDC by its inaction acquiesced to this type of behavior – routine excessive use of force – as acceptable, resulting in a pattern and practice of routine excessive use of force coupled with a complete failure by MDC to take any remedial action.

69. In the past 20 years the MDPD has had an unusually high turnover of police chiefs. Despite the well-known and well-documented history and pattern of improper use of force and unjustified use of lethal force, there is no evidence of any remedial action taken by the MDPD.  As a result, the unjustified use of force, including deadly force, has become

common and routine, to the extent that it is now, and was during 2016 at the time Ethan

was killed, a pattern and practice of behavior for MDPD police officers and the Defendant

MDC.

**F.  DAMAGES AND ATTORNEY'S FEES (FOR APPLICABLE CLAIMS)**

70. Pursuant to Florida's Wrongful Death Act, Fla. Stat. §§ 768.17 *et seq.*, the survivors of

Ethan Rincon and the Personal Representatives of his estate are entitled to recover the

following damages suffered as the result of Ethan's death:

   a.  Future loss of support and services from the date of death, reduced to present value;

   b.  The value of loss of support and services from the date of decedent's death, reduced
       to present value;

   c.  The survivors' mental pain and suffering from the date of death; and

   d.  Medical and/or funeral expenses due to the decedent's injuries or death.

71. As Personal Representatives of their son's estate, Carmen and Carlos Rincon may recover

for the decedent's estate the following:

   a.  The loss of prospective net accumulations beyond death, reduced to present value; and

   b.  Medical or funeral expenses due to the decedent's injuries or death that have become
       a charge against the estate or that were paid by or on behalf of decedent.

72.  In their claims pursuant to 42 U.S.C. § 1983, the following damages may additionally be

recovered:

   a.  The estate is entitled to recover hedonic damages suffered by the decedent. Hedonic
       damages are the value determined by the trier of fact of Ethan Rincon's past and future
       loss of enjoyment of life; and

    b.   The survivors are entitled to recover damages suffered for the deprivation without due process of their constitutionally protected interests in their relationship with Ethan, as guaranteed by the Fourteenth Amendment and state law, as incorporated into 42 U.S.C. § 1983.

73. Plaintiffs have retained legal counsel in this matter and are obligated to pay counsel reasonable fees for their services.

74. As to the claims pursuant to the ADA, Plaintiffs seek damages under Title II of the ADA and *Gebser v. Lago Vista Independent School District*, 524 U.S. 274 (1998). Plaintiffs further seek an award of attorney' fees under 42 U.S.C. § 12205.

75. As to all claims made pursuant to 42 U.S.C. § 1983, Plaintiffs are entitled to an award of attorney's fees pursuant to 42 U.S.C. § 1988 when they prevail on any one or more of those claims.

76. As against the four Defendant MDC Officers, Plaintiffs seek an award of punitive damages.

## COUNT I –VIOLATION OF AMERICANS WITH DISABILITIES ACT (AS TO ALL DEFENDANTS)

77. Plaintiffs reallege ¶¶ 1 through 76, *supra*, and incorporate them as if fully stated.

78. At the time of the shooting, any criminal mischief, the alleged vandalism to property, was over; it was not in progress. It was a crime against property and thus not a forcible felony or one of grave severity.

79. At the time of the shooting, Ethan did not pose an immediate threat to the safety of the MDPD Officers or others. He was in his bedroom either asleep or awake listening to music on his earphones.

80. Ethan was not actively resisting arrest or attempting to evade arrest by flight.

81. The ADA requires public entities to make reasonable modifications to rules, policies, and practices to ensure that individuals with disabilities are not discriminated against by public entities or excluded from or denied the benefits of services, programs, or activities of public entities.

82. Conflict Intervention Team ("CIT") training is a program specifically designed for law enforcement officers to evaluate and de-escalate potentially volatile situations involving individuals with potential mental health concerns. Officers employed by Defendant MDC have received or should have received CIT training, and its police department, MDPD, required or should have required CIT training for all of its police officers.

83. It was unreasonable and improper for the MDPD Officers not to recognize that Ethan presented a mental health concern and to pursue alternative means, some of which are provided for under the CIT protocol.

