## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.: 16-22254-CIV-GAYLES/McAliley

CARMEN RINCON and CARLOS RINCON,
as Personal Representatives of the Estate of
Ethan Rincon, deceased,

      Plaintiffs,

v.

MIAMI-DADE COUNTY, *et al.*,

      Defendants.

_____/

### DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' FOURTH AMENDED COMPLAINT AND INCORPORATED MEMORANDUM OF LAW

Defendants, Sergeant Victor Evans, Officer John Dalton, Officer Brian Zamorski, and Officer Marlene Taborda of the Miami-Dade Police Department ("MDPD") (collectively, the "Officers") and Miami-Dade County (the "County") (together with the Officers, "Defendants") hereby move to dismiss all counts—I through VII—of the Fourth Amended Complaint ("Complaint") [ECF No. 96] under Federal Rule of Civil Procedure 12(b)(6).

### INTRODUCTION

On March 22, 2016, Sergeant Evans, Officer Dalton, and Officer Zamorski encountered 21-year old Ethan Rincon ***wielding a pickaxe*** inside his home, and in response to the immediate threat posed by Ethan, discharged their firearms, killing Ethan. They had arrived, along with Officer Taborda, in response to various 911 calls that a subject matching Ethan's description was committing vandalism with a weapon near the Rincon residence in Palmetto Bay, Florida. Moreover, just before the Officers entered the house and encountered the pickaxe-wielding Ethan, they learned from Ethan's parents—Plaintiffs Carmen and Carlos Rincon—that Ethan's parents were attempting to have Ethan involuntarily committed because he had been behaving in an emotionally unstable manner over the previous forty-eight hours.

Now Plaintiffs, although they were ***outside*** the house throughout the incident, dispute what happened inside the house and allege the officers used excessive force in shooting Ethan, along with a host of other claims. For the reasons explained below, Plaintiffs fail to state a claim against the County, and—even at this stage—the Officers are entitled to qualified immunity as to the federal claims against them.

Plaintiffs' Fourth Amended Complaint asserts seven claims in total against five Defendants. Against the County, Plaintiffs assert two claims: Count I, an Americans with Disabilities Act (ADA) claim; and Count III, an excessive force claim brought pursuant to 42 U.S.C. § 1983 under a municipal liability theory (in other words, a *Monell* claim). Against the four Officers, Plaintiffs assert six claims: Count I, an ADA claim; Count II, for excessive force pursuant to 42 U.S.C. § 1983; Count IV, a state law civil conspiracy claim; Count V, a state law wrongful death claim; Count VI, a state law wrongful death claim under a "gross negligence" theory; and Count VII, for intentional infliction of emotional distress.

Defendants move to dismiss the Fourth Amended Complaint in its entirety. And given that this is the ***fifth*** iteration of Plaintiffs' complaint, they should not get any further bites at the apple.

## **LEGAL STANDARD**

To survive a motion to dismiss, a complaint must contain factual allegations which are "enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus, "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* (citations omitted). "Naked assertions devoid of further factual enhancement will not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 557). Rather, the facts in the complaint must be sufficient to

"nudge the[] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Thus, a pleading that offers mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" will not survive dismissal. *Id.*

A pleading fails to meet the basic pleading requirements outlined by the Supreme Court and the Eleventh Circuit if it is peppered with "conclusory allegations, unwarranted deductions of fact [and] legal conclusions masquerading as facts." *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1185 (11th Cir. 2003). "Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Iqbal*, 556 U.S. at 677-79 (quoting *Twombly*, 550 U.S. at 555). Moreover, the Eleventh Circuit has held that for purposes of a Rule 12(b)(6) motion to dismiss, a court does not have to take as true allegations based merely "upon information and belief." *Mann v. Palmer*, 713 F.3d 1306, 1315 (11th Cir. 2013). The Supreme Court has recognized that Rule 8 "marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678-79. A plaintiff cannot deflect an attack on conclusory allegations with a promise to "flesh them out" after discovery. *See Porter v. Ray*, 461 F.3d 1315, 1324 (11th Cir. 2006) ("[T]he discovery rules do not permit the appellants to go on a fishing expedition.").

## **ARGUMENT**

### I.    COUNT I FAILS TO STATE A CLAIM AGAINST THE OFFICERS OR THE COUNTY FOR DAMAGES UNDER THE ADA

Plaintiffs attempt to state a claim for damages under the ADA against *all* Defendants—the County and the Officers—on the basis that the Officers should have interacted differently

with Ethan that night, given his mental health issues, and "[i]t was unreasonable and improper for the MDPD Officers not to recognize that Ethan presented a mental health concern and to pursue alternative means." Fourth Am. Compl. ¶ 83. Plaintiffs allege "[e]ach MDPD Officer had the authority to address the discrimination and other ADA violations but did not." *Id.* ¶ 87. Eleventh Circuit law makes clear that Plaintiffs have failed to state a claim for relief in Count I.

As an initial matter, the ADA claim against the Officers as individuals is not cognizable:

It is well established in this circuit that "[o]nly public entities are liable for violations of Title II of the ADA." *Edison v. Douberly*, 604 F.3d 1307, 1308 (11th Cir. 2010). *See also Mason v. Stallings*, 82 F.3d 1007, 1009 (11th Cir. 1996) ("We hold that the [ADA] does not provide for individual liability, only for employer liability"). Other circuits follow the same rule. *See Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn*, 280 F.3d 98, 107 (2d Cir. 2001); *Alsbrook v. Maumelle*, 184 F.3d 999, 1005 n.8 (8th Cir. 1999) (en banc). . . . Based on these authorities, the district court did not err by dismissing Mr. Mazzola's claims against the defendants in their individual capacities. *See Edison*, 604 F.3d at 1310.

*Mazzola v. Davis*, No. 17-14662, 2019 WL 2438885, at *2–3 (11th Cir. June 11, 2019).

And as to the County, Plaintiffs fail to state a claim for ***damages*** under the ADA. Recent published Eleventh Circuit case law confirms that Count I—which seeks only damages under the ADA, and not injunctive relief—must be dismissed, even at this stage, because Plaintiffs have not stated a plausible claim for monetary relief under the ADA based upon the actions of the Officers that night. *See Silberman v. Miami Dade Transit*, No. 17-15092, 2019 WL 2498231, at *8 (11th Cir. June 17, 2019) (affirming dismissal of complaint for damages under the ADA where allegations were based on point-of-service denials by Miami-Dade employees).

As a threshold issue, it is unclear whether Plaintiffs have even plausibly alleged a violation of the ADA, let alone a claim for damages. To state a claim for violation of Title II of the ADA, a plaintiff must allege that (1) he is a qualified individual with a disability, (2) he was discriminated against by a public entity, and (3) the discrimination was due to the disability. *J.S. ex rel. J.S. v. Hous. Cty. Bd. of Educ.*, 877 F.3d 979, 985 (11th Cir. 2017). Plaintiffs do not

plausibly allege a violation of the ADA because their allegations fail to establish how Ethan was discriminated against on the basis of his disability by the Officers; to the contrary, they seem to be seeking preferential treatment—"alternative means" (¶ 83)—for Ethan. Plaintiffs do not allege a single right that Ethan was afforded under the ADA, and how it was violated. Instead, Plaintiffs assert the legal conclusion: "Ethan's rights under the ADA were violated by all of the Defendants." Fourth Am. Compl. ¶ 88. This allegation is not a factual one, and must be disregarded as conclusory. *See Edwards v. Prime, Inc.*, 602 F.3d 1276, 1291 (11th Cir. 2010).

In fact, both the Supreme Court and the Eleventh Circuit have questioned *whether* police officers can even violate Title II of the ADA in the course of their duties. *See City & County of San Francisco, Calif. v. Sheehan*, 135 S. Ct. 1765, 1778-79 (2015) (Scalia, J., dissenting in part) (noting certiorari was granted to hear "*whether* Title II applies to arrests of violent, mentally ill individuals" – a "controverted question of law that has divided the Circuits" – and not to evaluate a case that *assumed* Title II applied to such arrests); *see also Estate of Osorio v. Miami Dade County*, 717 F. App'x 957, 957 (11th Cir. 2018) ("This court has never addressed whether police officers can violate Title II of the ADA.").

And the Eleventh Circuit *has* cited with approval the Fifth Circuit's holding that Title II does not, in fact, apply to arrests: "Title II does not apply to an officer's on-the-street responses to reported disturbances or other similar incidents . . . prior to the officer's securing the scene and ensuring that there is no threat to human life." *Bircoll v. Miami-Dade County*, 480 F.3d 1072, 1083 (11th Cir. 2007) (emphasis removed) (quoting *Hainze v. Richards*, 207 F.3d 795, 801 (5th Cir. 2000) (holding that the ADA did not govern the actions of the officers, who "already face the onerous task of frequently having to instantaneously identify, assess, and react to potentially life-threatening situations")).

But more importantly, even if Plaintiffs *had* actually alleged a violation of Title II of the ADA, dismissal of Count I is still compelled because Plaintiffs seek **only damages**—not

injucutive relief—under the ADA. *See* Fourth Am Compl. ¶¶ 74, 89.

