UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 16-CV-22254-GAYLES/MCALILEY

CARMEN RINCON and CARLOS RINCON,
as Personal Representatives of the Estate of
Ethan Rincon, deceased,

      Plaintiffs,

v.

MIAMI-DADE COUNTY, *et al.*,

      Defendants.

_____/

## REPORT AND RECOMMENDATION ON MOTION TO DISMISS

Pending before the Court is Defendants' Motion to Dismiss Fourth Amended Complaint. (ECF No. 99). The motion is fully briefed, (ECF Nos. 104, 107), and the Honorable Darrin P. Gayles has referred all pretrial matters to me, (ECF No. 88). After a careful review, I recommend that the Court grant in part Defendants' motion.

**I.    Factual Background**

The following facts come from the fourth amended complaint. (ECF No. 96). At this stage of the proceedings, the Court accepts all well-pleaded facts as true but need not accept any legal conclusions. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

During the evening of March 22, 2016, the Miami-Dade Police Department ("MDPD") received a call that someone was vandalizing personal property in the neighborhood where Plaintiffs Carmen and Carlos Rincon, and their late son Ethan Rincon,

lived. (ECF No. 96 at ¶ 18). Defendants Victor Evans, John Dalton, Brian Zamorski and Marlene Taborda (collectively the "MDPD Officers") responded to the call. (*Id*. at ¶¶12-15, 18). Evans was a MDPD sergeant and Dalton, Zamorski and Taborda were MDPD officers. (ECF No. 96 at ¶¶ 12-15).

The complainant gave the MDPD Officers a description of Ethan. (*Id.* at ¶ 18). The Officers went to the Rincon home; Ethan was inside, alone, and the home was quiet. (*Id.* at ¶¶ 19, 26). A neighbor alerted Mrs. Rincon, who drove home, followed by Mr. Rincon. (*Id.* at ¶ 21). Mrs. Rincon told the MDPD Officers that Ethan was home alone, likely sleeping in his bedroom or listening to music with his headphones, and both parents assured the MDPD Officers that the house contained no firearms. (*Id.* at ¶ 22)

Mrs. Rincon informed the MDPD Officers that Ethan suffered from Asperger's Syndrome and had been "behaving emotionally unstable for the last 48 hours." (*Id.* at ¶¶ 22, 23). She also told the MDPD Officers that she and her husband had been trying to get their son professional help with the assistance of a private attorney, who was in the process of filing a Baker Act petition. (*Id.* at ¶ 23). The Rincons called the attorney so that he could provide information to the MDPD Officers, but when Mr. Rincon handed his cellphone to Sergeant Evans, the sergeant hung up the call, saying, "I don't need to talk to anybody." (*Id.* at ¶¶ 24, 25).

The MDPD Officers did not attempt to communicate with Ethan to have him exit the home voluntarily. (*Id.* at ¶ 28). Nor did they allow the Rincons to speak with Ethan through a door or window. (*Id.*). When the Rincons begged for the chance to talk with Ethan, the MDPD Officers became "nasty and unnecessarily assertive." (*Id.* at ¶ 29).

The MDPD Officers demanded that the Rincons unlock the front door. (*Id.* at ¶ 33). When the Rincons refused, the MDPD Officers threatened them with arrest, and Mrs. Rincon unlocked the door. (*Id.* at ¶¶ 33–34).

The front door of the Rincon home opens into the living room. (*Id.* at ¶ 38). Seven to eight paces left of the front door is a main hallway that leads to the left wing of the house. (*Id.*). This main hallway is 20-feet long and ends at an intersecting, perpendicular hallway, with three bedrooms: one at the extreme left, Ethan's in the middle, and a third in the extreme right. (*Id.*). The distance from the front door to Ethan's bedroom is 15 to 20 paces. (*Id.* at ¶ 39). Aided by the hallway's "tunnel effect", someone standing at the home's front door can clearly hear a "normal conversation" in Ethan's bedroom. (*Id.*).

Sergeant Evans and Officers Zamorski and Dalton entered the residence in "hunt mode." (*Id.*). Officer Taborda stayed at the front door, "restraining" the Rincons from entering the house or speaking with their son. (*Id.* at ¶ 36). "Within seconds," Sergeant Evans and Officers Zamorski and Dalton fired multiple shots at Ethan, killing him. (*Id.* at ¶ 39). Those officers gave no prior warnings or commands. (*Id.* at ¶ 40). Neither the Rincons nor neighbors close to the front door heard yelling or orders before the gunfire. (*Id.*). Sergeant Evans exited the house right after the shooting and said "that Ethan was shot because he attacked the MDPD Officers with a pickaxe." (*Id.* at ¶ 41).

A reconstruction of the scene of the shooting shows that Ethan was "well *inside* his bedroom," and officers "well *outside*" of it, during the shooting. (*Id.* at ¶ 49). The lack of stippling on Ethan's body indicates officers shot at Ethan from more than five to six feet

away. (*Id.* at ¶ 51).[1] Bullet trajectories demonstrate that one officer shot "blindly" at Ethan through the wall and door casing. (*Id.* at ¶ 49). Also, Ethan's bedroom door did not open the full 90 degrees because it was blocked by furniture. (*Id.* at ¶ 50). The limited aperture, coupled with Ethan's height and weight and the pickaxe's dimensions, shows that "it was not possible for Ethan to wield a pickaxe in any menacing way. . . ." (*Id.*).

