UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 16-22254-CIV-GAYLES/MCALILEY

CARMEN RINCON and CARLOS RINCON,
as Personal Representatives of the Estate of
Ethan Rincon, deceased,

      Plaintiffs,

vs.

MIAMI-DADE COUNTY, *et al.*,

      Defendants.

_____/

## REPORT AND RECOMMENDATION ON
## MOTION FOR SUMMARY JUDGMENT
## <u>AND ORDER GRANTING *DAUBERT* MOTION</u>

Defendants, Sergeant Victor Evans and Officers John Dalton and Brian Zamorski, of the Miami-Dade Police Department (collectively, "Defendants" or "Officers"), filed a Motion for Summary Judgment, (ECF No. 157), and a Motion to Exclude Expert Opinions of John Dale (the "*Daubert* Motion"), (ECF No. 171). Plaintiffs, Carmen Rincon and Carlos Rincon, as the personal representatives of the estate of their deceased son Ethan Rincon ("Plaintiffs"), filed response memoranda in opposition, (ECF Nos. 167, 183), and Defendants filed reply memoranda, (ECF Nos. 179, 187). The Honorable Darrin P. Gayles referred all pretrial matters to me. (ECF No. 88). I have carefully considered the parties' memoranda of law, the pertinent portions of the record and the applicable law. For the reasons that follow, I recommend that the Court grant Defendants' Motion for Summary Judgment, (ECF No. 157), and I hereby grant their *Daubert* Motion, (ECF No. 171).

## I.     Summary Judgment

### A.     Factual Background[1]

On March 22, 2016, the Officers, who were dispatched to respond to a disturbance at Plaintiffs' home, shot and killed 25-year-old Ethan Rincon ("Ethan"). Ethan had Asperger's Syndrome, a form of autism. (ECF No. 161 ¶ 9; ECF No. 169 ¶ 9).

Ethan lived with Plaintiffs, his parents, in a house in a quiet residential neighborhood (the "Rincon home"). (Carmen Rincon Statement at 4:3-13, ECF No. 161-9); (ECF No. 161 ¶ 39; ECF No. 169 ¶ 39). Ray and Sharon Delgado ("Ray" and "Sharon") lived next door, and Lourdes and Jesus Lugo ("Lourdes" and "Jesus") lived across the street. (Ray Delgado Dep. at 13:20-14:13, ECF No. 161-13).

### 1.   The long weekend before the shooting

On the Friday through Saturday, March 18-19, 2016, Ethan attended the Ultra Music Festival in Miami Beach. (ECF No. 161 ¶ 4; ECF No. 169 ¶ 4). He spent the entire weekend there and returned home Sunday evening. (ECF No. 161 ¶ 6; ECF No. 169 ¶ 6). His parents described his behavior over the next couple days as "odd" and "out of character"; they said there was "something wrong" with him and he was "acting weird". (ECF No. 161 ¶ 8; ECF No. 169 ¶ 8).

On Monday, March 21, Ethan and his mother got into a loud argument about his attending the music festival. (ECF No. 161 ¶ 10; ECF No. 169 ¶ 10). Ethan told her to leave, and both parents left him home, alone, that night. (ECF No. 161 ¶¶ 10-11; ECF

---

[1] Unless otherwise noted, the facts here are taken from the Officers' Statement of Undisputed Material Facts and Plaintiffs' Corrected Response thereto. (ECF Nos. 161, 169).

No. 169 ¶¶ 10-11).

The next day, in the afternoon, Mrs. Rincon returned home. (Carmen Rincon Dep. at 124:6-14, ECF No. 161-6). She spoke to Ethan briefly and left the house around 4:00 p.m. (*Id.* at 126:10-13); (Carmen Rincon Statement at 41:2-7, ECF No. 161-9). When she left, the home was not damaged and was in its normal condition. (Carmen Rincon Dep. at 127:11-15, ECF No. 161-6).

### 2. The neighbors call 911

On Tuesday, March 22, around 9:30 p.m., Ray and Sharon (the next-door neighbors), were inside their home when they heard loud banging noises outside. (ECF No. 161 ¶ 21; ECF No. 169 ¶ 21). Ray grabbed his handgun and went outside to look. (*Id.*). He saw a man wearing a dark hoodie walk from across the street (near the Lugo's home) toward the Rincon home, dragging something big. (*Id.*). Sharon called Mrs. Rincon, who was not home; Mrs. Rincon said that the man could be her son and that he had been partying all weekend and might be under the influence of drugs. (ECF No. 161 ¶ 22; ECF No. 169 ¶ 22).

Around the same time that Ray and Sharon heard noises, Lourdes and Jesus, who were inside their home, heard similar sounds outside. (Lourdes Lugo Dep. at 20:13-22, ECF No. 161-7); (Jesus Lugo Dep. at 17:8-17, ECF No. 161-15). They went out and saw the man in the dark hoodie; he was pacing back and forth and holding what appeared to be a weapon in one hand—possibly a bat—and a bottle in the other. (ECF No. 161 ¶ 29; ECF No. 169 ¶ 29); (Lourdes Lugo Dep. at 22:17-25, ECF No. 161-7). He was also making unintelligible comments and gibberish sounds. (ECF No. 161 ¶ 29; ECF No. 169 ¶ 29).

They watched as the man walked toward the Rincon home and sat on the front porch. (Lourdes Lugo Statement at 4:14-21, ECF No. 161-16).

The man then stood up, "grabbed something else" and walked toward Ray and Sharon's home next door. (Lourdes Lugo Statement at 6:20-24, ECF No. 161-16). Ray, who at this point was near the door to his home, saw a shadow move nearby and then heard a loud banging noise. (Ray Delgado Statement at 5:18-20, ECF No. 161-12). Jesus saw the man use a weapon to hit Ray and Sharon's cars, which were in front of their home, and stated that the man appeared "out of control." (Jesus Lugo Dep. at 22:19-23, 23:23-24:6, ECF No. 161-15); (ECF No. 161 ¶ 30; ECF No. 169 ¶ 30).

Ray confronted the man and pointed his gun and flashlight at him. (Ray Delgado Statement at 6:1-11, ECF No. 161-12). Ray could not identify him but saw that he was holding a pickaxe and appeared "crazy on drugs evil". (Ray Delgado Dep. at 34:17-36:1, ECF No. 161-13); (ECF No. 161 ¶ 24; ECF No. 169 ¶ 24). Ray yelled at him, "what are you doing? Get back. I have a gun. I'll shoot." (ECF No. 161 ¶ 25; ECF No. 169 ¶ 25). The man said nothing and did not acknowledge the gun. (*Id.*).[2] Instead, the man looked up, pointed toward the sky, walked to one of Ray's vehicles and struck it with the pickaxe. (ECF No. 161 ¶¶ 26, 28; ECF No. 169 ¶¶ 26, 28). Ray went inside and waited until police arrived. (Ray Delgado Dep. at 45:4-11, ECF No. 161-13).

---

[2] Ray described the interaction like this: "[H]e was either on something or was just evil. He just wanted to hurt someone ... he just had a glazy look like he was just looking through me. I mean, he didn't acknowledge that I had a gun aimed at him, didn't even flinch, didn't care, didn't care once. I told him, you know, I have a gun, stop what are you doing, you know, leave. He didn't care." (Ray Delgado Statement at 14:21-15:5; ECF No. 161-12).

As this took place, both Sharon and Lourdes called 911. (ECF No. 161 ¶¶ 33-35; ECF No. 169 ¶¶ 33-35). Lourdes advised the police that there was an unknown male with a bat who was drinking and assaulting a neighbor, and that the male was hitting her neighbor's door with the bat. (ECF No. 161 ¶ 34; ECF No. 169 ¶ 34). She also said that her neighbor had a fire extinguisher and that the two are "going at it." (*Id.*). In Sharon's call, she frantically asked for help and stated that there was man wearing a hooded sweatshirt, armed with an axe. (ECF No. 161 ¶ 35; ECF No. 169 ¶ 35).