84. Plaintiffs allege that Defendant MDC, by and through the MDPD and the MDPD Officers, either:

  - Failed to implement the CIT Training Program;

  - Improperly or insufficiently trained its officers under the CIT Training Program; or

  - Did not enforce or mandate its officers use of the CIT training.

85. Plaintiffs allege that the MDC Officers either:

  - Did not have CIT training;

  - Were not adequately trained under the CIT training protocol; or

  - Disregarded their CIT training.

86. As a direct and proximate result of these failures, the Defendants violated the ADA, resulting in Ethan's death.

87. At the outset, the MDPD Officers were made aware of Ethan's disability.  Each MDPD Officer had the authority to address the discrimination and other ADA violations but did not.

88. Ethan's rights under the ADA were violated by all of the Defendants in failing to make reasonable modifications to rules, policies, or practices, including the failures discussed above.

89. The Plaintiffs seek damages as enumerated in Section F herein.

   **WHEREFORE**, the Plaintiffs demand judgment against Defendant MDC and the MDPD Officers for their damages, attorney's fees, punitive damages, costs, and all other available relief.

## COUNT II - TITLE 42 U.S.C. §1983 – WRONGFUL DEATH RESULTING FROM EXCESSIVE USE OF FORCE AGAINST ETHAN (AS TO ALL FOUR MDPD OFFICERS)

90. Plaintiffs reallege ¶¶ 1 through 76, *supra*, and incorporate them as if fully stated.

91. On or about March 22, 2016, Evans, Dalton, Zamorski and Taborda were acting under color of state law as members of the MDPD.  Evans, Dalton, Zamorski, and Taborda subjected Ethan to the deprivation of rights and privileges secured to him by the Constitution of the United States, including the constitutional right to not be deprived of his life and liberty; the right to not be deprived of due process of law; the right to be free from the use of excessive force against his person; the right to be free from unlawful searches and seizures under the Fourth, Sixth, and Fourteenth Amendments to the United States Constitution; and the right to not be subjected to cruel and unusual punishment under the Eight Amendment to the United States Constitution.

92. On March 22, 2016, Evans, Dalton, and Zamorski, while acting outside of their discretionary authority with the MDPD, unlawfully entered the Rincon residence,

presumably to confront and arrest Ethan; Taborda remained outside the Rincon home restraining Carlos and Carmen Rincon from entering the residence and failed to intervene in the actions of the shooting officers.

93. Evans, Dalton, and Zamorski did not have probable cause, a search warrant, nor the valid consent of Ethan or of his parents to enter the home. Taborda knew that her fellow officers did not have probable cause, a search warrant, nor the consent of Ethan's parents to enter the Rincon residence. The Defendant Officers did not have probable cause or an arrest warrant to arrest Ethan. There were no exigent circumstances allowing Evans, Dalton, and, Zamorski to enter the residence and/or arrest Ethan.  Ethan was home alone and the Defendants were aware of that fact.  Taborda failed to take any action to prevent her fellow officers from illegally entering the Rincon residence and shooting Ethan unjustifiably.

94. Ethan did not take any action that objectively or subjectively could have been perceived as posing any threat to the safety of MDPD Officers or anyone else.

95. Without legal justification, Evans, Dalton, and Zamorski forcibly entered the Rincon home and once therein suddenly shot and killed Ethan without cause.  Taborda did nothing, despite her ability to do so, to prevent the illegal entry into the home and shooting.

96. Evans, Dalton, and Zamorski used excessive, unreasonable, and unnecessarily dangerous levels of force not reasonably necessary to accomplish the purpose of the moment. Their decisions and actions were in contravention of accepted law enforcement standards relating to: the entry of a structure, dealing with a person suffering from a mental health problem, dealing with a potentially "barricaded" subject, making a routine arrest, and the use of deadly force.