> ***In the ordinary course, proof of a Title II or § 504 violation entitles a plaintiff only to injunctive relief.*** *Silva v. Baptist Health S. Fla., Inc.*, 856 F.3d 824, 831 (11th Cir. 2017). To get damages—as Silberman seeks here—a plaintiff must clear an additional hurdle: he must prove that the entity that he has sued engaged in intentional discrimination, which requires a showing of "deliberate indifference." *Liese v. Indian River Cty. Hosp. Dist.*, 701 F.3d 334, 348 (11th Cir. 2012).
>
>      "Deliberate indifference," we have said, is an "exacting standard." *J.S.*, 877 F.3d at 987. It requires proof that "the defendant knew that harm to a federally protected right was substantially likely and . . . failed to act on that likelihood." *Liese*, 701 F.3d at 344 (citation omitted). Moreover, in order to hold a government entity liable, the plaintiff must demonstrate that an "official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the [entity's] behalf" had "actual knowledge of discrimination in the [entity's] programs and fail[ed] adequately to respond." *Id.* at 349 (quoting *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998)). To qualify, that "official" must be "high enough up the chain-of-command that his [or her] acts constitute an official decision by the [entity] not to remedy the misconduct." *J.S.*, 877 F.3d at 987 (internal quotation marks omitted).

*Silberman*, 2019 WL 2498231, at *6 (emphasis added; alterations in original); *see also Estate of Osorio v. Miami-Dade County*, 717 F. App'x 957, 958 (11th Cir. 2018) (affirming dismissal of ADA claim for damages where allegations relating solely to Miami-Dade police officers "failed to specify a single official who allegedly had authority to address the alleged discrimination, much less knowledge of and deliberate indifference to the alleged discrimination").

The Eleventh Circuit's published decision in *Silberman* reaffirms that Plaintiffs' claim for damages is not viable, even at the motion to dismiss stage. In *Silberman*, as here, the plaintiff sought only damages, not injunctive relief, under the ADA against the County. And in *Silberman*, as here, the plaintiff's claim for damages was based on allegations that rank-and-file employees were "officials" for deliberate indifference purposes, and that these "officials" had violated the ADA through their interaction with the plaintiff. *See Silberman*, 2019 WL 2498231, at *5-9. In *Silberman*, as here, Plaintiffs' "argument proves too much." *Id.* at 8.

Like in *Silberman*, Plaintiffs' allegations regarding rank-and-file employees at a point of service do not state a plausible claim for damages. Plaintiffs' allegations in support of their claim for damages under the ADA relate *solely* to actions taken by (1) the Officers (2) *that night*. *See* Fourth Am. Compl. ¶¶ 77-89. "Missing here are the key ingredients that have come to define the *Liese* test—namely, the action (or inaction) of an individual with 'substantial supervisory authority' within [the Department's] 'chain of command' who knows that discrimination has taken place and is in a position to do something about it." *Silberman*, 2019 WL 2498231, at *8 (quoting *Liese*, 701 F.3d at 350). Plaintiffs do not state a claim for damages under the ADA, and given that this is the only relief sought in Count I, it must be dismissed.

## II.   THE OFFICERS ARE ENTITLED TO QUALIFIED IMMUNITY ON PLAINTIFFS' EXCESSIVE FORCE CLAIM IN COUNT II

Plaintiffs cannot state a claim for excessive force against the Officers in Count II because they are entitled to qualified immunity. The doctrine of qualified immunity shields a public official acting within his discretionary authority from civil liability unless he has violated a federal statutory or constitutional right and the unlawfulness of his conduct was clearly established at the time. *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018). "That qualified immunity protects government actors is the usual rule; only in exceptional cases will government actors have no shield against claims made against them in their individual capacities." *Redd v. City of Enterprise*, 140 F.3d 1378, 1382 (11th Cir. 1998) (citation omitted); *see also Alexander v. Univ. of N. Fla.*, 39 F.3d 290, 291 (11th Cir. 1994) ("qualified immunity for government officials is the rule, liability and trials for liability the exception"). "[Q]ualified immunity questions should be resolved at the earliest possible stage of a litigation." *Anderson v. Creighton*, 483 U.S. 635, 646 (1987).

Qualified immunity is a "muscular doctrine" grounded on the premise that "officials can act without fear of harassing litigation only when they can reasonably anticipate—before they act

or do not act—if their conduct will give rise to damage liability for them." *Foy v. Holston*, 94 F.3d 1528, 1534 (11th Cir. 1996). "The 'breathing room' afforded by qualified immunity is generous; . . . 'it protects all but the plainly incompetent or those who knowingly violate the law.'" *Estate of Cummings v. Davenport*, 906 F.3d 934, 940 (11th Cir. 2018) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)). It also "gives ample room for mistaken judgments." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quotations omitted). "This accommodation for reasonable error exists because officials should not err always on the side of caution because they fear being sued." *Gold v. City of Miami*, 121 F.3d 1442, 1445 (11th Cir. 1997) (citation omitted).

To be entitled to qualified immunity, a defendant must first establish that he was acting within the scope of his discretionary authority. *See Gray ex rel. Alexander v. Bostic*, 458 F.3d 1295, 1303 (11th Cir. 2006); *Dalrymple v. Reno*, 334 F.3d at 991, 995 (11th Cir. 2003). The defendant satisfies this burden if he shows that his actions were "(1) undertaken pursuant to the performance of his duties, and (2) within the scope of his authority." *Estate of Cummings*, 906 F.3d at 940 (citation omitted). In this instance, there can be no legitimate question that responding to the home of a vandalism suspect for the purpose of investigating or effecting an arrest is within the scope of discretionary authority of a police officer. Each of the Officers was "performing a legitimate job-related function (that is, pursuing a job-related goal) . . . through means that were within his power to utilize." *Estate of Cummings*, 906 F.3d at 940. Thus, the burden shifts to Plaintiffs, who bear the burden to show that the Officers are *not* entitled to qualified immunity. *Alcocer v. Mills*, 906 F.3d 944, 951 (11th Cir. 2018). Their claims risk dismissal unless the facts as alleged show (1) that the Officers' conduct violated a constitutional or statutory right; and, if so, (2) that such a right was clearly established at the time of that conduct. *Baas v. Fewless*, 886 F.3d 1088, 1093 (11th Cir. 2018).

Plaintiffs cannot meet their burden to abrogate the Officers' entitlement to qualified immunity on the excessive force claim. They cannot show that the Officers' conduct violated the

8

Fourth Amendment because the Officers were forced to make a split-second decision to use force when they confronted Ethan holding a pickaxe inside the house. Ethan, armed with a deadly weapon, posed a very real threat of serious physical harm to the Officers. Under these circumstances, the use of force was objectively reasonable, so, as a matter of law, the Officers are entitled to qualified immunity because their use of force did not violate Ethan's constitutional rights. The Officers are also entitled to qualified immunity because they violated no clearly established right.

### A. The § 1983 claim against Officer Taborda in Count II fails as a matter of law.

Officer Taborda was not one of the shooting officers, and Plaintiffs' allegations regarding Officer Taborda's involvement in this incident fall far short of stating a claim for excessive force. As an initial matter, there is no actual force alleged to have been used by Officer Taborda. *See* Fourth Am. Compl. ¶¶ 90-102.  On its face, a claim for excessive force on Officer Taborda falls flat. But even generously construing the allegations against Officer Taborda as a claim for "failure to intervene," Plaintiffs' allegations do not state a claim against Officer Taborda.

First, for the reasons that follow, Plaintiffs have not shown that the shooting officers committed a constitutional violation. "[A] duty to intervene only arises if a constitutional violation occurs in another officer's presence." *Gainor v. Douglas County, Georgia*, 59 F. Supp. 2d 1259, 1289 (N.D. Ga. 1998) (citing *Byrd v. Clark*, 783 F.2d 1002, 1007 (11th Cir. 1986)). "[B]ecause there was no constitutional violation, there was no duty to intervene." *Id.*

Second, even if a constitutional violation had occurred, Plaintiffs' allegations do not establish that Officer Taborda had a reasonable opportunity to intervene. "An officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force, can be held liable for his nonfeasance." *Hadley v. Gutierrez*, 526 F.3d 1324, 1330 (11th Cir. 2008) (citation omitted). "***But it must also be true that the non-***

*intervening officer was in a position to intervene yet failed to do so.*" *Id.* at 1331 (emphasis added; citation omitted). Here, Plaintiffs' allegations admit that Officer Taborda did not enter the Rincon residence and was therefore not present at the time of the shooting. *See* Fourth Am. Compl. ¶ 48 ("Only Evans, Dalton, and Zamorski participated in and witnessed the shooting. Defendant Taborda did not see the shooting as she was restraining the Plaintiffs at the front door of the residence."). Given that Officer Taborda was not present for the shooting, she was clearly not in a position to intervene. Accordingly, Officer Taborda is entitled to qualified immunity as to Plaintiffs' claim against her—whether construed as an excessive force claim or a claim for failure to intervene. *See Hadley*, 526 F.3d at 1331 ("Hadley presented no evidence from which a reasonable jury could find that Gutierrez *could have anticipated and then stopped* Ortivero from punching Hadley once in the stomach. Therefore, the district court erred in denying qualified immunity to Officer Gutierrez because he committed no constitutional violation."); *see also Marantes v. Miami-Dade County*, 649 F. App'x 665, 672 (11th Cir. 2016) ("Marantes did not allege any facts that would allow us to conclude that the officers had time and were in a position to intervene.").