The Florida Department of Law Enforcement ("FDLE") investigated the shooting. (*Id.* at ¶ 43). Officer Taborda lied to the FDLE investigators by claiming that she heard yelling in the house before the shooting. (*Id.* at ¶ 44). "[T]o cover-up for themselves," the officers invoked the *Garrity* privilege[2] and refused to give voluntary statements to the investigators—instead, they waited for the FDLE to finish the investigation and for the Miami-Dade County State Attorney's Office ("SAO") to clear them of criminal charges. (*Id.* at ¶¶ 45, 48).

Defendant Miami-Dade County (the "County"), through media statements and its spokesperson, stated "that Ethan wielded a pickaxe at the police officers" and that the shooting was in self-defense (*Id.* at ¶ 47).

---

[1] Plaintiffs' allegation seems to be missing some words and is confusing. It states that "no stipling was found on Ethan´s body," which is "significant because it indicates that none of the 10 or 11 rounds fired at Ethan, all were fired at more than 5 to 6 feet from Ethan." (ECF No. 96 at ¶ 51). The two sentence fragments convey different ideas: that "none" of the rounds were "more than 5 to 6 feet from Ethan," and that "all" of the rounds were "more than 5 to 6 feet from Ethan. . . ." The Court, as it must, reads the complaint in the light most favorable to Plaintiffs, and given the context, believes it is best understood as alleging that the officers and Ethan were separated by more than 5 to 6 feet during the shooting.

[2] *Garrity v. New Jersey*, 385 U.S. 493, 500 (1967) held, among other things, that the Fifth Amendment's protection against self-incrimination applies to police officers who are subject to interrogation by other police officers.

## II.     Procedural History

Plaintiffs initially sued the Village of Palmetto Bay and the MDPD officers in June 2016. (ECF No. 1). Before Plaintiffs served Defendants, they amended once to correct typos and grammatical errors, (ECF No. 9), and then again to substitute the County for the Village of Palmetto Bay, (ECF No. 11). The second amended complaint raised two claims for wrongful death under 42 U.S.C. § 1983. (*Id.*).

In August 2016, the Court granted the County's motion to stay this case pending the resolution of related state criminal and administrative investigations. (ECF No. 25). Plaintiffs had not yet served the MDPD Officers. The Court lifted the stay in December 2018. (ECF No. 50).

In January 2019, Plaintiffs served the MDPD Officers, (ECF Nos. 65–68), with a third amended complaint that added 9 federal and state claims (ECF No. 59). In February 2019, Defendants moved to dismiss that complaint. (ECF Nos. 69, 72). In March 2019, Plaintiffs moved to amend the complaint to narrow their claims. (ECF No. 85). The Court granted that motion and denied the motions to dismiss as moot. (ECF No. 95).

Plaintiffs filed their fourth amended complaint in June 2019. (ECF No. 96). In it, they raise seven counts: Count I, against all Defendants, for violation of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132; Count II, against the MDPD Officers, for violation of 42 U.S.C. § 1983; Count III, against the County, for violation of § 1983—what is called a *Monell* claim;[3] Count IV, against the MDPD Officers, for

---

[3] *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978).

conspiracy; Count V, against Sergeant Evans and Officers Dalton and Zamorski, for wrongful death under Florida; Count VI, against the MDPD Officers, for wrongful death based on gross negligence under Florida law; and Count VII, against the MDPD Officers, for intentional infliction of emotional distress under Florida law.

Plaintiffs withdraw their claim in Count I against the MDPD Officers, (ECF No. 104 at 7), and I therefore recommend that the Court dismiss with prejudice Count I as against the MDPD Officers.

I address Defendants' remaining arguments in turn.

## III.   Analysis

### A.   *Count I - ADA*

Count I is a claim for damages against the County under the ADA. Title II of the ADA says that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The Department of Justice has promulgated regulations implementing Title II's prohibition against discrimination. *Bircoll v. Miami-Dade Cty.*, 480 F.3d 1072, 1081 (11th Cir. 2007). Those regulations include the requirement of public entities to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7)(i).

To state a claim under the ADA, Plaintiffs must allege:

(1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of the plaintiff's disability.

*J.S., III by & through J.S. Jr. v. Houston Cty. Bd. of Educ.*, 877 F.3d 979, 985 (11th Cir. 2017). To recover damages, Plaintiffs must also prove that the County engaged in intentional discrimination, which requires a showing of deliberate indifference. *Silberman v. Miami Dade Transit*, 927 F.3d 1123, 1134 (11th Cir. 2019) (citing *Liese v. Indian River Cty. Hosp. Dist.*, 701 F.3d 334, 348 (11th Cir. 2012).

As an initial matter, I disagree with the County's perfunctory argument that Plaintiffs have failed to allege how the County discriminated against Ethan. (ECF No. 99 at 5). Plaintiffs allege that the County failed to institute reasonable modifications in its policies, practices, or procedures prior to the police encounter with Ethan, who had a qualifying disability. (*See* ECF No. 96 at ¶¶ 81–86). Specifically, the County did not implement or enforce, or train its officers in the Conflict Intervention Team ("CIT") program, (*id.* at ¶¶ 84–85), which is "designed for law enforcement officers to evaluate and de-escalate potentially volatile situations involving individuals with potential mental health concerns." (*id.* at ¶ 82). Rather than expecting "preferential treatment" for their son, as the County claims, (ECF No. 99 at 5), Plaintiffs allege that the County discriminated against Ethan by violating the DOJ regulations promulgated under Title II of the ADA.