A police dispatcher made two calls to the Officers: the first advised of an unknown, violent male wearing a hoodie and armed with a pickaxe; the second advised of two males fighting, one armed with a bat and the other with a fire extinguisher. (ECF No. 161 ¶¶ 37-38; ECF No. 169 ¶¶ 37-38). The dispatcher alerted all units of a "232" in progress, which is an emergency call about an active assault and battery, that requires lights and sirens. (ECF No. 161 ¶ 39; ECF No. 169 ¶ 39).

After Sharon hung up with the police, she spoke to Mrs. Rincon on the phone. (ECF No. 161 ¶ 36; ECF No. 169 ¶ 36). Mrs. Rincon feared for her son, Ethan, and stated that she did not know where he was and that "she thought maybe her son was in danger from this [unknown] person." (*Id.*) (alteration in original).

### 3. The Officers and Mr. and Mrs. Rincon arrive

Officers Brian Zamorski ("Zamorski") and Marlene Taborda ("Taborda") arrived at the scene first. (ECF No. 161 ¶ 41; ECF No. 169 ¶ 41). They spoke to Ray, who told them there was an unknown male in the area, wearing a dark hoodie, who was damaging cars with a pickaxe. (ECF No. 161 ¶ 42; ECF No. 169 ¶ 42). Ray also told them about his earlier

confrontation with the man, when Ray pointed his gun at him and the man "continued to do whatever he wanted". (Ray Delgado Dep. at 50:7-13, ECF No. 161-13). Ray cautioned them to be "extra safe" with the man "because he obviously didn't care if weapons were even drawn". (*Id.* at 48:11-19). Zamorski and Taborda searched the area for the man with flashlights and guns drawn; they did not find him. (ECF No. 161 ¶ 44; ECF No. 169 ¶ 44); (Zamorski Statement at 8:6-10, ECF No. 161-25).

Officers John Dalton ("Dalton) and Victor Evans ("Evans") arrived next. (ECF No. 161 ¶ 45; ECF No. 169 ¶ 45). All four Officers saw several nearby vehicles that had broken windows and windshields, and tires slashed, consistent with the use of a pickaxe. (ECF No. 161 ¶ 47; ECF No. 169 ¶ 47). Later, they saw a pickup truck with similar damage outside the Rincon home. (ECF No. 161 ¶ 53; ECF No. 169 ¶ 53). The truck belonged to the Rincons. (Evans Dep. at 193:12-21, ECF No. 161-23).

At some point, Ray learned that the suspect could be Mr. and Mrs. Rincon's son, and he told the Officers. (ECF No. 161 ¶¶ 49-50; ECF No. 169 ¶¶ 49-50). Ray said that the Rincon's son could be in front of or inside the Rincon home, and he led the Officers to the front of the house. (ECF No. 161 ¶ 50; ECF No. 169 ¶ 50).

Zamorski, Dalton and Evans went to the right side of the house, through an open gate, to search the backyard, while Taborda stayed near the front of the house. (ECF No. 161 ¶ 51; ECF No. 169 ¶ 51); (Dalton Dep. at 71:19-25, ECF No. 161-24).

As this happened, Mrs. Rincon arrived and walked through the same gate as the Officers. (Carmen Rincon Dep. at 133:8-134:4, ECF No. 161-6); (Dalton Dep. at 74:25-75:5, ECF No. 161-24). Immediately to her left, on the side of the house, she saw her

garden in disarray. (Carmen Rincon Dep. at 194:4-10, ECF No. 161-6). According to Mrs. Rincon, all her pots had been broken, and her pickaxe was in the garden. (*Id.* at 194:8-17) ("First thing I see there is all of my broken pots and then I see my big pickax in there. It was thrown on the side.").[3]

Taborda told Mrs. Rincon that they thought the suspect may be inside her home. (ECF No. 161 ¶ 58; ECF No. 169 ¶ 58). Mrs. Rincon told the Officers that her son, who has Asperger's, should be inside sleeping. (ECF No. 161 ¶ 61; ECF No. 169 ¶ 61); (Carmen Rincon Statement at 24:8-17, ECF No. 161-9). All Officers and Mrs. Rincon went to the front of the house. (Dalton Dep. at 76:2-4, 77:18-78:2, ECF No. 161-24); (Carmen Rincon Dep. at 139:4-11, ECF No. 161-6); (ECF No. 161 ¶ 57; ECF No. 169 ¶ 57).

The front of the Rincon home has a large bay living room window. *See* (ECF No. 161-30). Through that window the Officers saw that it was dark inside the house. (Dalton Dep. at 78:25-79:13, ECF No. 161-24). With flashlights, however, they could see that the inside had been destroyed: furniture had been broken, there was broken glass, and the walls had holes and slice marks in them that were consistent with the use of a pickaxe. (ECF No. 161 ¶ 54; ECF No. 169 ¶ 54). The Officers directed Mrs. Rincon to the window, so that she could see the damage. (Carmen Rincon Dep. at 137:6-111, ECF No. 161-6); (Carmen Rincon Statement at 24:20-25:4, ECF No. 161-9). At some point, the Officers asked Mrs. Rincon about the layout of the home, which she described for them. (ECF

---

[3] As explained in more detail in Section D.1(i), *infra*, Mrs. Rincon gave that testimony at her April 2021 deposition. Soon after her son's death in April 2016, in a sworn statement to the Florida Department of Law Enforcement ("FDLE"), she stated, "that's where the ax could have been". (Carmen Rincon Statement at 48:10-11, ECF No. 161-9).

No. 161 ¶ 80; ECF No. 169 ¶ 80).

Mr. Rincon arrived while the Officers and Mrs. Rincon were at the front of the home. (Carlos Rincon Dep. at 190:1-2, ECF No. 161-2). He tried to hand his cell phone to the Officers for them to speak to an attorney, who was on the line, which the Officers would not do. (*Id.* at 190:3-11, 191:24-192:24).

One of the Officers led Mr. Rincon to the bay window and showed him the damage inside his home. (*Id.* at 194:19-195:22). Mr. Rincon told the Officers that he did not own any weapons, including an axe. (ECF No. 161 ¶ 63; ECF No. 169 ¶ 63). The Officers did not ask Mrs. Rincon if she owned any weapons, and she did not offer any information about weapons. (ECF No. 169 ¶ 63); (Carmen Rincon Aff. ¶ 4, ECF No. 169-2). Mrs. Rincon did not tell the Officers that she saw a pickaxe outside when she arrived home.

The Rincons advised the Officers that they left Ethan alone in the home and that he should be sleeping in his bedroom. (ECF No. 161 ¶¶ 60-61; ECF No. 169 ¶¶ 60-61). Mrs. Rincon repeatedly stated, "there's something wrong with the house, I thought there was something wrong with Ethan ... we need to make sure he is safe." (ECF No. 161 ¶ 67; ECF No. 169 ¶ 67).

While the Officers talked to Mr. and Mrs. Rincon outside, they heard no sounds coming from inside the house. (ECF No. 161 ¶ 69; ECF No. 169 ¶ 69). The Officers insisted that they needed to go in the house because they were concerned for the safety of anyone inside. (ECF No. 161 ¶ 68; ECF No. 169 ¶ 68).

### 4.   Entry into the home

Mrs. Rincon did not want to let the Officers in, but she felt forced to do so and

allowed them in. (ECF No. 161 ¶ 70; ECF No. 169 ¶ 70) (Carmen Rincon Dep. at 214:6-9, ECF No. 161-6). She unlocked the front door, let them inside and turned on the living room light. (ECF No. 161 ¶ 79; ECF No. 169 ¶ 79). The Officers did not allow her to go further inside. (*Id.*). The Officers went in with their guns drawn. (ECF No. 161 ¶ 81; ECF No. 169 ¶ 81).