97. The shooting death of Ethan by Evans, Dalton, and Zamorski was the result of an outrageous mishandling of a situation by all four officers present at the residence. At the time of their entry into the Rincon residence, there was no emergency.  The entry, confrontation, and shooting were in violation of clearly established constitutional law under the Fourth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, guaranteeing the rights to be free from unreasonable search and seizure, to be free from cruel and unusual punishment, and the right to due process.

98. Evans, Dalton, Zamorski, and Taborda are not entitled to qualified immunity because no reasonable police officer acting under these circumstances would have entered the residence in the first place, let alone attempt to engage Ethan or resort to the use of deadly force against Ethan as these Defendants did, and any reasonable officer observing such behavior by fellow officers would have intervened and prevented the fellow officers from entering the residence or shooting Ethan.

99. Evans, Dalton, and Zamorksi fired their weapons against Ethan. Their actions, in concert, contributed to the constitutional violations resulting in Ethan's death. Evans, Dalton, and Zamorksi had no lawful right to enter the home and no probable cause to arrest Ethan, especially to make a routine arrest.

100.     While Evans, Dalton, and Zamorski enjoyed the benefit of *Garrity* protection, they were not *prohibited* from giving voluntary statements to FDLE and they failed and refused to do so, triggering an inference of their guilt for pleading and proof purposes. Their failure to cooperate with FDLE and give statements regarding the shooting – now in this civil action – creates an adverse inference against them.  However, one or more of them conveniently leaked to the MDPD spokesperson that Ethan had attacked them with a

pickaxe in order to falsely create a sense in the community – and one that would serve them well with the FDLE and SAO – that this was a justified shooting.

101.     As a direct and proximate result of the acts described herein, Carmen and Carlos Rincon as the Personal Representatives of the Estate of Ethan Rincon, have been damaged as enumerated in section F herein.

102.     Evans's, Dalton's, Zamorski's, and Taborda's actions were willful, wanton, and outrageous and warrant a claim for punitive damages.

**WHEREFORE**, the Plaintiff demands judgment against Defendant MDC Officers Evans, Dalton, Zamorski, and Taborda for their damages, attorney's fees, punitive damages, costs and all other available relief.

## COUNT III - TITLE 42 U.S.C. §1983 - WRONGFUL DEATH RESULTING FROM EXCESSIVE USE OF FORCE AGAINST ETHAN (AS TO DEFENDANT MDC)

103.     Plaintiffs reallege ¶¶ 1 through 76, *supra*, and incorporate them as if fully stated.

104.     At all times material hereto, the Defendant MDC, as shown by the acts and omissions of its employees, including all four MDPD Officers named as Defendants herein, permitted, caused, and tolerated a pattern or practice of unjustified, unreasonable, and illegal searches; illegal arrests; use of excessive force against members of the public; mishandling of in-custody arrestees; and covering-up of misconduct, including by lying and perjury, by police officers of the MDPD.  Although such acts were improper, officers involved were not prosecuted and/or disciplined or otherwise required to undergo retraining.  Some of said incidents were in fact covered up with official claims that their acts were justified and proper.  As a result, the MDPD, including Defendant MDPD Officers, were caused and encouraged to believe that the members of the public could be subjected to unlawful arrests, illegal use of force, mishandling of members of the public

after their arrest, cover-ups, obstruction of justice, lying and perjury, and that said improper or illegal conduct would, in fact, be permitted by the Defendant MDC.

105.     The cited conduct represents a pattern in which citizens were abused, injured, endangered, or killed by the sometimes negligent and other times intentional and/or reckless misconduct of the MDPD's police officers and/or that serious incompetence or misbehavior was widespread throughout the MDPD.

106.     Defendant MDC has maintained a system of review of incidents of abuse of lawful authority such as illegal or excessive use of force and unlawful detentions and/or arrests and/or searches, among other things, as well as the mishandling of in-custody arrestees by police officers; and complaints thereof; cover-ups by he MDPD of police misconduct; lying, perjury, and obstruction of justice by several police officers; a tolerance for untruthfulness by its police officers which has failed to identify the unlawful use of force and/or seizures by failing to appropriately discipline, and/or supervise, and/or retrain, to the extent that it has become the de facto policy and custom of the Defendant MDC to tolerate such acts by its police officers.