**B. The Officers' use of deadly force is justified because they had arguable probable cause to believe that Ethan posed a threat of death or serious physical harm to them.**

It is by now settled law that excessive force claims are analyzed "under the Fourth Amendment's 'objective reasonableness' standard." *Salvato v. Miley*, 790 F.3d 1286, 1293 (11th Cir. 2015). "[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 388 (1989). "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment

10

interests against the countervailing governmental interests at stake." *Id.* at 396 (citations and internal quotation marks omitted). So too in the deadly force context, "[r]easonableness is dependent on all the circumstances relevant to an officer's decision to use deadly force." *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 821 (11th Cir. 2010).

The Eleventh Circuit has distilled from *Graham* three factors to assist in analyzing the facts and circumstances of a particular case: "the severity of the crime at issue, whether the suspect pose[d] an immediate threat to the safety of the officers or others, and whether he [] actively resist[ed] arrest or attempt[ed] to evade arrest by flight." *Crenshaw v. Lister*, 556 F.3d 1283, 1290 (11th Cir. 2009) (quoting *Graham*, 490 U.S. at 396). The second of these factors, and the most significant one here, "can be reduced to a single question: whether, given the circumstances, [the suspect] would have appeared to reasonable police officers to have been gravely dangerous." *Penley v. Eslinger*, 605 F.3d 843, 850 (11th Cir. 2010) (citation and internal quotation marks omitted). A police officer may use deadly force "to dispel a threat of serious physical harm to either the officer or others." *Singletary v. Vargas*, 804 F.3d 1174, 1181 (11th Cir. 2015). "[I]t is reasonable, and therefore constitutionally permissible, for an officer to use deadly force when he has 'probable cause to believe that his own life is in peril.'" *Id.* (quoting *Robinson v. Arrugueta*, 415 F.3d 1252, 1256 (11th Cir. 2005)).

The circumstances and events an officer faced "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Manners v. Canella*, 891 F.3d 959, 973 (11th Cir. 2018) (quoting *Graham*, 490 U.S. at 396). "Perspective . . . is crucial to the analysis: '[t]he only perspective that counts is that of a reasonable officer on the scene at the time the events unfolded.'" *Jean-Baptiste*, 627 F.3d at 821 (quoting *Garczynski v. Bradshaw*, 573 F.3d 1158, 1166 (11th Cir. 2009)). When examining whether an officer's use of deadly force is reasonable, courts are mindful that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the

11

amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97; *see also Ryburn v. Huff*, 565 U.S. 469, 477 (2012) (per curiam) (highlighting the "wise admonition that judges should be cautious about second-guessing a police officer's assessment, made on the scene, of the danger presented by a particular situation"). It is important to note that immunity from a Fourth Amendment claim requires only that the officer "have *arguable* probable cause, not actual probable cause." *Garczynski*, 573 F.3d at 1167 (emphasis added). Accordingly, these Officers are entitled to qualified immunity "if [they] 'reasonably could have believed that probable cause existed, in light of the information [they] possessed,' to shoot [Ethan], even if that belief was mistaken." *Jean-Baptiste*, 627 F.3d at 821 (quoting *Garczynski*, 573 F.3d at 1167).

A reasonable officer on the scene would have had arguable probable cause to believe his life was in danger at the time the Officers shot Ethan. Accepting Plaintiffs' well-pleaded allegations as true, here is the situation the Officers faced at the time of the incident. For starters, it was night. Compl. ¶ 18. Before they entered the house, the Officers knew that a suspect matching Ethan's description had been damaging personal property in the neighborhood. *Id.* ¶¶ 18-19. They had been told not only that Ethan suffered from a mental illness and had been behaving in an emotionally unstable manner over the previous forty-eight hours, but also that his behavior was so serious, the family was in the process of filing a Baker Act petition to have Ethan held for an involuntary mental examination. *Id.* ¶¶ 22-23. The Officers did not know whether Ethan was alone inside the house, whether any other individual was inside, or what was taking place inside the house at that moment.[1] When they entered the house, there was "absolute silence" inside. *Id.* ¶ 26. They walked directly toward Ethan's bedroom, which was only fifteen

---

[1] Plaintiffs try to state as fact that "no crime was in progress," that "Ethan was alone in the house," and that "there were no signs of Ethan having any intent to escape" (Compl. ¶ 26), but given Plaintiffs' admissions that they (1) were not home preceding this incident, (2) were not together preceding this incident as they arrived separately on scene, and (3) arrived after the Officers did (*id.* ¶ 21), these allegations are entirely speculative.

to twenty steps away from the front door, so the passage of time between entry and confrontation was markedly brief. *Id.* ¶ 39. Ethan's bedroom is located at the vertex of two hallways, so the Officers were in a confined space. *Id.* ¶ 38. And the door to Ethan's bedroom opened only 70 degrees at the most, further restricting the space the Officers had to maneuver should they have needed to access the bedroom. *Id.* ¶ 50. When they finally saw Ethan, they found him standing inside his room *holding a pickaxe. Id.*[2] Considering the time of night, the "absolute silence" inside the house, the knowledge that the individual they were looking for was mentally ill and emotionally unstable, and the exceedingly short time that elapsed between the Officers' entry and their discovery of Ethan, a reasonable officer would feel surprise and fear coming upon that individual holding a pickaxe inside his bedroom, just a few feet away. A reasonable officer, forced to make a split-second decision, would have arguable probable cause to use deadly force, believing that his life was in peril. *See Singletary*, 804 F.3d at 1181.

Plaintiffs' allegation that "it was not possible for Ethan to wield a pickaxe in any menacing way within the confined space of his bedroom" (Compl. ¶ 50), does not change the conclusion that Ethan "present[ed] . . . an imminent threat" and "would have appeared to reasonable police officers to have been gravely dangerous." *Penley*, 605 F.3d at 851. Accepting as true the allegation that Ethan did not "attack" the Officers, "the legal premise that no reasonable officer could have feared serious injury or death unless the [pickaxe]-holding hand was raised up at the time is wrong." *Shaw v. City of Selma*, 884 F.3d 1093, 1099 (11th Cir. 2018). In *Shaw*, the Eleventh Circuit held that a police officer did not use excessive force when he shot a 74-year-old man who wielded a hatchet, despite assuming that the man did not *raise* the hatchet at the time the officer fired. At the time of that shooting, the man (Shaw) was "within a few feet" of the officer and "could have raised the hatchet in another second or two and struck

---

[2] Critically, Plaintiffs dispute only Sergeant Evans's statement that Ethan "attacked" them with a pickaxe; they do not contest that Ethan possessed a pickaxe inside his bedroom at the time he was shot, or even that he was **holding the pickaxe at the time he was shot**. See Compl. ¶¶ 41, 47-48, 50.

[the officer] with it. Whether the hatchet was at Shaw's side, behind his back, or above his head doesn't change that fact." *Id.* at 1100. The court found the shooting justified because "a reasonable officer could have believed that Shaw posed a threat of serious physical injury or death at that moment." *Id.* A reasonable officer could have believed that Ethan posed a similar threat at the moment the Officers came upon him, given the reports of his emotional instability, the enclosed space in which Ethan and the Officers were located, the short distance between them, and the fact, which cannot be understated, that he was *armed with a pickaxe inside a house*. An individual holding a deadly weapon who could be perceived by a reasonable officer as "lying in wait" confronts that officer with "more than a possibility of harm," and justifies the use of deadly force. *Jean-Baptiste*, 627 F.3d at 822.

The few factual differences between the incident in *Shaw* and this incident serve to bolster the applicability of *Shaw*'s holding to these facts. The incident there took place almost entirely outside, in the middle of the afternoon, over the course of two minutes. Once the elderly Shaw picked up the hatchet, he first "slowly walk[ed] away" from the officers while they trailed him down the street from some distance; it wasn't until the very end of the encounter that he stopped, turned around, and walked toward the shooting officer. *Shaw*, 884 F.3d at 1097. The court nevertheless found that Shaw presented an imminent threat to the officers, which justified the shooting.

Compared to the circumstances the officers faced in *Shaw*, the Officers here were meaningfully restricted in both space and time. The *Shaw* officers had much more room to tactically maneuver, on public streets in broad daylight, than the Officers here had standing in a perpendicular dead-end of confined residential hallways at night. The *Shaw* officers also had more time to observe and react to 74-year-old Shaw's movements than the split-second the Officers had to react to the threat 21-year-old Ethan posed. The officers there were never surprised by Shaw's movements—holding the hatchet, he walked slowly away from them, then

14

stopped, turned around, and walked slowly toward them; the entire encounter they had sight on both Shaw and the hatchet. Here, however, a reasonable officer would have been surprised to find Ethan standing in his bedroom holding a pickaxe. In all, the dispositive issue for the *Shaw* court was the "presence of an imminent threat" at the time of the shooting, which is precisely what the Officers faced—and what a reasonable officer would've faced—here. 884 F.3d at 1099 (quoting *Penley*, 605 F.3d at 851).