I do, however, agree with the County that Plaintiffs have not stated a claim for damages under Title II of the ADA because Plaintiffs do not identify an "official" with authority to address the discrimination. "[T]o hold a government entity liable, the plaintiff

must demonstrate that an 'official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the [entity's] behalf' had 'actual knowledge of discrimination in the [entity's] programs and fail[ed] adequately to respond.'" *Silberman,* 927 F.3d at 1134 (quoting *Liese,* 701 F.3d at 349). And "[t]o qualify, that 'official' must be 'high enough up the chain-of-command that his [or her] acts constitute an official decision by the [entity] not to remedy the misconduct.'" *Id.* (quoting *J.S.,* 877 F.3d at 987).

In *Silberman*, an ADA action against Miami-Dade Transit, the Eleventh Circuit held that Miami-Dade Transit bus drivers were not qualifying "officials" because they were not "high enough up the org chart to permit a reasonable inference that, through their actions, they speak for MDT as a whole." *Id.* at 1135. The Court explained that "it's not enough that one be an 'official' in the abstract—which is to say, potentially any employee." *Id.* "Rather, the official [must] have the knowledge of and authority to correct an entity's discriminatory practices," and not just be a "line employee[]." *Id.* (internal quotations omitted). The Court further explained that "an 'official' needn't be so high up the chain of command that she is authorized to set an entity's policy," but "must be high enough that her actions constitute an official decision by the [entity] itself not to remedy the misconduct," which requires "substantial supervisory authority." *Id.* (internal citations omitted).

In *Estate of Osorio v. Miami Dade County*, 717 F. App'x 957 (11th Cir. 2018), an Eleventh Circuit panel affirmed the dismissal of a claim for damages under Title II of the ADA against the County based on the alleged discriminatory actions of police. The panel

agreed that "[t]he Estate has pled no facts to support the . . . existence of a Miami-Dade official who had actual knowledge of the police's discrimination of disabled individuals and failed to act accordingly." *Id.* at 958. "Specifically," the Court continued, "the complaint *failed to specify a single official* who allegedly had authority to address the alleged discrimination, much less knowledge of and deliberate indifference to the alleged discrimination." *Id.* (emphasis added).

The same is true here: Plaintiffs do not allege any facts that show that the MDPD Officers are qualifying officials. Plaintiffs allege that "[e]ach MDPD Officer had the authority to address the discrimination and other ADA violations but did not." (ECF No. 96 at ¶ 87). But Plaintiffs provide no facts to support that allegation, and their "mere conclusory statements" are not enough. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plaintiffs do not allege the MDPD Officers' supervisory authority or their knowledge of, and authority to correct, discrimination by the County, or their rank in the MDPD hierarchy. Plaintiffs allege only their job ranking: Evans was a "ranked uniform patrol police sergeant of the MDPD," and Dalton, Zamorski, and Taborda were "ranked uniform patrol police officer[s] of the MDPD." (ECF No. 96 at ¶¶ 12–15). Those allegations suggest that the MDPD Officers are "line employees" and without the authority to speak for the MDPD as a whole. *See Silberman*, 927 F.3d at 1135.

Plaintiffs only argument on this subject is that the MDPD officers were "officials" because "[t]he County bestows police officers with the authority to deprive citizens of their liberty and arms them so that, as here, they can deprive citizens of their very lives," and "[e]ach of the Officers had the authority to address the likelihood of discrimination because

each could have chosen not to participate in the invasion of the Rincon home and cold-blooded killing of Ethan." (ECF No. 104 at 11). Plaintiffs' contention, however, "eviscerates the requirement that there be a decision by an official," *Liese*, 701 F.3d at 349, because it would make every police officer a qualifying official. In *Liese*, which involved a hospital's failure to provide Plaintiff a sign-language interpreter, the Eleventh Circuit rejected the argument that "every single employee of the staff who knew of the [plaintiffs'] impairment and had the authority to provide the [plaintiffs] with an interpreter is an official." *Id.* Here, Plaintiffs essentially advance the same argument, which *Liese* and its progeny requires the Court to reject.

The closer question is whether the Court should dismiss the claim with prejudice. The Court should do so when further amendment would be futile. *Crawford's Auto Ctr., Inc. v. State Farm Mut. Auto. Ins. Co.*, 945 F.3d 1150, 1163 (11th Cir. 2019). Usually, "[t]hree attempts at proper pleading are enough." *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1057 (11th Cir. 2015). Although this is Plaintiffs' fourth amended complaint, this is the first time the Court has adjudicated a motion to dismiss. The County does not argue that amendment of Count I would be futile. Under *Liese* and its progeny, it is doubtful that Plaintiffs can successfully plead this requirement, but I cannot rule it out. On this reasoning, I recommend that the Court dismiss Count I as against the County, without prejudice.

## B.   *Count II: §1983 Excessive Force; Qualified Immunity*

The Eleventh Circuit set forth the doctrine of qualified immunity as follows:

"Qualified immunity shields "government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have

known.'" The doctrine is designed to permit "government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation." It "protect[s] from suit 'all but the plainly incompetent or one who is knowingly violating the federal law.'"

"In order to receive qualified immunity, the public official 'must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.'" If the official makes this showing, "the burden shifts to the plaintiff to show that qualified immunity is not appropriate." To defeat qualified immunity, "(1) the relevant facts must set forth a violation of a constitutional right, and (2) the defendant must have violated a constitutional right that was clearly established at the time of defendant's conduct."

*Carruth v. Bentley*, 942 F.3d 1047, 1053–54 (11th Cir. 2019) (internal citations omitted).