Mr. and Mrs. Rincon stayed outside near the front door while the Officers searched the inside. (Carlos Rincon Dep. at 116:24-25, ECF No. 161-2); (Carmen Rincon Statement at 28:15-30:4, ECF No. 161-9). According to the Officers, they announced themselves as police officers and called out for Ethan several times, including when they approached his bedroom door. (ECF No. 161 ¶¶ 82, 87, 93). The Rincons, however, did not hear anything. (ECF No. 169 ¶¶ 82, 87, 93).[4]

Once inside, the Officers saw the full extent of the damage, which one Officer described as "a small war zone." (ECF No. 161 ¶ 84; ECF No. 169 ¶ 84). These photos show some of that damage:

---

[4] They testified that from the front door, it is possible to hear what happens inside. (Carmen Rincon Dep. at 202:5-8, ECF No. 161-6); (Carlos Rincon Dep. at 145:22-25, ECF No. 161-2).





(ECF Nos. 161-35, 161-37).

The Officers found nobody in the kitchen and living room areas. (ECF No. 161 ¶ 88; ECF No. 169 ¶ 88). They then walked into the hallway where the bedrooms were. (*Id.*). The hallway is a narrow, tight space, about three to four feet wide. (Zamorksi Dep. at 108:11-20, ECF No. 161-22); (Carmen Rincon Dep. at 202:9-12, ECF No. 161-6). The Officers entered the master bedroom first and saw that it too had been destroyed. (ECF

No. 161 ¶¶ 89-90; ECF No. 169 ¶¶ 89-90). The Officers then went to the door to Ethan's

bedroom, which was closed. (ECF No. 161 ¶ 91; ECF No. 169 ¶ 91).

### 5. The pickaxe and the shooting

Zamorski first tried to open Ethan's bedroom door, but he was unable to because

something from inside blocked it. (*Id.*). Dalton then tried to open the door. (*Id.*).

Dalton first tried to force the door open with his foot; it opened slightly and bounced

back. (ECF No. 161 ¶ 94; ECF No. 169 ¶ 94). The Officers saw that a dresser was on the

other side of the door. (*Id.*). Dalton pushed the door open and looked in. (*Id.*). The hallway

lights were on, and Ethan's room was pitch-black inside. (*Id.*). Dalton stuck his foot

through the doorway, pushed the dresser with his foot and created more of an opening.

(ECF No. 161 ¶ 95; ECF No. 169 ¶ 95). At this point, Dalton was standing in the doorway

to Ethan's bedroom. (Dalton Dep. at 150:13-17, ECF No. 161-24).

Dalton then saw Ethan—who, as it turns out, was wearing a dark hoodie—in front

of him, with a pickaxe in his hands. (ECF No. 161 ¶ 96); (Zamorski Dep. at 202:15-203:1,

ECF No. 161-22). Ethan had a blank stare and was gritting his teeth. (ECF No. 161 ¶ 96).

Within a split second, Ethan stepped into his bedroom doorway toward Dalton and, without

saying a word, raised the pickaxe with both hands and swung it towards Dalton's head.

(ECF No. 161 ¶¶ 96, 106, 107). All three Officers saw this. (ECF No. 161 ¶ 102). The point

of the pickaxe came within inches of Dalton's head. (ECF No. 161 ¶ 101). Dalton took two

steps backwards and his back hit the other side of the hallway. (ECF No. 161 ¶ 97; ECF

No. 169 ¶ 97). At that same time, Evans fired his gun at Ethan. (ECF No. 161 ¶ 97; ECF

No. 169 ¶ 97). Dalton and Zamorksi also fired their guns at him. (ECF No. 161 ¶¶ 98,

100).[5]

Ethan started to fall backwards, then spun around and fell to the ground. (ECF No. 161 ¶ 103). He landed on his back with his head across the hallway, between Dalton's feet, and his legs towards the bedroom door. (ECF No. 161 ¶ 103); (Lew Report at 3, ECF No. 161-62). The pickaxe fell on Ethan's chest, and he reached for it while laying on the ground. (ECF No. 161 ¶ 104). Dalton kicked the pickaxe away from Ethan and Zamorski kicked it farther away, down the hallway. (ECF No. 161 ¶ 105). The pickaxe remained in the hallway until Fire Rescue arrived. (*Id.*). The Officers never touched the pickaxe with their hands. (ECF No. 161 ¶ 108).

Plaintiffs were outside of the house the whole time that the Officers were inside. (Carlos Rincon Dep. at 206:2-209:2, ECF No. 161-2); (Carmen Rincon Dep. at 169:13-171:7, ECF No. 161-6). They heard shots fired but they could not see the hallway where the shooting occurred. (ECF No. 161 ¶ 113); (Carlos Rincon Statement at 23:22-24:2, ECF No. 161-3); (Carmen Rincon Statement at 30:1-4, ECF No. 161-9). Dalton, Zamorski and Evans were the only eyewitnesses to the shooting. (ECF No. 161 ¶ 113; ECF No. 169 ¶ 113).

### 6. After the shooting

Immediately after the Officers shot Ethan, Dalton called Fire Rescue and Zamorski

---

[5] Zamorski described the situation like this: "Ethan just came right out like -- it was -- like it was boom. Like it was hide-and-go-seek and he just -- like when you watch a scary movie and you get that jump..." and "[t]his was, snap of the finger, and he was right there.... All of a sudden, he just appeared by the blink of an eye and Dalton jerked back, the axe was right to his head, and that's when we shot." (Zamorski Dep. at 126:10-13, 133:23-134:3, ECF No. 161-22).

performed CPR on Ethan. (ECF No. 161 ¶ 111; ECF No. 169 ¶ 111). Dalton ran out the front door to get a bag and gloves from his car. (*Id.*). While outside, Mr. Rincon asked Dalton whether his son died. (ECF No. 161 ¶ 112; ECF No. 169 ¶ 112). Dalton said, "[h]e's down, we're working on him, he came at me with an axe, I had no choice." (Carlos Rincon Dep. at 124:8-10, ECF No. 161-2).

Dalton returned inside less than thirty seconds later, and the Officers alternated performing CPR on Ethan and continued until Fire Rescue arrived. (ECF No. 161 ¶¶ 114, 116). Police found inside Ethan's bedroom a bottle of whiskey that was about one-eighths full. (ECF No. 161 ¶ 125; ECF No. 169 ¶ 125). Forensic testing identified Ethan's DNA on the handle of the pickaxe. (ECF No. 161 ¶ 109; ECF No. 169 ¶ 109). All other forensic evidence, including bullet holes in the doorframe, gunshot wounds on Ethan's body, wounds on Ethan's body from pieces of the doorframe as projectiles, and the position of Ethan's body on the floor, are consistent with the Officers' testimony about how Ethan attacked Dalton with the pickaxe. (ECF No. 161 ¶ 139). A toxicology report revealed that Ethan had alcohol, methamphetamine and amphetamines in his system. (ECF No. 161 ¶ 126; ECF No. 169 ¶ 126).

**B.    Procedural history**

Plaintiffs filed this action in June 2016. (ECF No. 1). The Court stayed it until state and administrative investigations concluded. (ECF Nos. 25, 50).[6] After several

---

[6] The FDLE, Miami-Dade State Attorney's Office, Miami-Dade Police Department's internal affairs division, and Professional Compliance Bureau investigated the shooting and they all found that the Officers did not violate any laws or policies. (ECF No. 161 ¶ 131; ECF No. 169 ¶ 131).

amendments to Plaintiffs' Complaint and litigation of a motion to dismiss, two claims remain in the Fourth Amended Complaint, which is the operative complaint here. *See* (ECF Nos. 1, 9, 11, 59, 96, 111, 117). They are first, excessive use of force, under 42 U.S.C. § 1983 ("Count II"), and second, wrongful death, under Florida law ("Count V"). (ECF No. 96 at 22-25, 28-30).

The parties have completed discovery and Defendants now ask the Court to enter summary judgment in their favor. (ECF No. 157). The Officers argue they are entitled to qualified immunity and therefore they are not liable on Plaintiffs' § 1983 claim. (*Id.* at 11-28). Regarding Plaintiffs' state law claim, the Officers assert they are entitled to sovereign immunity and that they cannot be held liable because they acted in self-defense. (*Id.* at 28-29).

### C.   Legal standard

Summary judgment is appropriate when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "when there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor." *Jessup v. Miami-Dade Cnty.*, 440 F. App'x 689, 691 (11th Cir. 2011) (quotation marks and citation omitted).