107.     Defendant MDC through the MDPD, has maintained a long-standing and widespread history of failing to properly hire, and/or train, and/or supervise, and/or discipline its police officers for, among other things, illegal use of force; unlawful arrests; misconduct in dealing with in-custody arrestees; cover-ups by the MDPD of police misconduct; and a tolerance for untruthfulness by its police officers, even though it had notice of this unlawful conduct by its employees.

108.     The foregoing acts, practices, omissions, policies, or customs of the Defendant MDC caused police officers, including Defendant MDPD Officers, to believe that such

acts such as described, *supra*, would not be investigated or sanctioned, but instead would be tolerated, with the foreseeable result that officers, including Defendant MDPD Officers were more likely to use excessive or improper force, cover-up police misconduct, and make unlawful seizures and arrests.

109.     Ethan was a victim of said abuses of lawful authority, and said illegal acts were the direct result of the previously described pattern of acts, omissions, practices, polices, or customs of the Defendant MDC.

110.     As a direct and proximate result of the acts described above, in violation of the United States Constitution, Ethan´s civil rights were violated. His residence was entered without consent or warrant. He was arrested without probable cause or warrant. He was shot and killed without warning or justification.

111.     Carmen and Carlos Rincon, as the Personal Representatives of the Estate of Ethan Rincon, have suffered damages as enumerated in Section F herein.

**WHEREFORE**, the Plaintiffs demand judgment against Defendant MDC for their damages, attorney's fees, costs, and all other available relief.

## COUNT IV – COMMON-LAW CONSPIRACY CLAIM (AS TO ALL FOUR MDPD OFFICERS)

112.     Plaintiffs reallege ¶¶ 1 through 76, *supra*, and incorporate them as if fully stated.

113.     All four MDPD Officers conspired, confederated, agreed, and collaborated to avoid their exposure to civil, criminal, and administrative liability for this unlawful entry, search, and unjustified shooting.

114.     The objective of the conspiracy was to avoid such liability.

115.     The manner and means of the conspiracy were as follows: the MDPD Officers directly involved in the shooting – Evans, Dalton, and Zamorksi – asserted their *Garrity*

rights and refused to give statements to FDLE or the SAO while Taborda gave materially false statements to FDLE to exonerate her fellow officers. Two components of her statements were false and knowingly false when made and obstructed justice in two critical ways.

116.　　Taborda's first false statement was that Ethan's parents consented to entry of residence. Taborda's second false statement was that there was a loud verbal exchange by and between the MDPD Officers and Ethan before the shooting.

117.　　 Three overt acts to accomplish the conspiracy were: the *Garrity* assertions by Evans, Dalton, and Zamorski; Taborda's false statements to FDLE; and a false claim by one or more of the MDPD Officers to the MDPD spokesperson, that Ethan attacked the MDPD Officers with a pickaxe.

118.　　These overt actions were in furtherance of the conspiracy to deprive Ethan of his constitutional rights.

119.　　Each of the MDC Officers understood, accepted, and either explicitly or implicitly knew that his/her overt actions would result in the deprivation of Ethan's rights as alleged herein.

120.　　As a direct and proximate result of the acts described above, Carmen and Carlos Rincon as the Personal Representatives of the Estate of Ethan Rincon have been damaged as enumerated in Section F herein.

**WHEREFORE**, the Plaintiffs demand judgment against Defendant MDPD Officers for their damages, attorney's fees, costs, and trial by jury for all issues so triable by right.

## COUNT V – STATE TORT-WRONGFUL DEATH CLAIM/HOMICIDE (AS TO DEFENDANTS EVANS, DALTON, AND ZAMORSKI)

121.　　Plaintiffs reallege ¶¶ 1 through 76, *supra*, and incorporate them as if fully stated.

122.     This is an action for damages brought pursuant to the Florida Wrongful Death Act, §§ 768.16 to .26, Florida Statutes. Carmen and Carlos Rincon were named Personal Representatives of Ethan Rincon's Estate, and are Ethan's statutory survivors.