Shaw underscores what the Eleventh Circuit has made exceedingly clear for over a decade: "the law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect." *Long v. Slaton*, 508 F.3d 576, 581 (11th Cir. 2007); *see also Scott v. Harris*, 550 U.S. 372, 385 (2007) (stating that police officers dealing with a suspect armed with a deadly weapon are not required to wait "and hope[] for the best"). Given the short distance between Ethan and the Officers, *even before* taking into account that the length of a pickaxe and the reach of the arm holding it would drastically reduce that distance, if not completely eliminate it, "[t]he officers were not required to wait and see if [Ethan] remained stationary" before firing. *Garczynski*, 573 F.3d at 1167. Under the circumstances, the Officers' use of force was objectively reasonable, and Plaintiffs cannot show that no reasonable officer would not have had at least arguable probable cause to use deadly force in response to what he perceived as a serious threat of physical harm.

Several other allegations in the pleading merit scrutiny. First, Plaintiffs assert, in a conclusory manner, that the Officers "had no reason to believe that Ethan was a danger to anyone, including himself." Compl. ¶ 26. Plaintiffs do not plausibly allege what the Officers perceived or thought because "[t]he state of mind of the defendant who commits a wrong is, more often than not, solely within the knowledge of that actor." *Prosper v. Martin*, No. 17-20323, 2018 WL 3084062, at *2 (S.D. Fla. June 21, 2018) (quoting *Alassar v. City of Homewood*, No. 10-2100, 2010 WL 11565396, at *3 (N.D. Ala. Nov. 23, 2010)); *see also id.*

(refusing to consider "conclusory allegations such as 'Defendant Officer did not perceive the Decedent as engaged in any violent or threatening act'").

Second, Plaintiffs go into some detail about a "reconstruction of the scene of the shooting" that they believe "admits of only one conclusion: Ethan was well *inside* his bedroom at the time he was shot and killed, notwithstanding the fact that he posed no clear and present danger of serious bodily injury or death." Compl. ¶ 49. The court's decision in *Prosper* demonstrates that allegations like this one cannot be considered in ruling on a motion to dismiss. In *Prosper*, despite the fact that the officer was the only living witness to the incident, the plaintiff's personal representative attempted to allege in her complaint that, immediately prior to the shooting, the decedent "was either on his knees or stomach when Defendant Officer approached." *Prosper*, 2018 WL 3084062, at *3. The court refused to accept this allegation. It was not "supported by a factual basis establishing Plaintiff's knowledge of the event as described," because the personal representative was not present at the scene of the incident and she stated no basis for her knowledge as to what transpired. *Id.* The court highlighted the personal representative's deficient allegations in a way that could just as easily describe Plaintiffs'. Indeed, if you change the names of the parties involved, it might as well be describing them:

> Plaintiff[s] do[] not state in the [Complaint] the facts [they] allege, such as [Ethan] did not engage in any threatening act, are peculiarly within the possession and control of [the Officers], and [they] ha[ve] not pled any other basis for knowing what happened during the confrontation between [the Officers] and [Ethan]. . . . By failing to allege any basis for [their] knowledge, Plaintiff[s] ha[ve] not "nudged [their] claims across the line from conceivable to plausible" as federal pleading standards require.

*Id.* (quoting *Twombly*, 550 U.S. at 570). Any allegation purporting to claim that Ethan did not pose a threat cannot be considered, as Plaintiffs have no basis of knowledge to claim that he didn't.

Next, Plaintiffs try to make much of the statement that Ethan, whether he committed the reported vandalism or not, was not committing a crime at the time of the shooting. *See* Compl. ¶¶ 19, 20, 26. Notwithstanding that this allegation is deficient for the same lack of knowledge just discussed, *Shaw* eviscerates Plaintiffs' argument: "If a reasonable officer could have believed that under the circumstances [Ethan] posed a threat of inflicting serious injury or death on him, the shooting was objectively reasonable regardless of whether [Ethan] had already committed a crime or was resisting or attempting to evade arrest." 884 F.3d at 1099 n.5.

Finally, Plaintiffs' continued insistence on what they perceive to be the "unlawfulness" of the Officers' entry into the house (*see* Compl. ¶¶ 1, 4, 27, 35, 92) seems to suggest an attempt by Plaintiffs to rely on a now-defunct "provocation" rule, which in some jurisdictions previously permitted an excessive force claim "where an officer intentionally or recklessly provoke[d] a violent confrontation, if the provocation is an independent Fourth Amendment violation," such as an unlawful search. *Billington v. Smith*, 292 F.3d 1177, 1189 (9th Cir. 2002). Whatever the viability of such a rule might have been in the Eleventh Circuit at some point in time, it is a nullity nationwide following the Supreme Court's decision in *County of Los Angeles v. Mendez*, 137 S. Ct. 1539 (2017). There, the Ninth Circuit had held that police officers' *reasonable* use of force—shooting an individual who pointed a BB gun at them—became *unreasonable* because the officers had "intentionally and recklessly brought about the shooting" by entering the plaintiff's residence without a warrant. *Id.* at 1545-46. The Supreme Court unanimously rejected the Ninth Circuit's provocation rule as an impermissible conflation of distinct Fourth Amendment claims:

> [T]he objective reasonableness analysis must be conducted separately for each search or seizure that is alleged to be unconstitutional. An excessive force claim is a claim that a law enforcement officer carried out an unreasonable seizure through a use of force that was not justified under the relevant circumstances. ***It is not a claim that an officer used reasonable force after committing a distinct Fourth Amendment violation such as an unreasonable entry.***

*Id.* at 1547 (emphasis added). In the wake of *Mendez*, Plaintiffs' allegations about an unreasonable entry into the house are irrelevant to an excessive force analysis. (In fact, they should be stricken because Plaintiffs do not raise an unreasonable search claim.) Plaintiffs have failed to state a constitutional violation. Their excessive force claim should be dismissed on qualified immunity grounds.

### C. Even if Plaintiffs had alleged a constitutional violation, Plaintiffs cannot show that the Officers' conduct under the circumstances violated a clearly established right.

"[C]learly established law must be 'particularized' to the facts of the case." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam) (quoting *Anderson*, 483 U.S. at 640). In their meager attempt to define clearly established law, Plaintiffs can muster only an allegation that the Officers violated "clearly established constitutional law under the Fourth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, guaranteeing the rights to be free from unreasonable search and seizure, to be free from cruel and unusual punishment, and the right to due process." Compl. ¶ 100. This falls far short of Plaintiffs' burden, which requires them to identify a case "where an officer acting under similar circumstances as [the Officers] was held to have violated the Fourth Amendment." *White*, 137 S. Ct. at 552.

"Use of excessive force is an area of the law 'in which the result depends very much on the facts of each case,' and thus police officers are entitled to qualified immunity unless existing precedent '*squarely governs*' the specific facts at issue." *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (per curiam) (emphasis added) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 309 (2015) (per curiam)). The Supreme Court over the last eight years has consistently granted qualified immunity to officers in cases where plaintiffs and courts tried to define clearly established law "at a high level of generality." *al-Kidd*, 563 U.S. at 742; *see also City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019); *Kisela*, 138 S. Ct. at 1152; *Wesby*, 138 S. Ct. at 590; *White*, 137 S. Ct. at 552; *Mullenix*, 136 S. Ct. at 308; *Sheehan*, 135 S. Ct. 1775-76; *Plumhoff v. Rickard*, 572

U.S. 765, 779 (2014). "If case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant." *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1557 (11th Cir. 1993), *modified*, 14 F.3d 583 (11th Cir. 1994).

The pleading here, which cites no more than the bare text of constitutional amendments and calls that law "clearly established," has contravened the settled principle of requiring *specificity* in defining clearly established law. "Such specificity is especially important in the Fourth Amendment context, where the Court has recognized that '[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.'" *Mullenix*, 136 S. Ct. at 308 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)). "[I]t does not suffice for a court," or a party for that matter, "simply to state that an officer may not use unreasonable and excessive force." *Kisela*, 138 S. Ct. at 1153. Plaintiffs have not a single case, so they cannot abrogate the Officers' entitlement to qualified immunity. Count II should be dismissed with prejudice.

## III.   PLAINTIFFS FAIL TO STATE A CLAIM FOR MUNICIPAL LIABILITY IN COUNT III.

Local governments cannot be held vicariously liable for the actions of their employees when their agents or employees have caused a constitutional injury. *See Monell v. Dep't of Social Servs.*, 436 U.S. 658, 691 (1978) ("[W]e conclude that a municipality cannot be held liable solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory."); *see also City of Canton v. Harris*, 489 U.S. 378, 385 (1989) ("*Respondeat superior* or vicarious liability will not attach under § 1983."); *Grech v. Clayton County*, 335 F.3d 1326, 1329 (11th Cir. 2003) (en banc) ("A county's liability under § 1983 may not be based on the doctrine of respondeat superior."); *Skop v. City of Atlanta*, 485 F.3d 1130, 1145 (11th Cir. 2007) ("[I]t is by now axiomatic that in order to be held liable for a §1983 violation, a

municipality must be found to have *itself* caused the constitutional violation at issue; it cannot be found liable on a vicarious liability theory.").