"To deny qualified immunity at the motion to dismiss stage, we must conclude both that the allegations in the complaint, accepted as true, establish a constitutional violation and that the constitutional violation was 'clearly established.'" *Sebastian v. Ortiz*, 918 F.3d 1301, 1307 (11th Cir. 2019). "[C]learly established law consists of holdings of the Supreme Court, the Eleventh Circuit, or the highest court of the relevant state." *Id.*

i.     *Discretionary Authority*

The Court employs a two-step inquiry to determine whether a defendant acted within his discretionary authority: "We ask whether the government employee was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize." *Id.* at 1054. The MDPD Officers argue "that responding to the home of a vandalism suspect for the purpose of investigating or effecting an arrest is within the scope of discretionary authority of a police officer." (ECF No. 99 at 8). I agree. "Investigating crimes, conducting searches, and making arrests are legitimate job-related functions within the discretionary authority of police officers." *Nigro*

*v. Carrasquillo*, 152 F. Supp. 3d 1364, 1368 (S.D. Fla. 2015), *aff'd*, 663 F. App'x 894 (11th Cir. 2016).

Plaintiffs respond that "to be within an officer's discretionary duty, the officer's action must be proper," and that the MDPD Officers acted improperly because they entered the Rincon home without consent, a warrant, or exigent circumstances, and without probable cause to arrest Ethan. (ECF No. 104 at 13–14). Plaintiffs' argument puts the cart before the horse. Plaintiffs' claim that the officers illegally entered the home is relevant to whether they violated a clearly established constitutional right,[4] which is the second part of the qualified-immunity inquiry. It is not relevant to whether the officers acted within their discretionary authority. *See, e.g., Kingsland v. City of Miami*, 382 F.3d 1220, 1232-33 (11th Cir. 2004) (officers acted within their discretionary authority in arresting plaintiff but were not entitled to qualified immunity for lying on arrest affidavit). Indeed, in the case Plaintiffs rely on for their discretionary-authority argument, *Jackson v. Sauls*, 206 F.3d 1156, 1165 n.11, 1165–66 (11th Cir. 2000),[5] the court analyzed whether officers had a

---

[4] I disagree with Defendants that Plaintiffs are not raising a separate unreasonable search claim (for illegal entry into the home) along with the unreasonable seizure claim (for use of excessive force). (ECF Nos. 99 at 18, 107 at 8). Count II's title, "wrongful death resulting from excessive use of force against Ethan," (ECF No. 96 at 22), does not fully describe the claim. Plaintiffs plainly allege that the officers also violated Ethan's Fourth Amendment rights by entering the home without probable cause, a search warrant or arrest warrant, valid consent, or exigent circumstances. (ECF No. 96 at ¶¶ 26, 91, 93, 98).

[5] It is unclear what other authority Plaintiffs rely on. Plaintiffs write this citation, "*Id.* (citing *Jackson v. Sauls*, 206 F.3d 1156, 1165-66 (11th Cir. 2000)," and the *id.* refers to this case: *Dunn v. City of Boynton Beach*, 192 F. Supp. 3d 1310, 1316–17 (S.D. Fla. 2016). (*See* ECF No. 104 at 13). But *Dunn* does not cite to *Jackson* or say what Plaintiffs say about discretionary authority. Therefore, I address *Jackson*.

reasonable suspicion to justify an investigatory stop. *Id.* at 1165–66. There was no dispute that the officers acted within their discretionary authority when they made the stop. *Id.* at 1165 n.11.

In short, I find that the MDPD Officers acted within their discretionary authority, which shifts the burden to Plaintiffs to plausibly allege a violation of a clearly established constitutional right.

ii.     *Violation of a Clearly Established Constitutional Right*

"The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest." *Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002). The Supreme Court, in the evaluation of excessive force, identified the following factors: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Sebastian*, 918 F.3d at 1308 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). "The second factor can be reduced to a single question: 'whether, given the circumstances, [the suspect] would have appeared to reasonable police officers to have been gravely dangerous.'" *Penley v. Eslinger*, 605 F.3d 843, 851 (11th Cir. 2010). The Eleventh Circuit has also added as a factor "'the relationship between the need and amount of force used' and 'the extent of the injury inflicted. . . .'" *Sebastian*, 918 F.3d at 1308 (quoting *Vinyard v. Wilson*, 311 F.3d 1340, 1347 (11th Cir. 2002)).

There is no bright-line rule, and "qualified immunity applies unless application of the standard would inevitably lead every reasonable officer in [the officer's] position to

conclude the force was unlawful." *Id.* Moreover, "an officer need only have arguable probable cause, not actual probable cause, in order to qualify for immunity from a Fourth Amendment claim." *Garczynski v. Bradshaw*, 573 F.3d 1158, 1167 (11th Cir. 2009).

"As to deadly force, a police officer may use such force to dispel a threat of serious physical harm to either the officer or others, or to prevent the escape of a suspect who threatens this harm." *Singletary v. Vargas*, 804 F.3d 1174, 1181 (11th Cir. 2015). It is thus "reasonable, and therefore constitutionally permissible, for an officer to use deadly force when he has probable cause to believe that his own life is in peril." *Id.* (internal quotations omitted). Conversely, since before Ethan's shooting, the law has been clear "that shooting a non-resisting suspect who has done nothing threatening and thus posed no immediate danger violates the Fourth Amendment right to be free from the use of excessive force." *Gregory v. Miami-Dade Cty., Fla.*, 719 F. App'x 859, 869 (11th Cir. 2017) (collecting cases).

Plaintiffs' allegations plausibly establish a violation of that clearly established Fourth Amendment right to be free of excessive force. To begin, the MDPD Officers were investigating vandalism, which is a nonviolent property crime. Although the Rincons told the MDPD Officers that Ethan had been acting "emotionally unstable," they did not say that he had been physically aggressive. The MDPD Officers refused to speak with the Rincon's attorney, who could have enlightened them about Ethan's mental state and behavior.