At the summary judgment stage, the Court must determine the relevant facts and draw all inferences in favor of the nonmoving party *"to the extent supportable by the record"*, and it must do so only for "genuine" disputes over material facts. *Garczynski v. Bradshaw*, 573 F.3d 1158, 1165 (11th Cir. 2009) (citation omitted). A genuine dispute

requires more than "some metaphysical doubt as to the material facts." *Id.* (citation omitted). The nonmoving party's presentation of a "mere scintilla of evidence" does not defeat summary judgment; rather, it must produce "substantial evidence" to demonstrate a genuine dispute of material fact. *Id.* (quoting *Kesinger v. Herrington*, 381 F.3d 1243, 1249-50 (11th Cir. 2004)).

"[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380.

### D.   Analysis

#### 1.   Plaintiffs' § 1983 claim for excessive force; qualified immunity

Title 42 U.S.C. § 1983 allows a citizen to sue any person acting under color of state law who violates that citizen's federal constitutional rights. *Garczynski*, 573 F.3d at 1165 (citation omitted). Plaintiffs claim the Officers violated Ethan's constitutional right to be free from excessive uses of force, which is grounded in the Fourth Amendment's protection against unreasonable seizures. (ECF No. 167 at 11-14 ¶¶ 24-31); *Graham v. Connor*, 490 U.S. 386, 394-95 (1989).

The Officers argue they cannot be held liable because they are entitled to qualified immunity. (ECF No. 157 at 11-20). The doctrine of qualified immunity completely protects

the Officers if, during their encounter with Ethan, they acted within their discretionary authority and they did not violate Ethan's "clearly established statutory or constitutional rights of which a reasonable person would have known." *Garczynski*, 573 F.3d at 1166 (quoting *Lewis v. City of West Palm Beach, Fla.*, 561 F.3d 1288, 1291 (11th Cir. 2009)). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). It protects from suit "all but the plainly incompetent or one who is knowingly violating the federal law." *Garczynski*, 573 F.3d at 1167 (citation omitted).

The burden of proof regarding qualified immunity shifts between the parties. *Powell v. Snook*, 25 F.4th 912, 920 (11th Cir. 2022). First, the Officers must establish that they acted within their discretionary authority. *Id.* (citation omitted). Here, the parties agree that the Officers met that burden. (ECF No. 157 at 12; ECF No. 167 at 10 ¶ 22). The burden then shifts to Plaintiffs to show that qualified immunity is "not appropriate." *Powell*, 25 F.4th at 920 (citation omitted). To accomplish this, Plaintiffs must demonstrate both that "(1) the [O]fficers violated a constitutional right, and (2) that right was clearly established at the time of the incident." *Garczynski*, 573 F.3d at 1166 (citation omitted). The Court may choose the order with which to address these prongs. *Id.* (citing *Pearson*, 555 U.S. at 236).

I find that Plaintiffs satisfy neither.

### i.   Constitutional violation

I begin with the first prong: whether the Officers' use of force violated Ethan's

Fourth Amendment rights. They did if their use of force was not "reasonable." *Garczynski*, 573 F.3d at 1166 (citing *Graham*, 490 U.S. at 395). The Court's assessment of reasonableness requires it to carefully balance the nature of the Fourth Amendment violation, against the government's interests. *Id.* (citation omitted). The government's interests include protecting the safety of police officers and the public at large. *Id.* (citations omitted).

The test of reasonableness is not precise. *Id.* (citations omitted). Rather, the analysis focuses on the facts of each case, in the context of the totality of the circumstances. *Id.* (citation omitted). Among other factors, courts consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Prosper v. Martin*, 989 F.3d 1242, 1251 (11th Cir. 2021) (quoting *Graham*, 490 U.S. at 396-97).

Reasonableness is an objective standard. *Id.* "The only perspective that counts is that of a reasonable officer on the scene at the time the events unfolded." *Garczynski*, 573 F.3d at 1166 (citation omitted). Courts must consider "that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Prosper*, 989 F.3d at 1251 (quoting *Graham*, 490 U.S. at 396-97). Courts may not view the officer's actions "with the 20/20 vision of hindsight" because "an officer's perspective in the field differs from that of a judge sitting peacefully in chambers". *Garczynski*, 573 F.3d at 1167 (citation omitted).

"[I]t is reasonable, and therefore constitutionally permissible, for an officer to use

deadly force when he has 'probable cause to believe that his own life is in peril.'" *Singletary v. Vargas*, 804 F.3d 1174, 1181 (11th Cir. 2015) (quoting *Robinson v. Arrugueta*, 415 F.3d 1252, 1256 (11th Cir. 2005)). Moreover, "an officer need only have arguable probable cause, not actual probable cause, in order to qualify for immunity from a Fourth Amendment claim." *Garczynski*, 573 F.3d at 1167 (citation omitted).

The law is equally clear that "shooting a non-resisting suspect who has done nothing threatening and thus posed no immediate danger violates the Fourth Amendment right to be free from the use of excessive force." *Gregory v. Miami-Dade Cnty., Fla.*, 719 F. App'x 859, 869 (11th Cir. 2017) (collecting cases).

The undisputed facts demonstrate that the Officers' use of force, when they shot Ethan, was objectively reasonable. This is because at that moment, the Officers had probable cause to believe that Ethan posed an immediate threat of serious physical harm to them.

The undisputed material facts begin with the Officers receiving an emergency dispatch to respond to an ongoing assault and battery. Dispatch advised the Officers that an unknown violent male wearing a hoodie was outside a residence armed with a pickaxe; it also advised that two males were fighting, one armed with a bat and the other with a fire extinguisher.

The Officers arrived at the Rincon home at night. Neighbors reported that an unknown male wearing a hoodie, appeared "out of control" and "crazy on drugs evil", and was violently striking cars with a pickaxe. The Officers saw that several nearby vehicles had been damaged in a manner consistent with the use of a pickaxe. A neighbor also told

them that when he pointed a gun at the man, "he obviously didn't care".

The Officers also learned that the Rincon's son might be the man whom the neighbors had seen, and that he might be inside the Rincon home. When they looked inside the front window to the home, the Officers saw complete destruction of the living room furniture that could have been done with a pickaxe. Mr. and Mrs. Rincon told the Officers that their son, Ethan, had Asperger's Syndrome, and that he should be inside the home sleeping. Mrs. Rincon repeatedly told the Officers, "there's something wrong with the house, I thought there was something wrong with Ethan ... we need to make sure he is safe."

The circumstances the Officers faced were "tense, uncertain, and rapidly evolving." *Graham*, 490 U.S. at 397. This what they knew: a man, who apparently was in a rage or otherwise out of control, had used a pickaxe, or possibly a bat, to damage cars in the neighborhood and threaten neighbors. It seemed highly likely that that same person had entered the Rincon home and destroyed the furniture. The Officers knew that Mrs. Rincon believed her son was in the house and she was very concerned about his safety. What the Officers did not know was whether the man who had caused this destruction was the Rincon's son, or someone else. They also did not know if that man was inside the Rincon home, and they did not know if Ethan was in that home and possibly was at risk himself or if he had been injured. With this information, it was objectively reasonable for the Officers to enter the home to confirm that no one was inside the home who was injured or otherwise

in need of assistance. The Officers thus reasonably entered the home.[7]

The Officers are the only eyewitnesses to what occurred inside the home and their testimony is consistent. What they saw inside the home "looked like a small war zone." They went to Ethan's bedroom last, after finding no one elsewhere in the home. As they stood in the narrow hallway at the door to Ethan's bedroom, they announced themselves and called out Ethan's name.[8] No one responded. When the Officers tried to open the door, it was blocked. Officer Dalton was able to partially open the door and then faced a man wearing a dark hoodie, who was still unknown to the Officers, and who appeared to have a blank stare and was gritting his teeth. The man had a pickaxe that he immediately raised and swung toward Officer Dalton, who was standing right in front of him. The pickaxe was within inches of striking Officer Dalton when the Officers opened fire.