123.     On March 22, 2016, Evans, Dalton, and Zamorski, while acting outside of their discretionary authority with MDPD, engaged in an unnecessarily dangerous confrontation inside the Rincon residence with Ethan, who, at the time was a threat to neither himself nor others.

124.     Evans, Dalton, and Zamorski did not have the consent of Ethan nor of his parents to enter into the home. They did not have probable cause to arrest nor an arrest warrant to cause Ethan's "routine" arrest. They had no search warrant for his residence.

125.     Evans, Dalton, and Zamorski had no reason to believe that there was any clear and present danger posed to anyone because Ethan was home alone and the police were aware of that fact.

126.     Ethan did not take any action that objectively or subjectively could have been perceived as posing any threat to the safety of the MDPD Officers or anyone else.

127.     Without legal justification, Evans, Dalton, and Zamorski forcibly entered the home. Rather than attempt to convince Ethan to come out so that he could be addressed, Evans, Dalton, and Zamorski instead indiscriminately hunted him down and suddenly opened fire on him, killing him without cause or justification.

128.     Evans, Dalton, and Zamorski used excessive, unreasonable, and unnecessarily dangerous levels of force not reasonably necessary to accomplish the purpose of the moment. Their decisions and actions were in contravention of accepted law enforcement

standards relating to the entry of a structure, relating to dealing with a person suffering from a severe mental health problem, and relating to the use of force.

129.     The shooting death of Ethan by Evans, Dalton, and Zamorski was the result of an outrageous mishandling of a situation.

130.     Evans, Dalton, and Zamorski intentionally shot and killed Ethan without justification.  Ethan offered no resistance. Ethan did not give any of these officers reasonable cause to believe that he could inflict serious bodily injury or death upon any of them.

131.     Evans, Dalton, and Zamorski are not entitled to any immunity since no reasonable police officer acting under these circumstances would have entered the residence in the first place, nor attempt to engage Ethan and kill him, as these officers did.

132.     While Evans, Dalton, and Zamorski enjoyed the benefit of *Garrity* protection, they were not *prohibited* from giving voluntary statements to FDLE and they failed and refused to do so, triggering an inference of their guilt. Their failure to cooperate with FDLE and give statements regarding the shooting creates an adverse inference against them in this civil action.

133.     As a direct and proximate result of the acts described herein Carmen and Carlos Rincon as the Personal Representatives of the Estate of Ethan Rincon have been damaged as enumerated in section F herein.

134.     Evans's, Dalton's, and Zamorski's actions were willful, wanton, and outrageous and warrant a claim for punitive damages.

**WHEREFORE**, the Plaintiffs demand judgment against Defendants Evans, Dalton, and Zamorski for their damages, attorney's fees, punitive damages, costs, and all other available relief.

**COUNT VI – STATE TORT – WRONGFUL DEATH – GROSS NEGLIGENCE (AS TO ALL FOUR MDPD OFFICERS)**

135.　　　Plaintiffs reallege ¶¶ 1 through 76, *supra*, and incorporate them as if fully stated.

136.　　　This is an action for damages brought pursuant to the Florida Wrongful Death Act, §§ 768.16 *et seq*, Florida Statutes. Carlos and Carmen Rincon were named Personal Representatives of Ethan Rincon's Estate.

137.　　　MDPD Officers have a common-law duty to exercise reasonable care in carrying out their law-enforcement responsibilities.

138.　　　Defendant MDPD Officers breached that duty when they wrongfully entered the Rincon residence and shot Ethan, resulting in his death.

139.　　　Alternative reasonable means of handling the situation were available to the MDPD Officers.

140.　　　The Defendant MDPD Officers' conduct was more than ordinary neglect. Their conduct was grossly outrageous, reckless, and with total abandon and disregard for Ethan's rights. They had no legal basis to force entry into his home; they had no legal right to search his home.  They had no reason or probable cause to arrest him. They had no justification to use deadly force upon him.

141.　　　As a direct and proximate result of Defendant MDPD Officers' breach of duty, Ethan was killed.

142.　　　As a further direct and proximate result of Defendant MDPD Officers' breach of duty, Carlos and Carmen Rincon as Personal Representatives of the Estate of Ethan Rincon suffered damages as enumerated in Section F herein.