A plaintiff has "two methods by which to establish a county's policy: identify either (1) an officially promulgated county policy or (2) an unofficial custom or practice of the county shown through the repeated acts of a final policymaker for the county." *Grech*, 335 F.3d at 1329. Perhaps recognizing that "a county rarely will have an officially-adopted policy of permitting a particular constitutional violation," *id.* at 1330, Plaintiffs wisely do not attempt to allege municipal liability based on policy. They therefore must travel the custom route.

"To prove § 1983 liability against a municipality based on custom, a plaintiff must establish a widespread practice [of violating the Constitution] that, 'although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a "custom or usage" with the force of law.'" *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1481 (11th Cir. 1991) (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)). Only a thoroughly engrained pattern of unconstitutional conduct will satisfy this standard so as to ensure that "a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." *Craig v. Floyd County*, 643 F.3d 1306, 1310 (11th Cir. 2011) (quoting *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 403-04 (1997)). This pattern of unconstitutional conduct "is ordinarily necessary" to demonstrate that the municipality has had "such a longstanding and widespread practice [that it] is deemed authorized by the policymaking officials because they must have known about it but failed to stop it." *Id.* (citations and internal quotation marks omitted).

The Fourth Amended Complaint does not plausibly allege that the County had an unofficial custom or practice of violating the Constitution by using excessive force. Plaintiffs assert essentially three allegations (or groups of allegations) in support of their custom claim: (1)

descriptions of five recent officer-involved incidents that resulted in shootings (Compl. ¶¶ 60, 62-65; (2) descriptions of previous federal litigation involving the County and its officers where excessive force was alleged (*id.* ¶¶ 53-59); and (3) that Officer Dalton's, Officer Zamorski's, and Sergeant Evans's employee profiles reveal that in the past two decades they were named in excessive force complaints (*id.* ¶ 68). Each of these allegations fails, as a matter of law, to support a custom finding.

**A.  The wealth of legal conclusions and conclusory allegations must be excised.**

Before the Court proceeds to any analysis of the substance of the municipal liability claim, the Complaint's <u>numerous</u> "conclusory allegations, unwarranted deductions of fact [and] legal conclusions masquerading as facts" must be identified and disregarded. *Davila*, 326 F.3d at 1185. In this Circuit, a court evaluating the sufficiency of a complaint employs a two-step framework. *McCullough v. Finley*, 907 F.3d 1324, 1333 (11th Cir. 2018) (citing *Iqbal*, 556 U.S. at 679). It first identifies allegations that are no more than conclusions, which are not entitled to the assumption of truth, and disregards them. *Id.* It then assumes the veracity of the remaining factual allegations and determines whether they plausibly give rise to an entitlement to relief. *Id.*

In multiple instances, Plaintiffs baldly assert legal conclusions. *See* Compl. ¶¶ 52, 61, 68, 69. Most egregiously, paragraphs 104 through 110 are nothing but a diatribe of conclusory allegations and legal conclusions littered with references to the elements of a municipal liability claim. This Court has disregarded conclusions like these before. In *Fernandez v. School Board of Miami-Dade County*, No. 15-21915, 2015 WL 9474616 (S.D. Fla. Dec. 29, 2015) (Gayles, J.), the plaintiffs, who were asserting a *Monell* claim against the School Board based on custom, alleged that the constitutional violations they suffered "resulted from an unofficial custom or practice of the School Board of Miami-Dade County." *Id.* at *4. This Court balked at that allegation and dismissed the claim: "This conclusory assertion is precisely the type of allegation that this Court has been directed to disregard under *Twombly* and *Iqbal*." *Id.* The Court should rule consistently

here. The "bare assertions" contained in these paragraphs "amount to nothing more than a 'formulaic recitation of the elements' of a [municipal liability] claim." *Iqbal*, 556 U.S. at 681 (quoting *Twombly*, 550 U.S. at 551).[3]

These allegations—and the others described above—are not entitled to any assumption of truth. The County urges this Court to clear away this distracting underbrush in order to more fully view the dearth of facts supporting Plaintiffs' municipal liability claim.

**B. The officer-involved incidents that took place in 2018 are immaterial to a custom claim because they both post-date this incident and involve dissimilar facts.**

A plaintiff cannot establish a *Monell* claim if he cannot point to ***prior*** incidents of unconstitutional conduct involving **similar facts**. *Mercado v. City of Orlando*, 407 F.3d 1152, 1162 (11th Cir. 2005). "[C]ontemporaneous or subsequent conduct cannot establish a pattern of violations that would provide notice to the [municipality] and the opportunity to conform to constitutional dictates . . . ." *Connick v. Thompson*, 561 U.S. 51, 63 n.7 (2011) (citation and internal quotation marks omitted). Without allegations evincing a pattern or practice of unconstitutional conduct that predates the incident here, it is impossible for Plaintiffs to establish that the municipality's "deliberate conduct . . . was the 'moving force' behind [his] injuries." *McDowell v. Brown*, 392 F.3d 1283, 1292 (11th Cir. 2004) (emphasis removed) (quoting *Bd. of Cty. Comm'rs*, 520 U.S. at 404); *see also Nix v. Ayers*, No. 16-3435, 2018 WL 3391213, at *1 (M.D. Fla. May 15, 2018) (dismissing *Monell* claim where plaintiff failed to show "a history of

---

[3] A number of other cases in this District have been disposed of on similar grounds. *See, e.g., Casado v. Miami-Dade County*, 340 F. Supp. 3d 1320, 1328 (S.D. Fla. 2018) (rejecting as conclusory under *Twombly* and *Iqbal* plaintiff's allegation that "these patterns, and implied or explicit policies have been ratified by the highest decision maker of the [County's] government leadership including the police, the chief, the mayor, city commissioners and/or high officials within the police department itself or other departments."); *Lordeus v. Miami-Dade County*, 263 F. Supp. 3d 1307, 1310 (S.D. Fla. 2017) (dismissing *Monell* claim); *Vila v. Miami-Dade County*, 65 F. Supp. 3d 1371, 1378 (S.D. Fla. 2014) ("The vast majority of Plaintiff's 'custom or policy' allegations are simply recitations of the elements of a section 1983 cause of action without any supporting facts. Such conclusory allegations 'carry no weight' in the Court's analysis, because '[c]onclusory allegations fail to apprise defendants of the factual basis of the plaintiff's claims.'" (quoting *Franklin v. Curry*, 738 F.3d 1246, 1250-51 (11th Cir. 2013)).

prior incidents similar to those at issue here"); *Asia v. City of Miami Gardens*, No. 14-20117, 2016 WL 739656, at *8 (S.D. Fla. Feb. 25, 2016) (same); *Davis v. McCarthy*, No. 15-0138, 2015 WL 5853662, at *9 (S.D. Ala. Aug. 26, 2015) (same); *Whitaker v. Miami-Dade County*, 126 F. Supp. 3d 1313, 1321 (S.D. Fla. 2015) (same); *cf. Depew v. City of St. Marys*, 787 F.2d 1496, 1501 (11th Cir. 1986) (holding that trial evidence that "revealed sufficient prior incidents where the police had used excessive force to put the city on notice" was "sufficient to support a finding that the city's officials implicitly ratified a custom which resulted in plaintiffs' injuries").

This timing requirement eliminates all of the officer-involved incidents Plaintiffs reference in paragraphs 62 through 65, each of which allegedly occurred in 2018—well after the date of this incident in March 2016. *See Simmons v. Bradshaw*, 879 F.3d 1157, 1168 (11th Cir. 2018) (affirming district court's "thorough" finding that the plaintiff "failed to demonstrate *prior* constitutional violations with respect to [municipality's] officer-involved shootings" (emphasis in original)).0, which involves a completely different universe of facts than does this case: a prolonged police chase pursuing an individual who, following a robbery of a Walgreens, shot a police officer and stole his patrol car; officers later shot the individual after he got into an accident in a second car he drove after he abandoned the stolen patrol car. *See* Compl. ¶ 60. Plaintiffs' allegations about these incidents do not support a *Monell* claim.

**C. The prior cases Plaintiffs cite are immaterial to a custom claim.**

Plaintiffs attempt to support a finding of an unconstitutional custom by citing seven cases, filed between 2012 and 2016, in which the plaintiffs alleged excessive force at the hands of MDPD officers. For multiple reasons, these cases are irrelevant for *Monell* purposes.