Also, the layout of the room and the shooting reconstruction, indicate that at least five to six feet separated Ethan, who was "well *inside* his bedroom," and the officers, who

were "well *outside*" the bedroom, when shots were fired through the bedroom wall and door frame. Those circumstances raise the reasonable inference that the MDPD Officers did were not in grave danger. Moreover, there are no allegations that Ethan tried to flee or resist arrest. Under Plaintiffs' version of events, no reasonable officer would conclude that the MDPD Officer's lawfully used deadly force.

The MDPD Officers' arguments in support of qualified immunity are unpersuasive for several reasons. First, their argument is premised on facts not found in the complaint.[6] In their motion to dismiss, the officers say that Ethan was not only "wielding a pickaxe," but that he "attacked" the officers with it, which justified their use of deadly force. (ECF No. 99 at 1, 9, 13, 14, 15, 26). Plaintiffs, however, do not allege that Ethan was wielding a pickaxe, let alone that he attacked officers with it.

What Plaintiffs actually alleged is the following:

(1) "Evans exited the house saying that Ethan was shot because he attacked the MDPD Officers with a pickaxe";

(2) "Evans did not claim that he – or any other officer – warned Ethan to drop any pickaxe before firing upon him";

(3) The County claimed that "Ethan wielded a pickaxe at the police officers," but

---

[6] I have not considered the SAO memorandum Defendants attached to their reply, which Defendants present to show "that Ethan was under the influence of various substances." (ECF No. 107 at 1 n. 1). Defendants present this new matter in the reply and it is therefore inappropriate for the Court's consideration. *See In re Air Crash Near Rio Grande Puerto Rico on Dec. 3, 2008*, No. 10-CV-81551, 2012 WL 760885, at *5 (S.D. Fla. Mar. 7, 2012) (striking argument presented for the first time in the reply). It is noteworthy that Defendants do not explain how Ethan's allegedly impaired state justified his shooting.

"the forensic evidence and reconstruction of the shooting scene completely contradict and eviscerate that defense and reveals the defense as an intentional cover-up"; and

(4) "Ethan could not have wielded the pickaxe in any menacing way," as shown by the shooting reconstruction and forensic evidence.

(ECF No. 96 at ¶¶ 41, 47, 50).

In other words, Plaintiffs acknowledge Defendants' claimed justification for shooting Ethan but dismiss it as a pretext. It is true, as Defendants point out, that Plaintiffs do not expressly deny that Ethan was holding a pickaxe when shot. And "the law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect." *Long v. Slaton*, 508 F.3d 576, 581 (11th Cir. 2007). "But the mere presence of a gun or other weapon is not enough to warrant the exercise of deadly force and shield an officer from suit." *Perez v. Suszczynski*, 809 F.3d 1213, 1220 (11th Cir. 2016).[7] "The reasonableness of the shooting depends on the totality of the circumstances[,]" *Shaw v. City of Selma*, 884 F.3d 1093, 1099 (11th Cir. 2018), and I find that, at the dismissal stage, the alleged circumstances do not support the MDPD Officers' qualified immunity from suit.

I disagree with the officers that *Prosper v. Martin*, No. 17-20323-CIV, 2018 WL 3084062 (S.D. Fla. June 21, 2018), compels me to ignore Plaintiff's allegations regarding

---

[7] The MDPD Officers also claim that "a door open to an angle of 70 degrees . . . provides sufficient doorway space to swing a several-foot-long pickaxe at an officer standing outside." (ECF No. 107 at 7 n.3). The complaint, however, does not state the length of the pickaxe. Moreover, the Court cannot, at the motion-to-dismiss stage, engage in the evidence-weighing that this argument necessarily entails.

what happened during the shooting. In *Prosper*, the Court found that the Plaintiff personal representative's allegations, regarding what happened when the decedent was shot by the defendant police officer, did not plausibly state an excessive-force claim because she was not present during the shooting and she did not set forth a basis for her knowledge of the alleged facts. *Id.* at *2–3. That is not the case here. Although Plaintiffs were not inside the room during the shooting, they were close to it, no more than 20-paces away. They and neighbors could hear what happened in the room. Plaintiffs, of course, are familiar with the layout of their home, and that information, along with the shooting reconstruction and forensics, presents the foundation for their allegation that Ethan did not pose a threat to officers.

Third, I disagree with the MDPD Officers that this case is just like *Shaw v. City of Selma*, in which the Eleventh Circuit affirmed summary judgment in favor of a city in an officer-involved shooting of a mentally ill person. Shaw is readily distinguishable from this case, and the differences, in fact, bolster my conclusion on qualified immunity. In *Shaw*, officers responded to a call that the decedent was "armed with a knife." 884 F.3d 1093 at 1097. When an officer approached the decedent, he picked up a hatchet and advanced towards the officers, ignoring "at least 26" commands to drop the weapon. *Id.* at 1097-98. The decedent shouted at officers to shoot him, which they did, when the decedent was "less than five feet away." *Id.* at 1097.

This is meaningfully different than the events alleged here. The MDPD Officers responded to a call of vandalism, not to a call of someone wielding a weapon. Shaw ignored 26 orders to drop the hatchet, and yet he continued to advance on the officers, demanding

they shoot him, and he closed the distance to less than five feet. Here, the MDPD Officers gave no warnings or commands to Ethan, there are no allegations that he was holding a pickaxe, let alone that he attacked the officers with it, and there were five or six feet between Ethan and the officers, separated by a partially obstructed door.

For these reasons, I recommend that the Court deny the motion to dismiss Count II on the basis of qualified immunity.