The Officers had to react to the threat of the pickaxe instantly. They had no time to demand that Ethan drop the pickaxe and wait to see if he complied, as it was already in motion. Moreover, the tight, narrow space of the hallway contributes to the Officers' reasonable belief that they had no other good option but to shoot Ethan to disable him and

---

[7] These undisputed material facts establish that exigent circumstances justified the Officers' entry into the home without a search warrant. I rely upon this finding, in Section D.2, *infra*, to conclude that the Officers are entitled to qualified immunity on Plaintiffs' claim that they violated Ethan's Fourth Amendment right to be free from warrantless searches.

[8] Plaintiffs, who were standing outside of the front door, did not hear the Officers identify themselves, and from this they contend that this testimony of the Officers is false. (ECF No. 161 ¶¶ 82, 87, 93; ECF No. 169 ¶¶ 82, 87, 93); (ECF No. 167 at 7 ¶ 16). The record does not definitively establish, however, that any police announcement outside of Ethan's bedroom would have to have been heard by people standing outside the house. Thus, Plaintiffs' testimony on this point does not contradict the Officers' testimony. Even if the Officers failed to make any announcements, that fact is immaterial because they did not shoot Ethan until he posed an immediate threat of harm to Officer Dalton.

prevent serious physical harm to Officer Dalton.

Courts have found that officers' use of firearms in similar circumstances was reasonable. *See, e.g.*, *Garczynski*, 573 F.3d at 1168-70 (officers shot a man who, after he put a gun to his head, pointed it in the direction of the officers); *Singletary*, 804 F.3d at 1182-84 (officer had only seconds to react when suspect accelerated his car towards him); *Prosper*, 989 F.3d at 1253-54 (officer shot violent suspect who "was behaving irrationally and erratically", and had the officer's finger locked between his jaws); *Wood v. City of Lakeland, Fla.*, 203 F.3d 1288, 1292-93 (11th Cir. 2000) (officer made "a reasonable split-second judgment call" and shot someone in a "volatile, emotional, and aggressive state" who was armed with a box cutter and slid toward the officer), *abrogated on other grounds*, *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

The Officers' testimony is consistent and supported by other record evidence. This includes: (1) Ethan's DNA on the handle of the pickaxe, (2) unrebutted expert testimony that the position of Ethan's body on the ground, after he was shot, is consistent with him being in the doorway or coming out of the bedroom when the Officers shot him, (3) unrebutted expert testimony that Ethan's entry and exit bullet wounds are consistent with his holding a pickaxe up and in front of his chest when he was shot, (4) Ray's testimony that he saw a man in a hoodie violently use a pickaxe, and that the man appeared "crazy on drugs evil", (5) Jesus' testimony that he saw a man in a hoodie use a weapon to damage cars, and that he appeared "out of control", (6) Ethan wore a hoodie when he was shot, (7) the extensive damage inside the home was consistent with the use of a pickaxe, and (8) immediately after the shooting, Officer Dalton ran out of the home and said to Mr.

Rincon, "he came at me with an axe, I had no choice."

The totality of this evidence leads the Court to conclude that when the Officers shot and killed Ethan, they acted reasonably and therefore did not violate Ethan's Fourth Amendment right to be free from unlawful seizure.

Plaintiffs do not argue that if the events unfolded as the Officers testified, they did not use reasonable force. Rather, they argue that the Officers testified falsely and that, in fact, Ethan did not have a pickaxe; rather, the pickaxe was outside the house when the Officers shot Ethan. Plaintiffs thus contend that the Officers shot "an unarmed suspect who present[ed] no danger to anyone." (ECF No. 167 at 12 ¶ 27). To reach this conclusion, Plaintiffs theorize that immediately after they shot Ethan, "[o]ne of the officers went to the side yard, retrieved the pickaxe, and brought it into the house, placing it in the hallway ...." (ECF No. 168 ¶¶ 108, 111, 116-18).

Plaintiffs offer no direct evidence to support their theory. The concede they cannot explain how "the officers got the pickaxe into the house", and that no witness "saw or heard any of the Officers leave the Rincon residence after shots were fired/heard, go outside, pick up an axe, and come back into the Rincon residence." (ECF No. 169 ¶¶ 108, 118); (ECF No. 161 ¶ 118).

Plaintiffs rely solely on Mrs. Rincon's testimony that she saw the pickaxe outside the house when she arrived home that night. From this, Plaintiffs conclude that the pickaxe remained there until after their son was shot. Mrs. Rincon gave this testimony, at deposition, five years after her son was shot:

> A:   Okay. On the wall [outside], I have my garden. I have desert rose in planters and I have rocks. I see that all my pots and everything is broken and –
>
> Q:   Let me ask you. What are the lighting conditions in this area?
>
> A:   I have a huge light so you can see everything there. That's where I put the bulbs so that's why I have a lot of light there. *First thing I see there is all of my broken pots and then I see my big pickax in there. It was thrown on the side.*

(Carmen Rincon Dep. at 194:8-17, ECF No. 161-6) (emphasis added).

Defendants point out, correctly, that Mrs. Rincon's deposition testimony is inconsistent with a statement she made to the FDLE years earlier, a couple weeks after her son was shot. Notably, when she gave that statement, Mrs. Rincon expressed doubt that her son had threatened the Officers with a pickaxe; she said that had her son held a pickaxe, she would have heard it fall to the floor when he fell – which she did not hear. (Carmen Rincon Statement at 32:4-5, ECF No. 161-9) ("There is no ax because I would have heard the thump."). Yet Mrs. Rincon did not tell the FDLE officers investigating her son's death, that she saw the pickaxe outside the house shortly before he was shot. Rather, she said:

> Q:   Okay. And the pickaxe, where is that normally at?
>
> A:   *I think [Carlos] left it in the garden.* It had to be with the tools, but it looked like he left it. [Carlos], usually puts everything, but it looked like it was there. He did work this weekend.
>
> Q:   Okay. Clearly there was some damage to the living room and outside the house there were some pots.
>
> A:   *Yes, that's where the ax could have been right there.*

(*Id.* at 48:1-11) (emphasis added).

No other witnesses testified that they saw a pickaxe outside, which is notable given the multiple witnesses who walked by that area.[9] Mrs. Rincon's testimony is without corroboration.

At the summary judgment stage, the Court "do[es] not weigh conflicting evidence or make credibility determinations; the non-movant's evidence is to be accepted for purposes of summary judgment." *Wate v. Kubler*, 839 F.3d 1012, 1018 (11th Cir. 2016). The Court here accepts Mrs. Rincon's deposition testimony as true. Yet it does not defeat entry of summary judgment, because her testimony does not contradict the Officers' testimony.

The parties agree that at least five to ten minutes elapsed between the time Mrs. Rincon arrived that night and the Officers' entry into her home. (ECF No. 161 ¶ 57; ECF No. 169 ¶ 57).[10] At her deposition, Mrs. Rincon testified that the pickaxe was the "[f]irst thing" she saw when she arrived. (Carmen Rincon Dep. at 194:15, ECF No. 161-6). After that, she and the Officers went to the front of the house where all Officers spoke with her until Mr. Rincon arrived. At that point, all Officers and Mr. and Mrs. Rincon remained at

---

[9] According to Mrs. Rincon, this is something anyone would have seen. (Carmen Rincon Dep. at 199:9-14, ECF No. 161-6) ("Q: Would it have been something that you can't miss? A: Oh, yes, you could not miss it. It was right there, yes, It's very close to the gate on the side over there. You can see all the lights. The light over there, you can see everything there."). Zamorski testified that the Officers did not see the pickaxe outside the house. (Zamorski Dep. at 170:8-13, ECF No. 161-22) ("And like I said before, when we went to the side of the house and we went to the back, if that pickaxe was back there, that would have been our weapon. That is a key fact for the case of the damage to the vehicles, so we would have secured that.").

[10] In their Reply, the Officers note that the time could have been as long as eighteen minutes. (ECF No. 179 at 12 n.2).

the front of the house, speaking and observing the damage, until the Officers went inside. The Rincons stayed outside near the front door until after the shots were fired. No witness went to the side of the house or the backyard during that timeframe.