**WHEREFORE,** Plaintiffs, Carlos and Carmen Rincon, seek judgment against Defendants Evans, Zamorski, Dalton, and Taborda and damages as enumerated in Section F herein.

## COUNT VII – STATE TORT CLAIM – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (AS TO ALL MDPD OFFICERS)

143.     Plaintiffs reallege ¶¶ 1 through 76, *supra*, and incorporate them as if fully stated.

144.     Defendant MDPD Officers' conduct was extreme and outrageous and was intentional and/or done recklessly.   Defendants Evans Dalton, Zamorsky, and Taborda were all four informed by Carmen and Carlos Rincon that their son, Ethan, suffered from Asperger's Syndrome, a condition which, as presumably trained police officers, they should have known was a condition on the Autism Spectrum.  Moreover, Carmen and Carlos Rincon told the four individual Defendants that Ethan was likely in his room listening to music and that there were no firearms in the residence.

145.     The MDPD Officers' acts described above went beyond the bounds of human decency, let alone the confines of the law, and were virtually certain to and did in fact result in emotional distress to the Plaintiffs.  Defendant Taborda restrained Carmen and Carlos Rincon at the entrance to the residence, forcing them to remain present but preventing them from entering the home during the time that the three other individual Defendants unlawfully entered the residence with guns drawn.  Carmen and Carlos Rincon were caused to witness and hear the entry into the residence and the subsequent gunfire ending Ethan's life.

146.     As a result of witnessing the unlawful entry, hearing the unlawful gunfire, and being restrained from leaving the entrance of the residence – thus forcing them audibly to witness the death of their son, Ethan, Plaintiffs, Carmen and Carlos Rincon, experienced and continue to experience severe emotional distress.  The experience of being forced to stand by helplessly while their son, Ethan, was assaulted, shot, and killed by three armed police

officers inside of his own home undeniably caused severe and extreme emotional distress on the part of Carmen and Carlos Rincon.

147.    As a direct and proximate cause of Defendant MDPD Officers' conduct, Carmen and Carlos Rincon have suffered severe physical, mental and emotional injuries, and loss of enjoyment of life as heretofore alleged.

148.    At all times relevant hereto Defendant MDPD Officers were acting outside the scope of their authority and in bad faith or with a malicious purpose or in a manner exhibiting wanton and willful disregard of the human rights rendering each individually liable.

149.    Plaintiffs have met all conditions precedent to this action or they have been waived.

**WHEREFORE**, in light of the foregoing, the Plaintiffs, Carmen and Carlos Rincon, individually, pray that this Honorable Court enter judgment against the Defendant MDPD Officers and award compensatory damages for mental pain and suffering as well as punitive damages, along with all other relief the Court deems proper and just.


## <u>JURY TRIAL DEMAND</u>

Plaintiffs demand trial by jury on all counts and on all issues so triable.


Dated this 3rd day of June, 2019.

Respectfully submitted,


By: /s/ Richard Diaz

_____

Richard J. Diaz, Esq.
Richard J. Diaz, P.A.
F.B.N. 0767697

3127 Ponce de Leon Blvd.
Coral Gables, FL  33134
Telephone: (305) 444-7181
Facsimile: (305) 444-8178
Email: rick@rjdpa.com


By: /s/ Roberto Pertierra
_____

Roberto Pertierra, Esq.
Roberto E. Pertierra, P.A.
F.B.N. 616370
2655 S. Le Jeune Road, Suite 1105
Coral Gables, FL  33134
Telephone: (305) 444-0011
Facsimile: (305) 441-2122
Email: pertierrapa@gmail.com


By: /s/ Domingo C. Rodriguez
_____

Domingo C. Rodriguez, Esq.
F.B.N. 394645
RODRIGUEZ LAW OFFICE, LLC.
95 Merrick Way – Suite 720
Coral Gables, FL 33134
Ph: (305) 774-1477
Fax: (305) 774-1075
Email: domingo@rlomiami.com