At the outset, the allegations must be rejected as conclusory and speculative because they fail to describe any ***facts*** about which Plaintiffs have any actual knowledge whatsoever. *Cf. Prosper v. Martin*, No. 17-20323, 2018 WL 3084062, at *3 (S.D. Fla. June 21, 2018) (rejecting personal representative's allegations about a police shooting because "[n]owhere in the

[complaint] does Plaintiff explain how she knows these events occurred or on what basis she alleges these facts," and explaining that "[a]n allegation as specific as '[t]he Decedent at this time was either on his knees or stomach when Defendant Officer approached' must be supported by a factual basis establishing Plaintiff's knowledge of the event as described" (citation omitted)). A number of the allegations are merely regurgitations of unproven allegations contained within the pleadings filed in those other actions. *Compare*, *e.g.*, Compl. ¶ 53, *with* Compl. ¶ 14, *Calderin v. Patterson*, No. 13-21069 (S.D. Fla. Mar. 26, 2013), ECF No. 1 ("He slowly and in a non-threatening manner began to display a sheathed knife he was carrying."), attached hereto as **Exhibit A**;[4] *and compare* Compl. ¶ 58, *with* Compl. ¶ 73, *Martinez v. Miami-Dade County*, No. 12-23534 (S.D. Fla. Sept. 28, 2012), ECF No. 1 ("Fortunately for Plaintiff [], and unbeknownst to Defendants HUERTA and FLEITES, a video of the majority of the episode was recorded by a mall surveillance camera which shows that the events at issue did not transpire in the manner as described in the Arrest Report prepared by Defendant FLEITES."), attached hereto as **Exhibit B**.

Plaintiffs then disingenuously try to pass off as proof of a custom allegations of excessive force from three cases in which the County ***prevailed***. First, in paragraph 55, Plaintiffs neglect to mention that Judge Williams dismissed all claims in that case and entered ***final judgment in the County's favor*** as a sanction for the plaintiff's "flagrant noncompliance with nearly every Court order that has been issued." *Soto v. Miami-Dade County*, 281 F. Supp. 3d 1320, 1324 (S.D. Fla. 2017). The Eleventh Circuit affirmed that judgment. *Soto v. Miami-Dade County*, No. 18-10170, 2019 WL 286153 (11th Cir. Jan. 22, 2019).

---

[4] On a motion to dismiss, courts are ordinarily limited to considering the face of the complaint and any documents attached to it. However, "a district court may consider an extrinsic document even on Rule 12(b)(6) review if it is (1) central to the plaintiff's claim, and (2) its authenticity is not challenged." *United States ex rel. Osheroff v. Humana Inc.*, 776 F.3d 805, 811 (11th Cir. 2015). Along these lines, a district court "may take judicial notice of and consider documents which are public records, [and] that are attached to a motion to dismiss." *JAWHBS, LLC v. Arevalo*, No. 15-24176, 2016 WL 4142498, at *7 (S.D. Fla. Aug. 4, 2016) (Gayles, J.) (quoting *Eisenberg v. City of Miami Beach*, 1 F. Supp. 3d 1327, 1337 (S.D. Fla. 2014)).

Next, in describing *Estate of Osorio v. Miami-Dade County*, *see* Compl. ¶ 56, Plaintiffs conveniently omit that Judge Scola **dismissed** the plaintiff's § 1983 claim against the County not once, not twice, but **three times** for failing to satisfy *Monell*. *See Estate of Osorio v. Miami-Dade County*, 191 F. Supp. 3d 1366, 1370 (S.D. Fla. 2016); *Estate of Osorio v. Miami-Dade County*, No. 16-20200, 2016 WL 9526401, at *3 (S.D. Fla. Oct. 28, 2016); *Estate of Osorio v. Miami-Dade County*, No. 16-20200, 2017 WL 3721505, at *2 (S.D. Fla. Feb. 10, 2017). The Eleventh Circuit affirmed that final dismissal. *See Estate of Osorio*, 717 F. App'x at 957-58.

And finally, in repeating the allegations in *Cordoves v. Miami-Dade County*, *see* Compl. ¶ 57, Plaintiffs fail to state that Judge Altonaga **granted summary judgment to the officer** after concluding that (1) the officer used *de minimis* force; (2) the use of force was **lawful**; and (3) the plaintiff had not otherwise carried her burden of abrogating the officer's entitlement to qualified immunity. *Cordoves v. Miami-Dade County*, 92 F. Supp. 3d 1221, 1236-38 (S.D. Fla. 2015).

Notwithstanding Plaintiffs' liberal use of the paraphrase and their seeming inability to recognize that cases they rely on resulted in findings in the County's favor, the prior litigation also substantively does not support a custom claim. Six of the seven cited cases did not "involve[] factual situations that are substantially similar to the case at hand." *Mercado*, 407 F.3d at 1162. This factual-similarity requirement sweeps the legs out from under Plaintiffs' attempt to use them:

- *Calderin* (Compl. ¶ 53) involved a plaintiff who allegedly was approached on the street by MDPD officers and was shot after he displayed a knife in response to an officer's question whether he possessed any weapons. *See* Exhibit A ¶¶ 12-15.

- *Barnes v. Miami-Dade Police Department* (Compl. ¶ 54) involved a plaintiff who allegedly was shot after running from MDPD officers in an unmarked car. *See* Am. Compl. ¶¶ 19-48, *Barnes v. Miami-Dade Police Dep't*, No. 13-20778 (S.D. Fla. Apr. 5, 2013), ECF No. 6, attached hereto as **Exhibit D**.

- *Soto* allegedly involved an altercation between a plaintiff and two MDPD officers after the plaintiff got into an argument with a county official at a Miami-Dade Code Compliance Board of Rules and Appeals meeting; the officers allegedly beat the plaintiff and her father inside an elevator, left the plaintiff in the back of a patrol car for an hour,

drove the plaintiff to a second location, then left her in the back of the patrol car for another hour, after which she passed out. *See* Exhibit C ¶¶ 12-55. (Regardless, the plaintiff lost. *See Soto*, 281 F. Supp. 3d at 1324.)

- *Cordoves* allegedly involved an altercation at a mall between a plaintiff and an MDPD officer; the officer was told by a mall security guard that the plaintiff had hit him, and the officer used force in arresting the plaintiff. *See* Compl. ¶¶ 11-32, *Cordoves v. Miami-Dade County*, No. 14-20114 (S.D. Fla. July 31, 2014), ECF No. 52, attached hereto as **Exhibit E**. (Regardless, the plaintiff lost. *See Cordoves*, 92 F. Supp. 3d at 1236-38.)

- *Martinez* allegedly involved MDPD officers who tackled and arrested a plaintiff while doing off-duty security detail at a bar-restaurant. *See* Exhibit B ¶ 13-22.

- And *Robertson v. Miami-Dade County* allegedly involved plaintiffs who were attacked by MDPD officers investigating a robbery suspect they believed to be on the premises of the plaintiffs' restaurant. *See* Fifth Am. Compl. ¶¶ 12-21, *Robertson v. Miami-Dade County*, No. 15-24371 (S.D. Fla. Jan. 19, 2016), ECF No. 19, attached hereto as **Exhibit F**.

The facts alleged in these cases do not even closely approximate those alleged in the incident here, where officers entered the home of an individual suspected of vandalism—who, by Plaintiffs' own admission, had a mental illness and had been behaving so "emotionally unstable" for the previous ***forty-eight hours*** that Plaintiffs and their attorney were trying to file a Baker Act petition against him—and shot him after he attacked them with a pickaxe. Compl. ¶¶ 18-19, 23. The only case that allegedly involved the shooting of an individual with a mental illness in his home is *Osorio*—a case in which the Eleventh Circuit affirmed the district court's dismissal of the *Monell* claim for failure to state a claim. *See Estate of Osorio*, 717 F. App'x 957.

Even had all of the cases involved similar facts, they would still be of no help to Plaintiffs, because none resulted in a finding that an officer's conduct was "deemed unjustified, unconstitutional, or [was] anything other than legitimate." *Whitaker*, 126 F. Supp. 3d at 1321. For a prior incident to have any weight in supporting the allegation of a custom, it must have resulted in a finding that a ***constitutional violation*** occurred. *See Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1329 n.21 (11th Cir. 2015) (affirming the dismissal of a *Monell* claim where allegations about prior shootings of the mentally ill that might have given the sheriff's office notice of a constitutionally questionable policy or custom did not include allegations that

the shootings had given rise to "similar constitutional violations" as the ones allegedly suffered by the plaintiffs (citation omitted)). None of the Plaintiffs' cited cases resulted in that required finding:

- All claims in *Calderin* were dismissed with prejudice following a joint stipulation by the parties. *See* Final Order of Dismissal and Order Denying All Pending Motions as Moot, *Calderin v. Schottenheimer*, No. 13-21069 (S.D. Fla. Dec. 4, 2015), ECF No. 83, attached hereto as **Exhibit G**. No constitutional violation was found.

- The parties settled all claims in *Barnes*. *See* Notice of Settlement, *Barnes v. Miami-Dade County*, No. 13-20778 (S.D. Fla. Jan. 26, 2015), ECF No. 72, attached hereto as **Exhibit H**. No constitutional violation was found.

- As stated previously, final judgment in *Soto* was entered in the County's favor. *Soto*, 281 F. Supp. 3d 1320, *aff'd*, 2017 WL 286153. No constitutional violation was found.

- As stated previously, all claims in *Estate of Osorio* were dismissed with prejudice. *See Estate of Osorio*, 2017 WL 3721505, at *2. No constitutional violation was found.

- And as stated previously, the court in *Cordoves* granted summary judgment to the officer. *Cordoves*, 92 F. Supp. 3d at 1236-38. No constitutional violation was found.