### C.   *Count II: Excessive Force; Officer Taborda's Failure to Intervene*

Plaintiff charges, in Count II, that Officer Taborda "failed to take any action to prevent her fellow officers from illegally entering the Rincon residence and shooting Ethan unjustifiably." (ECF No. 96 at ¶ 93; *see also* ¶ 95). Plaintiff further pleads that Taborda is "not entitled to qualified immunity because … any reasonable officer observing … [the excessive force] by fellow officers would have intervened and prevented the fellow officers from entering the residence and shooting Ethan." (*Id.* at ¶ 98).

"[A]n officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force, can be held liable for his nonfeasance." *Hadley v. Gutierrez*, 526 F.3d 1324, 1330 (11th Cir. 2008). The officer must have been "in a position to intervene yet failed to do so." *Id.* at 1331. In this fashion, a Plaintiff might establish that an officer's conduct was a violation of a clearly established right, such that the officer is not protected by qualified immunity. *Id.*

I agree with Defendants that under the facts alleged, Officer Taborda was not in a position to prevent Ethan's shooting. Specifically, the MDPD Officers who entered the Rincon home shot Ethan without warning and within seconds. Officer Taborda never

entered the home; she was standing at least 20-paces away during the shooting, out of sight. It was not physically possible for Officer Taborda to have timely intervened. As such, Plaintiffs have failed to state a claim against Officer Taborda for failure to intervene. *See, e.g., Carr v. Tatangelo*, 338 F.3d 1259, 1270 n.21 (11th Cir. 2003), *as amended* (Sept. 29, 2003) (officer entitled to qualified immunity when he was across street from the scene of the shooting, could not see whether the suspects had a weapon, did not participate in the shooting, and "was unaware of the rapidly developing situation until he heard the racking of a gun immediately preceding the shooting, which gave him no time to act from across the street").

Plaintiffs argue that Officer Taborda is liable for failure to intervene, even without entering the home, because "she was present at the scene," saw "[t]he Officers' storming the house with weapons drawn,"[8] and "prevented the Plaintiffs from entering their own home so that the [MDPD] Officers—without a warrant, probable cause, or exigent circumstances—could invade the home." (ECF No. 104 at 12). I cannot agree. At best, Officer Taborda failed to intervene in an unlawful search, which has not been recognized in this Circuit as a constitutional violation.

> "Multiple courts in this circuit have noted that the Eleventh Circuit has recognized such a theory of 'bystander' liability only in the excessive force context and that it is unclear whether such a theory extends beyond this context. [Plaintiff] does not cite any decision of the Supreme Court, the Eleventh Circuit, or the Florida Supreme Court that clearly establishes that a non-supervisory officer's failure to intervene to prevent another officer's

---

[8] Plaintiffs did not allege in their general allegations, or in Count II, that the MDPD Officers entered the Rincon home with their guns drawn. Plaintiffs make that claim only in Count VII. (ECF No. 96 at ¶ 145).

unconstitutional conduct violates a person's constitutional rights outside the excessive force context."

*Rance v. Bradshaw*, No. 15-CV-81210-KAM, 2016 WL 3199002, at *9 (S.D. Fla. June 9, 2016) (internal citations omitted); *accord O'Keefe v. Patterson*, No. 8:18-CV-01957-T-02CPT, 2019 WL 652509, at *9 (M.D. Fla. Feb. 15, 2019) (collecting cases).

Last, I find it futile to allow a further amendment of this claim as there are no additional facts that will change the reason why Officer Taborda could not have intervened (she was outside the home and 20-paces away from a shooting that started within seconds). I therefore recommend that the Court dismiss Count II with prejudice against Officer Taborda.

### D.   *Count III - Monell Claim Against the County*

"[A] county is liable [under § 1983] only when the county's 'official policy' causes a constitutional violation. *Grech v. Clayton Cty., Ga.*, 335 F.3d 1326, 1329 (11th Cir. 2003) (*en banc*) (quoting *Monell*, 436 U.S. at 694). That policy can be "(1) an officially promulgated county policy or (2) an unofficial custom or practice of the county shown through the repeated acts of a final policymaker for the county." *Id.* But "[b]ecause a county rarely will have an officially-adopted policy of permitting a particular constitutional violation," Plaintiffs typically "must show that the county has a custom or practice of permitting it and that the county's custom or practice is "the 'moving force [behind] the constitutional violation.'" *Id.* at 1330 (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989)).

"To state a *Monell* claim, a plaintiff must show: "(1) that his constitutional rights

were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." *Johnson v. Darnell*, 781 F. App'x 961, 964 (11th Cir. 2019) (quoting *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004)).

Here, Plaintiffs allege that between 2010 and 2016, MDPD officers were involved in eight incidents of excessive force and did not face termination, discipline, or remedial training. (ECF No. 96 at ¶¶ 52–60). They further allege that the MDPD Officers who entered the home have prior excessive-force complaints in their file: 28 against Officer Dalton between 1998 and 2016, 9 against Officer Zamorski from 1996 to 2016, and 7 against Sergeant Evans between 1999 and 2016. (*Id.* at ¶ 68).[9] Plaintiffs allegations are insufficient for several reasons.

First, "Plaintiffs do not allege that these other shootings were deemed unjustified, unconstitutional, or were anything other than legitimate, self-defense shootings." *Whitaker v. Miami-Dade Cty.*, 126 F. Supp. 3d 1313, 1321 (S.D. Fla. 2015). Indeed, as the County points out, three of the cases resulted in judgments in favor of the County. (ECF No. 99 at 24–25).[10] "[A] plaintiff certainly cannot establish a widespread unconstitutional practice

---

[9] Plaintiffs also allege that, since the shooting, there have been four more similar incidents of excessive force by the MDPD. (ECF No. 96 at ¶¶ 62–65). Plaintiffs, however, conceded in their response that the Court can ignore post-shooting incidents because they are irrelevant to establishing a pre-shooting custom, (ECF No. 104 at 23).