The Rincon home has a door at the back of the house. (ECF No. 167 at 17 ¶ 39). During the time that elapsed, it is conceivable that Ethan could have used a rear door to exit the house, pick up the pickaxe and take it back inside. With this possibility, Mrs. Rincon's deposition testimony is not "substantial evidence" that places in dispute the Officers' testimony that they shot Ethan because they reasonably believed he threatened them with deadly force. *Garczynski*, 573 F.3d at 1165.

These circumstances are somewhat similar to those considered in *Prosper*. There, the plaintiff, Prosper, argued that a very poor-quality video created a genuine dispute of a material fact because it showed, *inter alia*, that the officer "chased Prosper down as he attempted to 'crawl[] away from [the officer] through the bushes,' stood over him 'in a shooting position,' and then either tased Prosper again or shot him with his firearm." *Prosper*, 989 F.3d at 1252 (first alteration in original). If Prosper's version of events was true, then the Court would have had evidence before it that the officer "tas[ed] and [shot] him without provocation while he slowly retreated ...." *Id.* The video, however, did not actually depict "much of anything other than some very gross movements." *Id.* The Eleventh Circuit concluded that "[a] blurry video that does not depict much of anything cannot give rise to issues of fact about what did or did not happen on a particular occasion." *Id.* at 1252-53. It found, as the District Court did, that "the video 'does not *contradict* [the officer]'s statements; at best, it failed to *corroborate* them.' [The officer]'s version of

events thus remains unrebutted and controls our analysis." *Id.* at 1253 (quoting the District Court).

Like *Prosper*, Plaintiffs "make[] too much of" Mrs. Rincon's testimony. *Id.* at 1252. They ask this Court to, based on her deposition testimony alone, broadly speculate that the Officers committed a "cold-blooded shooting" because they shot "an unarmed suspect who present[ed] no danger to anyone", and then ran outside, grabbed the pickaxe, and planted it at the scene. (ECF No. 167 at 2 ¶ 3, 12 ¶ 27). This is too great a leap. The Court will not "treat as true a party's unfounded speculation about what happened." *Prosper*, 989 F.3d at 1252 (citing *Blackston v. Shook & Fletcher Insulation Co.*, 764 F.2d 1480, 1482 (11th Cir. 1985)).

Plaintiffs advance one other theory to support their claim of excessive use of force. They argue that "[a]t the time of the shooting, a dresser partially blocked the door to Ethan's bedroom from opening" and therefore, Ethan "could not have wielded a pickaxe as the Defendants allege." (ECF No. 167 at 8 ¶ 18). In their Response, Plaintiffs offer little argument, and no evidence, to support this.

Officer Dalton testified that when he pushed the door open, he stuck his foot through the doorway and pushed the dresser, which had been touching the door, with his foot to create more of an opening. (Dalton Dep. at 150:4-12, ECF No. 161-24). He then took a step forward because his foot came off the back of the dresser and slid to the floor. (*Id.* at 150:13-17). At that moment, he was in the doorway to Ethan's bedroom, and that is when Ethan came through the doorway and swung the pickaxe at him, which caused Officer Dalton to step backwards. (*Id.* at 150:17-151:1). He further described how Ethan held the

pickaxe:

> [H]e had the ax up over and as he clears the doorway and steps
> out, he's kind of choked up on the ax. He's not holding it by
> the bottom half of the ax, but he's not holding it all the way up
> by the metal part of the ax. He's holding it like midway through
> over his shoulder. As he clears the door, he comes up like just
> above, not completely over his head, but above his head --
> above his ear ....

(*Id.* at 151:8-16). Officers Zamora and Evans provided similar testimony. *See* (Zamorski

Dep. at 125:8-138:8, ECF No. 161-22); (Evans Dep. at 149:15-151:5, ECF No. 161-23).

The Officers also present forensic evidence that corroborates their testimony. Dr. Emma

Lew, Chief Medical Examiner for the Miami-Dade County Medical Examiner's

Department, found, *inter alia*, that the location of Ethan's body suggests that when the

Officers shot Ethan, he "was in the doorway and/or coming out of the doorway of the

bedroom". (Lew Report at 5, ECF No. 161-62).

"A party asserting that a fact ... is genuinely disputed must support the assertion by

*citing to particular parts of materials in the record* ...." Fed. R. Civ. P. 56(c)(1)(A)

(emphasis added). Plaintiffs cite no evidence that places these facts in dispute. The Court

must reject Plaintiffs' second theory.

In sum, I conclude that Plaintiffs do not meet their burden to show that the Officers

violated Ethan's Fourth Amendment rights.

### ii.    Clearly established law

Plaintiffs also fail to demonstrate that the law clearly established Ethan's Fourth

Amendment right to be free from the force the Officers used that night.

"In determining whether the constitutional right at issue was 'clearly established' at

the time the officer acted, [courts] ask whether the contours of the right were sufficiently clear that every reasonable officer would have understood that what he was doing violates that right." *Prosper*, 989 F.3d at 1251 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). "The salient question is whether the state of the law at the time of an incident provided 'fair warning' to the defendant that his alleged conduct was unconstitutional." *Singletary*, 804 F.3d at 1184 (alterations adopted) (quoting *Tolan v. Cotton*, 572 U.S. 650, 656 (2014)).

Plaintiffs may show that a right was "clearly established" through: "(1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law." *Prosper*, 989 F.3d at 1251 (quoting *Perez v. Suszczynski*, 809 F.3d 1213, 1222 (11th Cir. 2016)).

The most common way that fair warning is provided is through "materially similar" case law, which must come from the United States Supreme Court, the Eleventh Circuit Court of Appeals, or the highest state court in which the case arose. *Singletary*, 804 F.3d at 1184 (citation omitted). To demonstrate whether case law is "materially similar," courts ask, "whether the factual scenario that the official faced 'is fairly distinguishable from the circumstances facing a government official' in a previous case." *Terrell v. Smith*, 668 F.3d 1244, 1256 (11th Cir. 2012) (quoting *Vinyard v. Wilson*, 311 F.3d 1340, 1352 (11th Cir. 2002). "If so, the cases are not materially similar and, thus, provide insufficient notice to the official to clearly establish the law." *Id.* (citation omitted). The facts need not be

identical, but they must be "particularized" to the facts of the case and must not be defined

"at a high level of generality". *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *al-Kidd*,

563 U.S. at 742. The Supreme Court has emphasized that specificity is critical:

> Specificity is especially important in the Fourth Amendment
> context, where the Court has recognized that it is sometimes
> difficult for an officer to determine how the relevant legal
> doctrine, here excessive force, will apply to the factual
> situation the officer confronts. Use of excessive force is an area
> of the law in which the result depends very much on the facts
> of each case, and thus police officers are entitled to qualified
> immunity unless existing precedent squarely governs the
> specific facts at issue.

*Kisela v. Hughes*, 138 S. Ct. 1148, 1152-53 (2018) (alteration adopted) (quotation marks

and citation omitted).

To show that the Officers violated a clearly established constitutional right,

Plaintiffs rely on four cases from the Eleventh Circuit: (1) *Gregory v. Miami-Dade Cnty.,

Fla.*, 719 F. App'x 859 (11th Cir. 2017); (2) *Perez v. Suszczynski*, 809 F.3d 1213 (11th Cir.

2016); (3) *Mercado v. City of Orlando*, 407 F.3d 1152 (11th Cir. 2005); and (4) *McKinney

v. DeKalb Cnty., Ga.*, 997 F.2d 1440 (11th Cir. 1993). All those cases involve factual

scenarios that are materially distinguishable from the circumstances here.