- All claims in *Martinez* against the County and the officers were settled by the parties in the middle of the case, while the plaintiffs continued litigating claims against the bar-restaurant. *See* Notice of Partial Settlement, *Martinez v. Miami-Dade County*, No. 12-23534 (S.D. Fla. July 31, 2013), ECF No. 58, attached hereto as **Exhibit I**. No constitutional violation was found.

- All claims in *Robertson* were dismissed with prejudice following a joint stipulation after the claims were settled at mediation. *See* Stipulation for Dismissal With Prejudice, *Robertson v. Miami-Dade County*, No. 15-24371 (S.D. Fla. Mar. 28, 2016), ECF No. 39, attached hereto as **Exhibit J**. No constitutional violation was found.

So with all Plaintiffs' irrelevant allegations about the cases stripped away, it becomes clearer that Plaintiffs cited seven random, factually dissimilar cases, three in which the County prevailed, and all in which resulted in no finding of a constitutional violation. They do not support a *Monell* claim.

### D. The nonmeritorious excessive force complaints against the three officers are immaterial to a custom claim.

This leaves Plaintiffs' allegations—unsurprisingly devoid of supporting detail—that Officer Dalton, Officer Zamorski, and Sergeant Evans have been the subject of excessive force complaints over the past twenty-plus years. If prior complaints against officers are not

meritorious, they are a nonfactor in the *Monell* calculus. *See Simmons*, 879 F.3d at 1168; *Brooks v. Schleib*, 813 F.2d 1191 (11th Cir. 1987). In *Brooks*, the Eleventh Circuit held that although there had been ten complaints about an officer defendant, the municipality had no notice of misconduct for purposes of *Monell* because the plaintiff "never demonstrated that the past complaints of police misconduct had any merit." *Brooks*, 813 F.2d at 1193. That multiple complaints were lodged against the three officers here is of no consequence, for "the number of complaints bears no relation to their validity." *Id.* Plaintiffs do not allege that any of the complaints against the officers were meritorious; they just allege that the complaints exist, which in insufficient in this Circuit.

Without i) the legal conclusions; ii) the other incidents; iii) the prior cases; and iv) any meritorious complaints, Plaintiffs are forced to resort to relying on allegations about this incident alone, "which is, at most, '[p]roof of a single incident of unconstitutional activity' [that] is 'not sufficient to impose liability' under section 1983." *Craig*, 643 F.3d at 1312 (quoting *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985)). They cannot demonstrate any "widespread abuse" that is "obvious, flagrant, rampant, and of continued duration," just this "isolated occurrence[]." *Keith v. DeKalb County*, 749 F.3d 1034, 1048 (11th Cir. 2014) (emphasis added) (quoting *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999)). Their own experience is not enough to hold the County liable for violating § 1983.

Having cited no actual evidence of a municipal custom, the Fourth Amended Complaint "read[s] as an attempt to hold the [County] liable for the actions of [its] employees . . . . But this type of respondeat superior liability is specifically proscribed under *Monell*, and the Court [should] not entertain such claims here." *Fernandez*, 2015 WL 9474616, at *4 (Gayles, J.). At bottom, "[t]he Supreme Court has mandated that 'rigorous standards of culpability and causation' must be satisfied to impose municipal liability.' The Plaintiffs' allegations fail to meet those rigorous standards." *Id.* (citation omitted) (quoting *Bd. of Cty. Comm'rs*, 520 U.S. at 405).

Accordingly, the municipal liability claim in Count III must be dismissed with prejudice.

## IV.    THE STATE LAW CLAIMS SHOULD BE DISMISSED.[5]

### A.  The common-law conspiracy claim in Count IV fails to state a claim.

Under Florida law, stating a claim for civil conspiracy requires the plaintiff to allege (1) "an agreement between two or more parties"; (2) "to do an unlawful act or to do a lawful act by unlawful means"; (3) "the doing of some overt act in pursuance of the conspiracy"; and (4) "damage to plaintiff as a result of the acts done under the conspiracy." *Charles v. Fla. Foreclosure Placement Ctr., LLC*, 988 So. 2d 1157, 1159-60 (Fla. 3d DCA 2008) (citation omitted).

### 1.  Plaintiffs' conclusory allegations of an agreement do not suffice.

The fact of an agreement may be based on circumstantial evidence, *Burrell v. Bd. of Trs.*, 970 F.2d 795, 789 (11th Cir. 1992), but "an allegation of parallel conduct and a bare assertion of conspiracy will not suffice," *Twombly*, 550 U.S. at 556. That is exactly what Plaintiffs alleges here: (1) parallel conduct (Sergeant Evans, Officer Dalton, and Officer Zamorski invoked their *Garrity* privilege to decline to speak to FDLE; Officer Taborda spoke to FDLE; and someone told the MDPD spokesperson that Ethan attacked the Officers with a pickaxe) and (2) bare assertions of conspiracy (the Officers "conspired, confederated, agreed, and collaborated"). *Twombly* makes clear that allegations like these do not amount to a claim for conspiracy: "Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." 550 U.S. at 556-57; *see also id.* at 557 ("[T]erms like 'conspiracy,' or even 'agreement,' are border-

---

[5] If the Court dismisses the federal claims, it should simply decline to exercise supplemental jurisdiction over Plaintiffs' state law claims, pursuant to 28 U.S.C. § 1367(c)(3), which grants a district court the authority to dismiss pendent state-law claims when the court has dismissed all claims over which it had original jurisdiction. *See United States ex rel. Brown v. BankUnited Tr. 2005-1*, 235 F. Supp. 3d 1343, 1362 (S.D. Fla. 2017) (Gayles, J.), appeal dismissed, No. 17-10821, 2017 WL 3741069 (11th Cir. Mar. 9, 2017); *Fischer v. Fed. Nat'l Mortg. Ass'n*, 302 F. Supp. 3d 1327, 1333 (S.D. Fla. 2018) (Gayles, J.).

line: they might well be sufficient in conjunction with a more specific allegation—for example, identifying a written agreement or even a basis for inferring a tacit agreement, . . . but a court is not required to accept such terms as a sufficient basis for a complaint." (quoting *DM Research, Inc. v. Coll. of Am. Pathologists*, 170 F.3d 53, 56 (1st Cir. 1999))). By failing to plausibly allege an agreement in a non-conclusory manner, and to support that allegation with facts, Plaintiffs state no claim for conspiracy under state law.

> 2.   <u>The intracorporate conspiracy doctrine bars the claims.</u>

Even had the Plaintiffs actually stated the elements of either cause of action, the Officers are protected from both by the intracorporate conspiracy doctrine. "The intracorporate conspiracy doctrine holds that acts of corporate agents are attributed to the corporation itself, thereby negating the multiplicity of actors necessary for the formation of a conspiracy." *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir. 2000) (en banc). "Simply put, under the doctrine, a corporation cannot conspire with its employees, and its employees, when acting in the scope of their employment, cannot conspire among themselves." *Id.* This doctrine applies with equal force to municipalities and their employees. *See Dickerson v. Alachua Cty. Comm'n*, 200 F.3d 761 (11th Cir. 2000) ("[T]he County jail and its employees are considered to constitute a single legal entity that cannot conspire with itself."). Florida courts recognize the doctrine, as well. *E.g.*, *Mancinelli v. Davis*, 217 So. 3d 1034, 1036-37 (Fla. 4th DCA 2017).

All four Officers are County employees. Plaintiffs allege that each of the Officers was acting outside the scope of his or her discretionary authority, but "the question of whether a defendant acted within the scope of his employment is distinct from whether the defendant acted unconstitutionally." *Grider v. City of Auburn*, 618 F.3d 1240, 1261 (11th Cir. 2010). "The scope-of-employment inquiry is whether the employee police officer was performing a function that, but for the alleged constitutional infirmity, was within the ambit of the officer's scope of

30

authority (*i.e.*, job-related duties) and in furtherance of the employer's business." *Id.* In *Grider*, the Eleventh Circuit invoked the intracorporate conspiracy doctrine to dismiss a conspiracy claim where the plaintiff alleged that two police officers conspired to make a false bribery charge against him. The court found that it was within one of the officer's job duties to file and prosecute violations of law, including bribery, for the inquiry was "not whether Officer Crook had the authority to prosecute in an unconstitutional manner and with malicious intent, but instead whether engaging in prosecutions is part of Crook's job-related powers and responsibilities." *Id.* at 1262. Similarly here, the inquiry is not whether the Officers have been granted authority by the County to obstruct an investigation or give false statements, but instead whether giving a statement to investigating authorities—or invoking *Garrity* to decline to do so—is part of the Officers' job-related powers and responsibilities. Of course they are. *See, e.g.*, *Meyer v. City of Gainesville*, No. 15-0185, 2016 WL 674659, at *5 (N.D. Fla. Jan. 7, 2016) (rejecting plaintiff's outside-the-scope-of-employment argument because "[t]here is little doubt that when the officers arrested Plaintiff the officers were performing a function that was in the ambit of their scope of authority as police officers"); *Little v. Dean*, No. 13-0165, 2014 WL 4388298, at *17 (N.D. Ala. Aug. 29, 2014) (finding that coordinating enforcement of city's nuisance procedures "fell squarely within the scope" of defendant's job as code official, despite plaintiff's allegations that the defendant made false statements in support of an arrest warrant); *Villar v. City of Aventura*, No. 13-22708, 2014 WL 3400988, at *8 (S.D. Fla. July 11, 2014) (holding police officers were acting within the scope of their authority for purposes of an intracorporate conspiracy doctrine analysis when they arrested and apprehended the plaintiff, despite plaintiff's allegations that the officers used excessive force).