[10] Courts may consider matters of which they have taken judicial notice when ruling on a Rule 12(b)(6) motion to dismiss *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). That would include public records, such as filings in federal court. *See, e.g., Universal Express, Inc. v. U.S. S.E.C.*, 177 F. App'x 52, 53–54 (11th Cir. 2006) ("Because the complaint filed in the Southern District of New York is a public document, the district court was not obliged to convert the motion to dismiss to one for summary judgment or comply with the notice requirements of

through prior constitutional actions." *Whitaker*, 126 F. Supp. 3d at 1321 (internal quotations omitted). It is not enough for Plaintiffs to simply list the number of court actions filed against the County to show that a pattern exists. *Casado v. Miami-Dade Cty.*, 340 F. Supp. 3d 1320, 1328 (S.D. Fla. 2018).

Second, even if all alleged prior incidents were constitutional violations, they are not enough to allege a *Monell* claim. The requisite custom must be so "persistent and widespread" and "so settled and permanent that it takes on the force of the law." *McDowell v. Brown*, 392 F.3d 1283, 1290 (11th Cir. 2004). *Whitaker* is instructive. There, four shooting incidents in one year were not enough to establish a pattern. 126 F. Supp. 3d at 1321. Here, Plaintiffs identified eight incidents in almost as many years—from 2010 to 2016—only half of which involved a shooting, which is even less suggestive of a pattern, especially when we consider the breadth and size of the Miami-Dade jurisdiction. (ECF No. 96 at ¶¶ 53–60). In the context of *Monell* and its progeny, Plaintiffs' alleged incidents present, at best, "random acts or isolated incidents," which "are insufficient to establish a custom or policy." *Depew v. City of St. Marys, Georgia*, 787 F.2d 1496, 1499 (11th Cir. 1986).

Third, regarding the complaints against the individual officers, Plaintiffs provide no details about them. It is not enough to state the number of complaints. *See Gaviria v. Guerra*, No. 17-23490-CIV, 2018 WL 1876124, at *6 (S.D. Fla. Apr. 19, 2018) (plaintiff failed to state a *Monell* claim where he set forth "vague allegations" regarding "history of reports of excessive use of force incidents" by two police officers). Plaintiffs must allege

---

Rule 56(c).").

that those complaints had merit. *See Brooks v. Scheib*, 813 F.2d 1191, 1193 (11th Cir. 1987) (reversed jury verdict where plaintiff "never demonstrated that past complaints of police misconduct had any merit" explaining that "the number of complaints bears no relation to their validity"); *accord Whitaker*, 126 F. Supp. 3d at 1321 (relying on *Brooks* to dismiss *Monell* claim).

It likely will be difficult for Plaintiffs to allege a viable *Monell* claim, but I cannot say that it is futile, and I therefore recommend that the Court dismiss Count III without prejudice.

### E.    *Count IV - Conspiracy*

A conspiracy claim under Florida law has four elements: "(1) an agreement between two or more parties; (2) to do an unlawful act or to do a lawful act by unlawful means; (3) the doing of some overt act in pursuance of the conspiracy; and (4) damage to plaintiff as a result of the acts done under the conspiracy." *Honig v. Kornfeld*, 339 F. Supp. 3d 1323, 1345 (S.D. Fla. 2018) (quoting *Philip Morris USA, Inc. v. Russo*, 175 So. 3d 681, 686 n.9 (Fla. 2015)). To allege the requisite agreement, "an allegation of parallel conduct and a bare assertion of conspiracy will not suffice. Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." *Id.* (internal quotations omitted).

Here, Plaintiffs state, in a conclusory manner, that "[a]ll four MDPD Officers conspired, confederated, agreed, and collaborated to avoid their exposure to civil, criminal, and administrative liability for this unlawful entry, search, and unjustified shooting." (ECF No. 96 at ¶ 113). The alleged facts that support that conspiracy are "the *Garrity* assertions

by Evans, Dalton, and Zamorski; Taborda's false statements to FDLE; and a false claim by one or more of the MDPD Officers to the MDPD spokesperson, that Ethan attacked the MDPD Officers with a pickaxe." (*Id.* at ¶ 117). Those are allegations of parallel conduct; they fall well short of Plaintiffs' pleading burden. Notably, Plaintiffs did not address this issue in their response, (ECF No. 104 at 30), effectively conceding the pleading problem.

For those reasons, I recommend that the Court dismiss Count IV without prejudice.[11]

### F.   *Count V – Wrongful Death*

Count V is a wrongful death claim under Florida law against Sergeant Evans and Officers Dalton and Zamorski. Those Defendants argue that "[i]f a court finds that a use of deadly force is objectively reasonable under the Fourth Amendment, no further analysis of the use of force under state law is necessary." (ECF No. 99 at 32). As I have already explained, Plaintiffs have stated a plausible claim under § 1983 for use of excessive force by those Defendants, who raise no independent argument for Count V's dismissal. Therefore, I likewise recommend that the Court decline to dismiss Count V.