First, in *Gregory*, in 2012, a police officer stopped an individual who was walking

on the side of a road late at night. 719 F. App'x at 861. The officer saw a bulge on the

individual's right hip with two inches of a shiny metallic object protruding out of the top

of the individual's pants. *Id.* The officer believed that object to be a gun. *Id.* at 862. Standing

about seven feet away from the individual, the officer ordered him to lay prone on the

ground. *Id.* The officer testified that he saw the individual's hand move quickly to touch

the bulge on his side and that the officer believed he was going to pull out a gun and shoot him. *Id.* In response, the officer shot him. *Id.* The individual, however, testified that he never moved his hands. *Id.* at 863. The Eleventh Circuit found that a genuine dispute of material fact existed as to "whether [the individual] moved his hands towards the bulge on his hip and thus posed an immediate risk of serious bodily harm to [the officer]." *Id.* at 867. Although the Eleventh Circuit decided *Gregory* in November 2017 (after the shooting here), the Court stated: "The law was clearly established as of May 28, 2012 that *shooting a non-resisting suspect who has done nothing threatening and thus posed no immediate danger* violates the Fourth Amendment right to be free from the use of excessive force." *Id.* at 869 (emphasis added) (citations omitted).

Second, in *Perez*, officers arrived at a parking lot in response to a call of two women fighting. 809 F.3d at 1217. The officers ordered a bystander, Arango, to get on the ground. *Id.* He complied, laid face down, and kept his hands behind his back. *Id.* An officer noticed that Arango had a gun, and another officer removed it and threw it about ten feet away. *Id.* An officer then shot Arango twice in the back, in a manner a witness described as "execution-style," from about twelve to eighteen inches away. *Id.* The Eleventh Circuit held that "no reasonable officer would have shot Arango while he was *lying prone, unarmed, and compliant.*" *Id.* at 1218 (emphasis added).

Third, in *Mercado*, officers responded to a home regarding an attempted suicide. 407 F.3d at 1154. Upon arrival, they found Mercado inside sitting on the kitchen floor crying, with a cord wrapped around his neck and pointing a knife toward his heart. *Id.* The officers ordered Mercado to drop the knife, but he refused. *Id.* Without warning Mercado

that they would use force if he did not drop the knife, an officer from six feet away fired a Sage Launcher at him, which expelled a projectile that hit him in the head and fractured his skull. *Id.* at 1154-55. The Eleventh Circuit found that the officer unreasonably used excessive force "[b]ecause [Mercado] was not committing a crime, resisting arrest, *or posing an immediate threat to the officers at the time he was shot in the head*". *Id.* at 1157-58 (emphasis added).

Finally, in *McKinney*, police officers responded to a woman's call that her sixteen-year-old son had locked himself in his bedroom and with a knife. 997 F.2d at 1442. Police entered the room and found him sitting on the floor of his closet holding a butcher knife in one hand and a twelve-inch stick in the other. *Id.* An officer knelt a few feet away from him and spoke to him for about ten minutes with no response. *Id.* What followed was contested. In one version, the boy made some motion, "during which he allegedly threw the stick out toward Officer Nelson and began to rise from his seated position" when Officer Nelson shot him. *Id.* In the other version, as alleged by the plaintiffs, the boy "previously put down his knife and was merely shifting position, *not threatening the safety of any persons*, when Officer Nelson shot him." *Id.* at 1443 (emphasis added). The Eleventh Circuit found that summary judgment was not appropriate because "facts are in dispute as to what happened that led Officer Nelson to fire his gun" and that "the facts alleged by the plaintiffs support a claim of violation of clearly established law." *Id.*

Each of these decisions are not "materially similar" because they involve no immediate threat to the safety of an officer. *Singletary*, 804 F.3d at 1184.

In sum, Plaintiffs fail to meet the second prong of their burden to show that

preexisting law provided fair warning to the Officers that their conduct was unlawful.

### 2.  Unlawful entry, under § 1983

Count II, titled "Wrongful Death Resulting From Excessive Use Of Force ..." includes allegations that the Officers, in addition to their unconstitutional use of excessive force, also unconstitutionally entered the Rincon home; both in violation of the Fourth Amendment. (ECF No. 96 at 22-25). Plaintiffs conflate their unlawful entry and excessive force claims. For example, they allege that "[w]ithout legal justification, [the Officers] forcibly entered the Rincon home and once therein suddenly shot and killed Ethan without cause." (*Id.* at 23 ¶ 95). They also allege that the Officers "are not entitled to qualified immunity because no reasonable police officer acting under these circumstances would have entered the residence in the first place, let alone attempt to engage Ethan or resort to the use of deadly force against Ethan ...." (*Id.* at 24 ¶ 98). Plaintiffs also allege that "[t]here were no exigent circumstances [that] allow[ed] [the Officers] to enter the Rincon residence". (*Id.* at 23 ¶ 93). In Count II, Plaintiffs appear to claim that the Officers' alleged unlawful entry led to and thus contributed to their alleged use of excessive force.

In their Motion, the Officers offer two reasons why Count II's allegations about unlawful entry are not properly plead, and they contend that the Court "should not consider" this claim. (ECF No. 157 at 20-21). Alternatively, the Officers argue that the Court should find that they are entitled to qualified immunity on the claim of unlawful entry, and grant summary judgment on that basis. (*Id.* at 22-28). I recommend that the Court do the latter.

### i.   Plaintiffs did not properly plead an unlawful entry claim

Plaintiffs combine two distinct claims into Count II: that the Officers unlawfully entered the home, in violation of the Fourth Amendment prohibition on warrantless searches, and that the Officers used excessive force in violation of Ethan's Fourth Amendment right to not be seized without a warrant.

"A § 1983 claim requires proof of an affirmative causal connection between the defendant's acts or omissions and the alleged constitutional deprivation. Recovery of damages is limited to those injuries proved to be caused by the defendants." *Troupe v. Sarasota Cnty, Fla.*, 419 F.3d 1160, 1165 (11th Cir. 2005) (citation omitted).

The record is at odds with Plaintiffs' confounding pleading of Count II. The Officers' alleged unlawful entry did not cause Ethan's death. Plaintiffs allege that the Officers' use of excessive force caused Ethan's death. (ECF No. 167 at 15-16 ¶ 36). At best, the alleged violation of Ethan's Fourth Amendment right to be protected from a warrantless search of his home caused nominal injury. *See Slicker v. Jackson*, 215 F.3d 1225, 1231 (11th Cir. 2000) ("We have held unambiguously that a plaintiff whose constitutional rights are violated is entitled to nominal damages even if he suffered no compensable injury.") (citations omitted). Plaintiffs do not identify in the Complaint any injury caused by the alleged unlawful entry to the Rincon home.

In their Motion, the Officers point out, correctly, that the Supreme Court, in *Cnty. of Los Angeles, Cal. v. Mendez*, 137 S. Ct. 1539 (2017) ruled out a "provocation" claim. (ECF No. 157 at 22-23). That is, the Court held that a "different Fourth Amendment violation cannot transform a later, reasonable use of force into an unreasonable seizure."

*Mendez*, 137 S. Ct. at 1539.

In their Response, Plaintiffs contend they do not rely on the so-called provocation rule that the high Court rejected in *Mendez*. (ECF No. 167 at 15-16 ¶ 36). Plaintiffs offer no persuasive justification for combining into one count their claims of an unlawful warrantless search, by entry into the house, and unlawful warrantless seizure, by use of excessive force.

Rule 8(d)(2) of the Federal Rules of Civil Procedure permits a plaintiff to set out, in a single count, two or more alternate statements of a claim. Fed. R. Civ. P. 8(d)(2). "[I]t does not allow multiple distinct claims to be amassed into a single undifferentiated count." *Marlborough Holdings Grp., Ltd. v. Azimut-Benetti, Spa, Platinum Yacht Collection No. Two, Inc.*, 505 F. App'x 899, 907 (11th Cir. 2013).

Plaintiffs argue that the ship has sailed on this argument. Citing Federal Rule of Civil Procedure 12(b)(6), they correctly point out that this pleading failure was appropriate for a motion to dismiss for failure to state a claim. (ECF No. 167 at 15 ¶ 34). They wrongly argue, however, that Defendants made this argument in their Motion to Dismiss, and that the Court rejected it. (*Id.* ¶ 35). In fact, the Officers' Motion to Dismiss Count II was confined to one argument: that the lawsuit should be dismissed based on qualified immunity. (ECF No. 99 at 7-19). They did not seek dismissal under Rule 12(b)(6).