The doctrine bars Plaintiffs' conspiracy claim, because the Officers cannot conspire with each other as a matter of law. *See Rehberg v. Paulk*, 611 F.3d 828, 854 (11th Cir. 2010) ("The 'conspiracy' occurred only within a government entity, and thus the intracorporate conspiracy

doctrine bars [the claim].").

**B. Plaintiffs' state-law wrongful death claim in Count V fails as a matter of law because the use of force at issue was reasonable under the circumstances.**

In addition to the § 1983 excessive force claim, Plaintiffs assert a state-law wrongful death claim, contending the Officers used excessive force which caused Ethan's death. A law enforcement officer is provided a complete defense to an excessive use of force claim where the officer, in effectuating a lawful arrest, "reasonably believes [the use of any force, including deadly force] to be necessary to defend himself or another from bodily harm while making the arrest." Fla. Stat. § 776.05(1). "The question of whether or not deadly force was reasonable under section 776.05(1), as with the Fourth Amendment, is an objective inquiry. '[A] police officer is entitled the defense under Section 776.05(1) merely by establishing that the use of force was objectively reasonable.'" *Fontanez v. Lamberti*, No. 10-61428, 2011 WL 4499016, at *14 (S.D. Fla. Sept. 27, 2011) (quoting *Btesh v. City of Maitland*, No. 10-0071, 2011 WL 3269647, at *26 (M.D. Fla. July 29, 2011)). If a court finds that a use of deadly force is objectively reasonable under the Fourth Amendment, no further analysis of the use of force under state law is necessary. *See Davis v. Williams*, 451 F.3d 759, 768 (11th Cir. 2006); *Btesh*, 2011 WL 3269647, at *26. As discussed above, the facts alleged in the Fourth Amended Complaint show that, under the circumstances, the Officers' belief that deadly force was necessary to defend from bodily harm was reasonable. Count V should be dismissed.[6]

---

[6] In the event the Court denies the motion to dismiss this claim on § 776.05 grounds, the Officers make clear their intention to thereafter invoke their entitlement to an evidentiary hearing based on the immunity afforded to them by Florida's Stand Your Ground law. The Stand Your Ground law provides, in relevant part, that a person "is justified in using . . . deadly force if he or she reasonably believes that using . . . such force is necessary to prevent imminent death or great bodily harm to himself or herself or another." Fla. Stat. § 776.012(2). Any person who uses force as permitted by the law is immune from civil action for that use of force. Id. § 776.032(1). A law enforcement officer is entitled to invoke Stand Your Ground immunity in response to a civil excessive force claim:

> Because these statutes [Fla. Stat. §§ 776.012(2) & 776.032(1)] plainly and unambiguously afford Stand Your Ground immunity to any "person" who acts in self-defense, there should be no reason for further analysis. Put simply, a law enforcement

**C. The Florida Wrongful Death Act does not permit a claim sounding in gross negligence that arises from an alleged use of excessive force (Count VI).**

Plaintiffs assert a ***second*** wrongful death against the Officers, this time under a theory of gross negligence. Under Florida's Wrongful Death Act, a wrongful death claim arises "[w]hen the death of a person is caused by the wrongful act, negligence, or breach of contract or warranty of any person." Fla. Stat. § 768.19. Although the act does "allow[] for recovery where the death is caused by negligence, when a plaintiff's allegations concern excessive force, the liability must arise from intentional torts." *Fontanez*, 2011 WL 4499016, at *13; *see also Vaughn v. City of Orlando*, No. 07-1695, 2009 WL 3241801, at *8 (M.D. Fla. Sept. 29, 2009) ("Any liability under state law attributed to Officer Smith for the use of excessive force must arise from the intentional tort of battery, not negligence."), *aff'd*, 413 F. App'x 175 (11th Cir. 2011). "[I]t is not possible to have a cause of action for 'negligent' use of excessive force because there is no such thing as the 'negligent' commission of an 'intentional' tort." *City of Miami v. Sanders*, 672 So. 2d 46, 48 (Fla. 3d DCA 1996); *accord Estate of Osorio v. Miami-Dade County*, 191 F. Supp. 3d 1366, 1368-69 (S.D. Fla. 2016). The wrongful death claim in Count VI is explicitly asserted under a

---

officer is a "person" whether on duty or off, and irrespective of whether the officer is making an arrest. Although neither of the two statutes defines the word "person," it must be given its plain and ordinary meaning. In common understanding, "person" refers to a "human being," which is not occupation-specific and plainly includes human beings serving as law enforcement officers.

*State v. Peraza*, 259 So. 3d 728, — (Fla. 2018) (citations and internal quotation marks omitted). The law's immunity provision, § 776.032(1), "is a true immunity provision, not merely an affirmative defense, which requires a trial court to adjudicate disputed fact issues rather than passing them on to a jury as it would an affirmative defense." *State v. Yaqubie*, 51 So. 3d 474, 476 (Fla. 3d DCA 2010). The Officers anticipate demanding an evidentiary hearing, which the Court must hold. *See Prof'l Roofing & Sales, Inc. v. Flemmings*, 138 So. 3d 524, 530 (Fla. 3d DCA 2014) ("[D]etermining such an immunity claim on a motion for summary judgment is not appropriate. Rather, the appropriate procedure for determining such a claim . . . requires an evidentiary hearing to confront and weigh factual disputes, wherein the defendant bears the burden of establishing, by a preponderance of the evidence, entitlement to the immunity conferred by the Stand Your Ground law."); *Pages v. Seliman-Tapia*, 134 So. 3d 536 (Fla. 3d DCA 2014) (affirming dismissal of a civil action under the Stand Your Ground law where the trial court held an evidentiary hearing and applied the preponderance of the evidence standard). The Officers announce their intention to raise the immunity but do not brief it to avoid attaching evidentiary materials to this motion to dismiss, given that all of Plaintiffs' other claims are not subject to attack using material outside the four corners of the complaint.

"gross negligence" theory, but all allegations surrounding the wrongful death claim in the Complaint deal with the Officers' use of excessive force against Ethan. Thus, Plaintiffs cannot—as a matter of law—state a wrongful death claim based on gross negligence. Count VI should be dismissed with prejudice.

### D. Count VII, for intentional infliction of emotional distress claim against all four Officers, is barred by official immunity

In Florida, a government officer cannot be held liable for acts committed in the scope of his employment unless he "acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard for human rights, safety, or property." Fla. Stat. § 768.28(9)(a). An officer acts within the scope of his employment if "(1) the conduct is of the kind the employee is hired to perform, (2) the conduct occurs substantially within the time and space limits authorized or required by the work to be performed, and (3) the conduct is activated at least in part by a purpose to serve the master." *Sussman v. Fla. E. Coast Props., Inc.*, 557 So. 2d 74, 76 (Fla. 3d DCA 1990).

Though Plaintiffs allege (in a conclusory manner) that the Officers were acting outside the scope of their employment, the actual ***conduct*** they engaged in—responding to a vandalism complaint and effecting an arrest—is precisely the kind of conduct the Officers were hired to perform, it occurred while they were on duty, and it was activated at least in part by a purpose to serve their employer, the County. Plaintiffs' conclusory allegation that the Officers are not immune from an intentional infliction of emotional distress claim is unavailing. Eleventh Circuit precedent holds that claims for intentional infliction of emotional distress against police officers are ***categorically barred*** by the sovereign immunity statute. *Weiland*, 792 F.3d at 1330; *see also Casado v. Miami-Dade County*, 340 F. Supp. 3d 1320, 1330 (S.D. Fla. 2018) (dismissing intentional infliction of emotional distress claims with prejudice as barred by section 768.28(9)(a)). Count VII should be dismissed with prejudice.

**CONCLUSION**

The Fourth Amended Complaint should be dismissed, in its entirety, with prejudice.

Dated: June 24, 2019                                   Respectfully submitted,

                                                      ABIGAIL PRICE-WILLIAMS
                                                      Miami-Dade County Attorney
                                                      Stephen P. Clark Center
                                                      111 N.W. 1st Street, Suite 2810
                                                      Miami, Florida 33128
                                                      (305) 375-5151

                                                      By: *s/ Anita Viciana*
                                                      Anita Viciana
                                                      anita@miamidade.gov
                                                      Florida Bar. No. 115838
                                                      Bernard Pastor
                                                      pastor@miamidade.gov
                                                      Florida Bar No. 46582
                                                      Assistant County Attorneys

**CERTIFICATE OF SERVICE**

I hereby certify that on June 24, 2019, I electronically filed the foregoing document using

CM/ECF and copy of the foregoing was served this day on all counsel of record via CM/ECF.

                                                      *s/ Anita Viciana*
                                                      Anita Viciana
                                                      Assistant County Attorney