### G.   *Count VI – Wrongful Death*

Count VI asserts a wrongful death under Florida law based on gross negligence against the MDPD Officers. "Florida's Wrongful Death Act allows for recovery when the death of a person is caused by, *inter alia*, negligence or a 'wrongful act,' which includes

---

[11] The Court need not address whether the intracorporate conspiracy doctrine bars the conspiracy claim.

the use of excessive force by a police officer." *Fontanez v. Lamberti*, No. 10-61428-CIV, 2011 WL 4499016, at \*13 (S.D. Fla. Sept. 27, 2011) (internal quotations omitted). But "[a]lthough Florida's Wrongful Death Act allows for recovery where the death is caused by negligence, when a plaintiff's allegations concern excessive force, the liability must arise from intentional torts." *Id.*; *accord Severe v. City of Miami*, No. 17-22153-CIV, 2019 WL 2603090, at \*12 (S.D. Fla. June 25, 2019). "[I]t is not possible to have a cause of action for 'negligent' use of excessive force because there is no such thing as the 'negligent' commission of an 'intentional' tort." *City of Miami v. Sanders*, 672 So. 2d 46, 48 (Fla. Dist. Ct. App. 1996).

Plaintiffs say that those rules do not apply here because "Count VI is not based on excessive force," but "is based on the Officers' unlawful entry into the Rincon home." (ECF No. 104 at 31). This is inconsistent with the allegations in the complaint. Plaintiffs allege that the "MDPD Officers have a common-law duty to exercise reasonable care in carrying out their law-enforcement responsibilities," and that they "breached that duty when they wrongfully entered the Rincon residence and shot Ethan, resulting in his death." (ECF No. 96 at ¶¶ 137–38). Ethan's death was obviously the result of the shooting, not the illegal entry, and Count VI is a claim for wrongful *death*. Count VI is necessarily based on excessive force, and as such, Plaintiffs cannot rely on gross negligence to state a claim.

I therefore recommend that the Court dismiss Count VI with prejudice.

### H.    *Count VII – Intentional Infliction of Emotional Distress*

"To state a claim for intentional infliction of emotional distress ('IIED') under Florida law, Plaintiff must allege facts establishing that: '(1) Defendant's conduct was

intentional or reckless, (2) Defendant's conduct was outrageous, (3) Defendant's conduct caused Plaintiff's emotional distress, and (4) the emotional distress was severe.'" *Bowe v. City of Hallandale Beach*, No. 0:16-CIV-60993, 2016 WL 10587944, at *2 (S.D. Fla. Aug. 26, 2016). Regarding the fourth element, it is not enough for Plaintiffs to state in a conclusory manner that they suffered severe distress. *See id.* at *3 ("To the fourth element, Plaintiffs merely plead that 'the officers caused Bowe III extreme fear and emotional distress.' Such pleading is inconsistent with the *Twombly/Iqbal* standard.").

Plaintiffs allege that, because of the shooting, they "experienced and continue to experience severe emotional distress." (ECF No. 96 at ¶ 146). The distress, according to Plaintiffs, is "severe physical, mental and emotional injuries, and loss of enjoyment of life. . . ." (*Id.* at ¶ 147). This is not enough to meet the fourth element. *See Bickel v. City of Coral Springs*, No. 17-CV-60606, 2017 WL 3336722, at *2, *3 (S.D. Fla. Aug. 4, 2017) (the Court had previously dismissed an IIED claim without prejudice for "merely alleging in conclusory fashion that [the plaintiff] suffered severe emotional distress," and found that the subsequent complaint's additional particular allegations of emotional distress, to include nightmares, paranoia, and extreme daily anxiety were sufficient to survive a motion to dismiss").

I therefore recommend that the Court dismiss Count VII without prejudice.[12]

---

[12] I disagree with Defendants that Florida Statute § 768.28(9)(a) precludes Plaintiffs' IIED claim. That statute shields police officers "from personal tort liability while acting in their scope of employment unless the officer 'acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.'" *Gregory v. Miami-Dade Cty., Fla.*, 719 F. App'x 859, 870 (11th Cir. 2017). Plaintiffs' alleged facts, when taken as true, set forth a plausible claim that the MDPD Officers meet the statutory exception to immunity.

## IV.    Recommendations

Based on the foregoing, I recommend that the Court **grant in part** Defendants'
Motion to Dismiss Fourth Amended Complaint. (ECF No. 99) as follows:

> 1.    Dismiss Count I as against the MDPD Officers, with prejudice, and dismiss
>        Count I as against the County without prejudice;
>
> 2.    Dismiss Count II as against Officer Taborda, with prejudice, but not as to the
>        other MDPD Officers.
>
> 3.    Dismiss Count III without prejudice;
>
> 4.    Dismiss Count IV without prejudice;
>
> 5.    Deny the Motion to dismiss Count V;
>
> 6.    Dismiss Count VI with prejudice; and
>
> 7.    Dismiss Count VII without prejudice.

## V.    Objections

**No later than fourteen days from the date of this Report and Recommendation**
the parties may file any written objections to this Report and Recommendation with the
Honorable Darrin P. Gayles, who is obligated to make a *de novo* review of only those
factual findings and legal conclusions that are the subject of objections. Only those
objected-to factual findings and legal conclusions may be reviewed on appeal. *See Thomas
v. Arn*, 474 U.S. 140 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 28

---

*See id.* at 873 (claim that officer shot person 9 times, who had committed no crime, did not resist,
and posed no threat, taken as true, necessarily showed a wanton and willful disregard for the
victim's rights).

U.S.C. § 636(b)(1); 11th Cir. R. 3-1 (2016).

RESPECTFULLY RECOMMENDED in Miami, Florida this 31st day of March 2020.

CHRIS MCALILEY
UNITED STATES MAGISTRATE JUDGE

cc:   The Honorable Darrin P. Gayles
      Counsel of record