The Officers rely on the Eleventh Circuit's decision in *Marlborough Holdings Grp.* as authority that the Court can rely upon Plaintiffs' improper pleading to grant summary judgment. The *Marlborough* Court upheld a district court's grant of summary judgment for a defendant, that rested on the finding that the plaintiff wrongly failed to plead civil

conspiracy as a separate count. 505 F. App'x at 907. On appeal, the plaintiff there argued that the trial court, in this manner, erroneously disregarded the allegations of civil conspiracy when it entered summary judgment. *Id.* The Court of Appeals wrote: "even if the district court declined to consider Marlborough's civil conspiracy claim (and we are not convinced that it did), the court did not err by doing so because Marlborough should have presented the claim in a separate count." *Id.* Relying on this, the Officers argue that this Court should now "decline Plaintiffs' invitation to address a claim that has not been properly pled." (ECF No. 157 at 21).

The Court is reluctant to rely upon *Marlborough Holdings Grp.* for the proposition that at the summary judgment stage, the Court can enter judgment for a defendant on a claim that the Court now finds was not properly plead. The *Marlborough* Court did not address the timeliness of the defendant's pleading challenge, and it may be that that argument had been waived. Moreover, *Marlborough* is an unpublished opinion. It may be cited as persuasive authority; it is not binding precedent. *McNamara v. Gov't Emps. Ins. Co.*, 30 F.4th 1055, 1060 (11th Cir. 2022).

On this reasoning, I turn to the application of qualified immunity, as it clearly applies to this Fourth Amendment claim.

ii.   **Qualified immunity protects the Officers from the unlawful entry claim**

As noted, to overcome qualified immunity, Plaintiffs must show that the Officers violated a clearly established constitutional right. The Fourth Amendment sets forth a general prohibition on warrantless searches of a person's home. *United States v. Holloway*,

290 F.3d 1331, 1334 (11th Cir. 2002). The Supreme Court has recognized certain exceptions and one is exigent circumstances. *Id.* That exception recognizes that a "warrantless entry by criminal law enforcement officials may be legal when there is compelling need for official action and no time to secure a warrant." *Id.* (quoting *Michigan v. Tyler,* 436 U.S. 499, 509 (1978)). "One of the most compelling events giving rise to exigent circumstances is the occurrence of an emergency situation.... The most urgent emergency situation excusing police compliance with the warrant requirement is, of course, the need to protect or preserve life." *Id.* at 1335 (citations omitted).

For the reasons already expressed in Section D.1(i), *supra*, the undisputed evidence establishes the Officers' reasonable belief that someone might have been inside the Rincon home who was gravely injured, or at risk of such injury. The Court concludes that Plaintiffs have failed to show that when the Officers entered Ethan's home without a warrant, they violated a clearly established constitutional right. The Officers are therefore entitled to qualified immunity on this claim, and I recommend that the Court enter summary judgment for the Officers on this basis.

### 3. State law claim

The Officers assert defenses of self-defense and sovereign immunity in response to Plaintiffs' claim for wrongful death brought under Florida law. (ECF No. 157 at 28-29).

Florida's self-defense law provides that a person is justified in using deadly force "if he or she reasonably believes that using ... such force is necessary to prevent imminent death or great bodily harm to himself or herself or another ...." Fla. Stat. § 776.012(2). The law further provides that the person who uses such deadly force "does not have a duty to

retreat". *Id.*

Florida law also provides sovereign immunity to police officers who carry out their duties, unless their actions were committed "in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property." *Penley v. Eslinger*, 605 F.3d 843, 855 n.8 (11th Cir. 2010) (quoting Fla. Stat. § 768.28(9)(a)).

Plaintiffs advance the same argument to support their state law claim than they do for their § 1983 claim: that Mrs. Rincon's testimony that she saw the pickaxe outside of her home before the shooting, places in dispute whether Ethan had the pickaxe when the Officers entered the house. Plaintiffs thus argue that the Officers were not justified in using deadly force and that they acted "in a manner exhibiting wanton and willful disregard of human rights, safety, or property. (ECF No. 167 at 19 ¶ 44).

For the reasons stated above, I conclude that there is no genuine dispute that Ethan did not have the pickaxe. On this record, the Officers' use of force was justified. It thus follows that the Officers did not act "in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property." Fla. Stat. § 768.28(9)(a). I therefore conclude that summary judgment on Plaintiffs' state law claim should be granted in favor of the Officers, based on both sovereign immunity and the Officers' affirmative defense of self-defense.

## E.   Conclusion

Ethan's death was a tragedy. The Court knows that the Rincons' loss is immeasurable. The Rincons understandably urge that the Officers could have handled the

situation in a manner that would have spared Ethan's life. This may be so. That, however, is not the question that the doctrine of qualified immunity presents to this Court.

For the reasons stated here, the Court finds that the Officers reasonably believed that exigent circumstances demanded that they enter the Rincon home, and once they were face-to-face with Ethan, that they use deadly force. I therefore conclude that Defendants are entitled to judgment as a matter of law on all claims remaining in the Fourth Amended Complaint (Counts II and V). Accordingly, I **RESPECTFULLY RECOMMEND** that the Court **GRANT** Defendants' Motion for Summary Judgment. (ECF No. 157).

### F.    Objections

**No later than fourteen days from the date of this Report and Recommendation** the parties may file any written objections to this Report and Recommendation with the Honorable Darrin P. Gayles, who is obligated to make a *de novo* review of only those factual findings and legal conclusions that are the subject of objections. Only those objected-to factual findings and legal conclusions may be reviewed on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 28 U.S.C. § 636(b)(1); 11th Cir. R. 3-1 (2016).

## II.    Defendants' *Daubert* Motion

Defendants ask the Court to exclude from evidence at trial a portion of the testimony of Plaintiffs' expert, John Dale, under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). (ECF No. 171). Mr. Dale is an expert in police practices and procedures, and Plaintiffs wish to introduce at trial his opinion regarding "whether [the Officers] acted in accordance with reasonable professional standards, widely

accepted police practices and customs regarding their actions leading to the death of Ethan Rincon ...." (John Dale Report at 2, ECF No. 174-1).

The portion of his testimony that Defendants seek to exclude from evidence concerns scene reconstruction. At deposition, Mr. Dale testified in response to Defendants' counsel's questions as follows: "If there's testimony that says [Ethan] raised the pickaxe up over his head and came down in a downward motion, we can see that he's 5-foot-8. If he's holding the pickaxe well above his head in a swinging, arcing motion, that door is too small for that." (John Dale Dep. at 197:10-16, ECF No. 171-2).

Plaintiffs acknowledge that Mr. Dale is not an expert in scene reconstruction, as does Mr. Dale. (ECF No. 183); (John Dale Dep. at 22:23-23:5, 199:14-200:10, ECF No. 171-2). This alone is sufficient reason to grant the *Daubert* Motion.

Plaintiffs do not clarify whether they intend to introduce at trial Mr. Dale's opinion regarding scene reconstruction. Plaintiffs' two-page response memorandum suggests that they may introduce that opinion because "Defendants opened the door to the testimony" by "specifically asking him" at deposition. (ECF No. 183 ¶ 3).

The concept of "opening the door" provides that "when a party offers inadmissible evidence *before a jury*, the court may in its discretion allow the opposing party to offer otherwise inadmissible evidence on the same matter to rebut any unfair prejudice created." *Bearint ex rel. Bearint v. Dorell Juvenile Grp., Inc.*, 389 F.3d 1339, 1349 (11th Cir. 2004) (emphasis added) (citations omitted). We are not at trial, and Defendants' counsel's questioning at deposition did not "open the door" to the admission of that opinion at trial.

The Court **GRANTS** Defendants' Motion to Exclude Expert Opinions of John Dale,

(ECF No. 171).

RESPECTFULLY RECOMMENDED in Miami, Florida this 8th day of June 2022.

CHRIS MCALILEY
UNITED STATES MAGISTRATE JUDGE

cc:     Honorable Darrin P. Gayles
        Counsel of record